Alison M. Clark, OSB No. 080579
Email: alison_clark@fd.org
Federal Public Defender's Office
101 SW Main Street, Suite 1700
Portland, OR  97204
Tel: (503) 326-2123
Fax: (503) 326-5524

Attorney for Petitioner

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DIVISION OF PORTLAND

| | |
|---|---|
| **LISA MARIE ROBERTS,** | **Civ. No. 08-1433-HU** |
| **Petitioner,** | |
| | **MEMORANDUM IN SUPPORT OF** |
| **v.** | **PETITIONER'S MOTION FOR** |
| | **DISCOVERY ORDER** |
| **MARK NOOTH,** | |
| **Respondent.** | |

# TABLE OF CONTENTS

**Page**

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

I.    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Afternoon Discovery Of Jerri Lee Williams' Body At Kelley Point Park
        And Subsequent Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    Williams Was Last Seen And Heard From Alive On The Morning Of May
        25, 2002 En Route To NE 82nd Avenue In Portland.. . . . . . . . . . . . . . . . . . . . 4

    C.    The State's Theory Of Roberts' Guilt Centered On Cell Phone Records. . . . . . . 5

    D.    The Police Lab's Forensic Reports Are Incomplete And Excluded
        Exculpatory Information about Male DNA. . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    E.    The Prosecution, Mental Fitness, And Guilty Plea Of Roberts. . . . . . . . . . . . . 10

III.  Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A.    A Petitioner Is Entitled To Discovery To Prove Actual Innocence In Order To
        Overcome Procedural Barriers When She Demonstrates Good Cause. . . . . . . . . 12

        1.    Discovery Is Available If A Petitioner Shows "Good Cause.". . . . . . . . 12

        2.    Actual Innocence Excuses Procedural Barriers To A Habeas Corpus
            Petition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        3.    The Actual Innocence Exception Allows this Court To Grant
            Discovery. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            a.    28 U.S.C. § 2254(e) Does Not Bar Discovery Where A
                Petitioner Seeks To Establish Actual Innocence In Order To
                Waive Procedural Barriers To Her Habeas Corpus Petition. . . . . 16

            b.    Where A Petitioner Seeks To Establish Her Actual Innocence
                With Scientific Evidence, She Has Presented Good Cause
                And Therefore Should Be Granted Discovery. . . . . . . . . . . . . . . 17

B.    Roberts Is Entitled To Discovery To Prove Her Actual Innocence. . . . . . . . . . . . 17

      1.    Chest Swabs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      2.    Fingernail Scrapings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      3.    Pillowcase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

C.    Roberts' Motion Requires An Independent Laboratory Test to Examine The Male DNA Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

IV.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Bousley v. United States,*
    523 U.S. 614 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Bracy v. Gramley,*
    520 U.S. 899 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 12, 13, 20

*Cherrix v. Braxton,*
    131 F. Supp. 2d 756 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Cristin v. Brennan,*
    281 F.3d 404 (3d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*District Attorney's Office for Third Judicial District et al. v. Osborne,*
    129 S. Ct. 2308 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Dorsainvil,*
    119 F.3d 245 (3d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Engle v. Isaac,*
    456 U.S. 107 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Harris v. Nelson,*
    394 U.S. 286 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Jones v. Woods,*
    114 F.3d 1002 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Majoy v. Roe,*
    296 F.3d 770 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*McClesky v. Zant,*
    499 U.S. 467 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Miller v. Marr,*
    141 F.3d 976 (10th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Murray v. Carrier,*
    477 U.S. 478 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*O'Neal v. Lampert,*
    199 F. Supp. 2d 1064 (D. Or. 2002). . . . . . . . . . . . . . . . . . . . . . . . . 2, 12, 15, 16, 17

*Payne v. Bell,*
    89 F. Supp. 2d 967 (W.D. Tenn. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Pham v. Terhune,*
    400 F.3d 740 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 13, 20

*Schlup v. Delo,*
    513 U.S. 298 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12, 14, 15, 16, 17, 18, 20

*Smith v. Baldwin,*
    510 F.3d 1127 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Triestman v. United States,*
    124 F.3d 361 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**STATE CASES**

*Charles v. Baldwin,*
    1999 WL 694716 (D. Or. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Smith v. Wasden,,*
    2010 WL 672745 (D. Idaho 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**FEDERAL STATUTES**

28 U.S.C. § 2254. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 12, 15, 16

I.      INTRODUCTION

At the time that Lisa Marie Roberts pleaded guilty to Manslaughter in the First Degree in the death of her girlfriend, Jerri Lee Williams, she was unaware that the Oregon State Police Laboratory (herein after refered to as "Police Lab") held exculpatory scientific evidence.  Upon ineffective assistance from trial counsel and due in part to her overwhelmed mental state, Roberts relented in protestations of innocence and followed her counsel's emphatic advice that she plead guilty.

Undersigned counsel retained forensic specialist Karen Lawless to review the DNA evidence in this case.  After acquiring the laboratory reports, raw data, and notes from the Police Lab, Lawless created a report which is attached to the Motion for Discovery.  The Lawless Report reveals previously unreported male DNA and matching allele information present in samples taken from the victim's body and a pillowcase found next to the body.  The Lawless Report details the additional forensic investigation and techniques that are necessary to identify the male DNA contributor(s).

Upon the recent discovery of new exculpatory evidence, Roberts now seeks retesting of all available deoxyribonucleic acid (DNA) evidence by a police laboratory capable of using Y-STR, Mini-STR and with the ability to process non-routine evidentiary samples.  Because the Police Lab does not perform these techniques for trace DNA analysis, an independent, reputable laboratory is necessary to conduct the review.

Roberts seeks discovery in good faith.  She seeks to perform specifically defined tests upon a particularized set of evidence for an identified purpose:  to prove actual innocence in order to overcome procedural barriers to her habeas corpus petition.  Roberts' discovery request is specific and tied to her purpose in asserting actual innocence.  *Bracy v. Gramley*, 520 U.S. 899 (1997).

PAGE 1 - MEMORANDUM IN SUPPORT OF MOTION FOR DISCOVERY ORDER

Roberts requires discovery in the present case so that she may pursue her meritorious ineffective assistance of counsel and miscarriage of justice habeas corpus claims despite procedural default and the untimely filing of her habeas corpus petition. *See Schlup v. Delo*, 513 U.S. 298, 315 (1995). Barring Roberts' discovery request will unfairly prevent her from identifying the male DNA contributor and from proving that she is presently incarcerated in violation of the Constitution and laws of the United States. Although her habeas claims face procedural barriers, this District has recognized the right of a habeas corpus petitioner to discovery in order to prove actual innocence to exempt procedural default and statute of limitations violations. *O'Neal v. Lampert*, 199 F.Supp.2d 1064 (D. Or. 2002).

At this stage, Roberts need not prove that she will be able to demonstrate her actual innocence if granted discovery. *See Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005). Instead, to obtain discovery, Roberts needs only to demonstrate that specific allegations show reason to believe that she is entitled to relief.

## II.    STATEMENT OF FACTS:

### A.    The Afternoon Discovery Of Jerri Lee Williams' Body At Kelley Point Park And Subsequent Investigation:

On May 26, 2002, police detectives visited Lisa Roberts at the home she shared with Jerri Lee Williams. After confirming that she was acquainted with Williams, the police told Lisa Roberts that Williams was deceased. According to police, Roberts appeared to be genuinely shocked. She "immediately broke down and began sobbing." Search Warrant Affidavit, Ex. A. She informed the police that Williams was her lover. She told them who the family friends were who should be called to make funeral arrangements. After the police left, Roberts called mutual friends she shared with Williams, still crying, to inform them of Williams' death. Austria Report, Ex. B, p. 8.

According to police, Jerri Lee Williams's body had been found at Kelley Point Park in the northwestern corner of Portland at approximately 2:55 pm on the afternoon of Saturday, May 25, 2002. Christensen Report, Ex. C, p. 3. Two women alerted a nearby police officer, but several other park goers observed the body.

Kelley Point Park is in a remote corner of the city, but is well used. It has a reputation as a vice location. (Sentiniel Article, Ex. D). The park sits at the confluence of the Willamette and Columbia Rivers and features a canoe/kayak launch, hiking trails and a beach area. Park Info, Ex. E. On Saturday, May 25, 2002, the weather was sunny and the high temperature was 81 degrees. Weather report, Ex. F.

Jerri Williams was clearly visible from the parking area, in stark contrast with the grass. The body was completely naked, lying on its side. The police estimated the body was found fifteen feet from the curbline of the parking lot. Wagner Report, Ex. G, p. 6, 7. The medical examiner estimated it was only 8 to 10 feet away. Medical Examiner Report, Ex. H, p. 4. A heavily soiled pillow case was found near the victims right hand. Id. (See also Police Lab Report). A piece of what appeared to be a dog leash, and various other items were also recovered from the area. Wagner Report, Ex. G at p. 7, 8.

Two park visitors, Adam and Ann Cross, had parked their vehicle and unloaded their dog along the curb where the body was later located. They estimated they had parked at around 3 p.m. and did not see the body and did not believe it was there before they went hiking. When they returned, they encountered the police crime scene and reported their observations. Wagner Report, Ex. G, p. 6. Many other park visitors were contacted at Kelley Point Park that Saturday afternoon according to the police reports.

Although the body was found naked and outdoors, the victim was not heavily soiled. Autopsy, Ex. I, p. 4, 5. Scattered abrasions spread over the lower thighs and knees, accompanied by dirt and grass, suggested that the body was pulled across the grass before it was abandoned. Autopsy, Ex I, p. 5. The medical examiner found that it had been "dumped" and the death did not likely occur at the park. Medical Examiner Report, Ex H, p. 2, 4. The body weighed approximately 140 pounds. Autopsy p. 3. Although the victim's arms reveal puncture sites for intravenous drug use, the toxicology report was negative. Autopsy, Ex. I, p. 1.

The medical examiner found that Jerri Lee Williams died of homicidal strangulation. Medical Examiner Report, Ex. H, p. 3. The neck revealed abrasions and contusions. The right sternhyoid muscle and cartoid artery were deeply hemmoraged. The hyoid and thyoid cartilages were not broken. Autopsy, Ex I, p. 6.

### B.   Williams Was Last Seen And Heard From Alive On The Morning Of May 25, 2002 En Route To NE 82nd Avenue In Portland:

The police homicide investigation revealed that Jerri Lee Williams had a history of prostitution. On the Saturday morning that she died, Williams called and spoke with her friend Kathleen Loop who had a room at the Madison Suites Apartments on Northeast 82nd avenue in Portland, Oregon between Fremont Avenue and Sandy Boulevard. This is a well-known vice area. Williams planned to meet Kathleen Loop to spend the weekend there. Search Warrant Affidavit, Ex. A, p. 3. Kathleen Loop confirmed that Williams was planning to meet her, but never arrived.

According to Lisa Roberts, the last time she saw Jerri Lee Williams alive, she had dropped her off at a McDonald's Restaurant on approximately one block away from the Madison Suites Apartments sometime before 10 a.m. Search Warrant Affidavit, Ex. A.

**C.      The State's Theory Of Roberts' Guilt Centered On Cell Phone Records:**

Roberts had plans on May 25, 2002 to pick up her ex-girlfriend's child, Jennifer Locke. They were scheduled to spend time together over the weekend while Collins was supposed to be in Reno, Nevada. Locke confirmed that Roberts picked her up on May 25, 2002. She estimated that the time was between 1 pm and 2 pm in the afternoon but she was not sure. The cell phone call investigation by police confirms that Lisa Roberts picked up Locke much earlier, at approximately 11 am.

The state's theory of Roberts' culpability is summarized in an Affidavit for a Court Order seeking a search warrant of house that Roberts and Williams had shared. The affidavit is attached for this Court's review and was prepared for filing on or about August 15, 2002, almost three months after the homicide. Search Warrant Affidavit, Ex. A. The police were looking for Williams' cell phone, the items she was wearing when she disappeared, and a sleeping bag. Search Warrant Affidavit, Ex, A, p. 19. The search recovered the sleeping bag, (this was tested by the Police Lab) but no other items were located and no other physical evidence was apparently found linking Roberts to Williams' murder.

The state's theory was that Roberts and Williams had a difficult, unstable relationship. Roberts also maintained contact with her ex-girlfriend, Terry Collins. Collins had a 14 year-old daughter named Jennifer Locke who Roberts took care of sometimes. Roberts was strictly forbidden from allowing Locke to be around Williams. Collins detested Williams and Collins had physically attacked Williams in the past. Williams placed harrassing calls to Collins.

A friend of Collins' named Julia Patterson claimed to have seen Collins' truck (borrowed for the weekend by Roberts) driving eastbound on Marine Drive on Saturday, May 25 (which would be in the opposite direction of Kelley Point Park) someplace between NE 33rd Avenue and NE 122nd

Avenue. She claimed to have immediately called Collins about seeing the truck. Phone records show that the only call placed to Collins from Patterson on May 25, 2002 was at 10:30 am. Search Warrant, Ex. A, at 7.

The identification of Roberts as the leading suspect in the death of Williams appears to have turned on the police examination of cell phone records.[1] The police investigation attempted to identify Roberts' and Williams' location on May 25, 2002 at various times based on the location of cell phone calls and the radio range of area cell phone towers. The subpoena supervisor at Verizon Wireless explained that this range varied between two and ten miles. A map created by the police showing the location of the residences and cell phone towers is attached. Cell Phone Map, Ex J.

Based on phone calls placed between Roberts' cell phone and home phone at approximately 5:30 a.m. on May 25, 2002, police speculated that Roberts was out of the house that morning and been untruthful in reporting her whereabouts. The investigation also suggested a benign reason for Roberts to call her own cell phone since this is a method she used for retrieving voice mail messages. Search Warrant Affidavit, p. 9. Since Williams was confirmed to have called and spoken with her friend Kathleen Loop hours later after 8 a.m, these calls originated hours before Williams was killed.

The last call to Williams' cell phone was made at 11:42 am. This call was placed at least three hours after Williams was scheduled to be on 82nd Avenue. The phone call went through and

---

[1] Undersigned counsel is in the process of investigating the accuracy of the state's conclusions regarding cell phone tower activity. Although Attorney William Brennan's advice urging Roberts to accept a manslaughter plea was based on his concerns over the cell phone data (See Brennan Affidavit, Ex. N), he does not appear to have retained a qualified expert to assist in his investigation and verification of this data. If undersigned counsel's investigation of the cell phone triangulation data is probative to Roberts' actual innocence claims, this information will be furnished to the Court in the memorandum supporting this petition. This Court has ordered that the memorandum be filed no later than September 7, 2010.

lasted 3 seconds.  An examination of cell tower information suggests that this call may have been placed near the residence Williams shared with Roberts. Search Warrant Affidavit, Ex. A p. 11.

Police further speculated that one of Roberts' cell phone calls bounced off a tower three miles west of Kelley Point Park.  This call was placed at 10:27 am on May 25, 2002 to the home phone number of Terry Collins and Jennifer Locke.  This is almost the same time that Lisa Roberts was alleged to have been seen by Julia Patterson at 10:36 am, on Marine Drive someplace east of NE 33rd Avenue.  That intersection is approximately 8 miles east of Kelley Point Park. Google Map, Ex. K.  The next five phone calls from Roberts connect to a cell tower even further east, at 13350 NE Rose Parkway between 10:40 am and 10:45 am.  Calls at 10:47 a.m. and 10:46 a.m. appear to be made within a few blocks of Collins' house on NE Multnomah Street, where Lisa was to pick up Jennifer Locke.  Search Warrant p. 9, 10.  Police speculate that the cell tower records show that between 12:00 pm and 3:57 pm, Roberts was at or near her home at 7568 SE 65th Avenue.  *Id*.

 Jennifer Locke was interviewed on May 29, 2002.  She reported receiving at least two phone calls from Lisa Roberts on May 25, 2002.  She received one call stating that Roberts was on her way to pick her up and another call approximately 45 minutes later.  Locke said that Roberts arrived to pick her up about 25 minutes later.  Police confirmed that Roberts' cell phone called Jennifer Locke's home phone at 9:38 am and 10:27 am.  Cell phone tower information also places Roberts in the vicinity of meeting Jennifer Locke sometime around 10:45 am.  Police believe the 10:27 am call came from the vicinity of Kelley Point Park.

Jennifer Locke stated that she and Roberts went to Roberts' home and stayed there all day. Roberts believed that she took Locke to her home, but that they later went fishing in East Multnomah County in the afternoon and also drove by a swimming pool on 72nd Avenue.  Search Warrant, Ex.

A, p. 13.  In any case, Roberts appears to have been with Locke or on the way to get her from 10:36 am on May 25, 2002 onwards.  Jerri Lee Williams' body was not found in the park that Saturday afternoon until approximately 3 pm.

Other evidence in the Search Warrant that tended to indicate Roberts' guilt was the statement of Terry Collins.  Collins claimed that Roberts once choked her during an argument and that Roberts knew "martial arts."  Collins placed a recorded phone call to Roberts with police assistance during which Roberts said she remembered that happening.  Search Warrant Affidavit, Ex. A, p. 14.

### D.    The Police Lab's Forensic Reports Are Incomplete And Excluded Exculpatory Information about Male DNA:

The search warrant affidavit summarizes police conclusions based on DNA evidence collected in the case.  Although it was not mentioned in the search warrant affidavit, it was known to the parties at the time of the plea that spermatozoa was found in the victim's vagina.  It was also established that Lisa Roberts and Jerri Williams lived together as a couple, likely shared possessions, and were in a sexual relationship.  The search warrant emphasizes that Roberts' DNA was consistent with samples taken from the pillowcase. Search Warrant Affidavit, Ex. A at p. 16.  The search warrant theorizes that the pillowcase could have been used by the killer (Roberts) to obscure the face of the victim while the body was being disposed because murderers "do not want to see the face of the victim." Search Warrant Affidavit, Ex. A.

Neither the search warrant affidavit or the Police Lab reports state that unidentified male DNA was found on the pillowcase.  See Lawless Report, Ex. L, p. 7.  From three cuttings, the lab notes (but not the written report) reveal the DNA from at least four different individuals and at least one male contributor with a "y" chromosomal allele.  The "heavily soiled" pillowcase may have been carried from the home by Williams as a useful sack, thus explaining the presence of Roberts' DNA

and the dirty condition of the pillowcase.  A matching set of sheets was not found in the search of Williams and Roberts residence.

The report also did not reveal that a male allele from the pillowcase is a match to the male allele from a swab of the victim's naked chest area. See Lawless Report, Ex. L, p. 7.  Matching alleles cannot conclusively connect the chest swabs to the pillowcase and the sperm, but additional testing could yield this information.

Neither Roberts, her attorney, or apparently the prosecuting attorney for the state knew that male DNA was present under the fingernails of the right hand of the victim based on the Police Lab reports.  See Lawless Report, Ex. L, p. 6.  This information was not included in the Police Lab report.  Further, trace male alleles from the right hand fingernails are consistent with trace alleles in the vaginal swabs where the spermatozoa was detected.

The presence of matching DNA from Roberts is not necessarily consistent with Roberts strangling Williams to death as is implied by the Search Warrant Affidavit, Ex. A at p. 16.  Roberts DNA could have been transmitted to the victim's fingernails during digital sex or through other contact.  Roberts has asserted that she had sex with Williams on the night of May 24, 2002.

Neither Roberts, her attorney, or apparently the prosecuting attorney for the state knew that male DNA was present on the swabs from Williams' naked chest based on the Police Lab Report. See Lawless Report, Ex L. p. 5.  Since male alleles from the chest swabs match trace alleles from the pillowcase, this male depositor is possibly linked to Williams' death.  Two swabs from the chest area apparently still exist and have never been tested. Lawless Report, Ex. L, Ex. 5.  The male DNA swabbed from Williams naked chest could be subjected to further testing.

The Police Lab was aware that the male depositor was a person of interest in the investigation. Using incomplete DNA information from the spermatozoa heads, the Police Lab attempted to find a match in an Oregon DNA database. The search did not return an identification. In 2002, that Oregon database contained 32,570 profiles. As of 2008, that number had grown to nearly 100,000 profiles and is even larger today. The CODIS database, which can generally only be searched using a complete DNA profile, is nationwide and contains millions of comparative profiles.

### E.    The Prosecution, Mental Fitness, And Guilty Plea Of Roberts:

Lisa Roberts was indicted for Williams murder and other related charges on August 26, 2002. Trial docket, Ex. M. She was in custody throughout the proceedings. Over the course of the trial preparation for her defense, her counsel changed repeatedly at no fault of her own. At some point after Roberts' arrest, a female inmate made an unsubstantiated claim that Roberts had confessed. This caused Attorney Ken Walker to resign as counsel, due to a conflict of interest related to the jail informant. Attorney Walker was replaced by Attorney Steven Smith.

On October 7, 2003, Attorney Smith filed a motion to determine her mental fitness to proceed to trial. *Id.*, p. 8. Roberts was committed to the Oregon State Hospital for an evaluation. On March 2, 2004, Attorney Smith moved for leave to withdraw. His reason for withdrawal was related to his opinion that Roberts' was incompetent. The court appointed William J. Brennan as replacement counsel. Docket sheet, Ex. M, p. 9. On April 23, 2004, the Court found Roberts able to aid and assist.

The Court appointed Attorney Jane Claus to assist Roberts but she declined the position. On June 30, 2004, Attorney Sweeney was appointed to replace Claus. A trial date of December 1, 2004 was scheduled.

On the intended trial date, Roberts entered a plea to the reduced charge of manslaughter. Attorneys for the State of Oregon later prepared an affidavit that was signed by William Brennan which explains the circumstances leading up to the plea. Brennan Affidavit, Ex. N. Mr. Brennan explained that the critical evidence against Roberts was a cell phone call that appeared to have originated from the vicinity of Kelley Point Park. Brennan recalled that at the "last moment" before trial, cell phone evidence was developed that could "pin point" Roberts' location in the vicinity of Kelley Point Park.

Given Brennan's perception that this evidence would persuade the jury of Roberts' guilt, "the defense team believed the better option would be to try to make a deal on this case." Brennan admitted that Roberts was "very upset" about entering a plea. He stated she was "ready for trial and going forward with a trial" until almost the last moment. Brennan believes her decision to plead guilty was informed and intelligent. Roberts testified at her state post-conviction hearing that she pleaded guilty because she was told to do so.

Attorney Brennan has previously advised an actually innocent defendant to enter a plea of guilty in a homicide case. He was counsel to John Sosnovske who pleaded guilty in 1991 for being responsible for the "Happy Face Murders." NY Times Article, Ex. O. An inmate at the Oregon State Penitentiary, Jesperson, was later proved to have committed the murder. Sosnovske was later exonerated and released from custody.

III.    **ARGUMENT:**

    A.    **A PETITIONER IS ENTITLED TO DISCOVERY TO PROVE ACTUAL INNOCENCE IN ORDER TO OVERCOME PROCEDURAL BARRIERS WHEN SHE DEMONSTRATES GOOD CAUSE.**

In *Harris v. Nelson,* 394 U.S. 286 (1969), the Supreme Court recognized the critical role that discovery must play in habeas corpus cases. Holding that district courts have the ability to order discovery, the Court wrote:

> [T]his court has emphasized, taking into account the office of the writ and the fact that the petitioner, being in custody, is usually handicapped in developing the evidence needed to support in necessary detail the facts alleged in his petition, that a habeas corpus proceeding must not be allowed to founder in a 'procedural morass.'

*Harris*, 394 U.S. at 291-92. Rule 6(a) of the Rules Governing § 2254 Cases was enacted to be consistent with *Harris*, and provides that discovery should be granted to a habeas corpus petitioner upon a showing of "good cause." 28 U.S.C. § 2254 Rule 6(a) (2006).

If a habeas corpus petitioner meets the "good cause" threshold, she is entitled to discovery to prove "actual innocence" in order to overcome procedural barriers that would otherwise foreclose substantive review of her petition. *See O'Neal v. Lampert*, 199 F.Supp.2d 1064 (D. Or. 2002); *Schlup*, 513 U.S. at 315. Actual innocence creates a gateway through which a petitioner facing procedural barriers may pass to have the merits of her habeas corpus petition heard. *Schlup,* 513 U.S. at 315.

    1.    *Discovery Is Available If A Petitioner Shows "Good Cause."*

A petitioner is entitled to discovery when she asserts good cause. *Bracy*, 520 U.S. at 908-09. Rule 6(a) of the Rules Governing § 2254 Cases provides that upon such a showing the court may "authorize a party to conduct discovery under the Federal Rules of Civil Procedure . . . ." This rule must be applied consistently with the Supreme Court's direction that, "where specific allegations

before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that [s]he is . . . entitled to relief, it is *the duty* of the court to provide the necessary facilities and procedures for an adequate inquiry." *Bracy*, 520 U.S. at 908-09 (1997) (emphasis added) (citing *Harris v. Nelson*, 394 U.S. 286, 300 (1969)). Thus, petitioner's good cause triggers a court's duty to grant discovery. *Bracy*, 520 U.S. at 908-09. *See, e.g., Smith v. Warden*, No. CV 08-227-S-EJL, 2010 WL 672745, at *5 (D. Idaho 2010) (a request that was "specific, narrow, and tied to the issue in the case" met Rule 6's good cause standard).

Next, the good cause standard for discovery is not equivalent to the standard for a court's grant of an evidentiary hearing. *Jones v. Woods*, 114 F.3d 1002, 1009 (9th Cir. 1997) (the standard for a court's grant of an evidentiary hearing is higher than the "good cause" required for a discovery request). Second, the good cause inquiry does not depend upon whether the petitioner will ultimately prevail on her underlying claim; a finding of good cause for discovery purposes does not necessitate a finding that petitioner is close to proving, for example, her actual innocence. *Pham*, 400 F.3d at 742 (citing *Bracy*, 520 U.S. at 909) ("It may well be ... that petitioner will be unable to obtain evidence sufficient to support a finding of actual judicial bias in the trial of his case, but we hold that he has made a sufficient showing...to establish 'good cause' for discovery."); *Smith*, 2010 WL 672745, at *4 ("Although Petitioner is presently far from establishing his innocence, he has made a minimal threshold showing of good cause for discovery on the issue.").

    2.    *Actual Innocence Excuses Procedural Barriers To A Habeas Corpus Petition.*

The Supreme Court has expressly recognized that where a petitioner demonstrates a "fundamental miscarriage of justice," she is entitled to have the merits of her claims heard, even where her claims are procedurally defaulted. *McClesky v. Zant*, 499 U.S. 467, 494 (1991).

Incarceration of an actually innocent person constitutes a fundamental miscarriage of justice; "the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" *Murray v. Carrier*, 477 U.S. 478, 495 (1986) (quoting *Engle v. Isaac*, 456 U.S. 107, 135 (1986)). Thus, a petitioner who demonstrates that she is actually innocent may pass through a "gateway . . . to have [her] otherwise barred constitutional claim considered on the merits." *Schlup*, 513 U.S. at 315 (1995) (citation omitted).

In order to pass through the "actual innocence gateway," a petitioner must demonstrate that "it is more likely than not that no reasonable juror would convict [her] of the relevant crime." *Smith v. Baldwin*, 510 F.3d 1127, 1140 (9th Cir. 2007) (en banc) (citing *House v. Bell*, 547 U.S. 518 (2006). The *Schlup* gateway standard requires "a holistic judgment about all the evidence." *House*, 547 U.S. at 537. While in *Schlup* the Supreme Court specifically highlighted scientific evidence, trustworthy eyewitness accounts and critical physical evidence as particularly probative, "the habeas court's analysis is not limited to such evidence." *House*, 547 U.S. at 537. Instead, the court must take all reliable evidence into account when determining whether the *Schlup* actual innocence threshold is met. *House*, 547 U.S. at 538.

The *Schlup* innocence gateway is available irrespective of whether the petitioner was convicted after a criminal trial or pled guilty. *See Bousley v. United States*, 523 U.S. 614, 622- 23 (1998). In *Bousley*, the Court found that the proper remedy for a petitioner who attacked his guilty plea on collateral review was a remand to determine whether the petitioner's actual innocence exempted procedural default of his claim. *Bousley*, 523 U.S. at 623. *See also Smith v. Baldwin*, 510 F.3d 1127, 1140 n.9 (9th Cir. 2007) (assuming without deciding that the actual innocence exception applies to a no contest or guilty plea).

The Ninth Circuit and this District have indicated that actual innocence constitutes grounds for equitable tolling.  *See Majoy v. Roe*, 296 F.3d 770 (9th Cir. 2002); *O'Neal v. Lampert*, 199 F.Supp 2d 1064 (D. Or. 2002).  In *O'Neal*, this District held that an actual innocence exception to the habeas corpus statute of limitations is a "logical extension of the Supreme Court's well-established rule that a habeas corpus petitioner may circumvent a 'procedural default' by proving [her] 'actual innocence.'"  *O'Neal*, 199 F.Supp.2d 1064, 1066 ("When a federal court on habeas corpus review applies the 'actual innocence' exception . . . the federal court necessarily transgresses principles of federalism and comity as well as the principle of 'finality' in criminal cases.  However, due to the prisoner's actual innocence, such important principles must give way to justice.").

In *Majoy*, the Ninth Circuit declined to rule upon whether the merits of Majoy's untimely petition could be reached until Majoy was able to satisfy the *Schlup* actual innocence standard.  *Majoy*, 296 F.3d at 777.  However, the court cited to Second, Third and Tenth Circuit opinions that express concern over the constitutionality of preventing an actually innocent petitioner from filing a federal habeas corpus petition simply because her petition is untimely.  *Majoy*, 296 F.3d at 776-77 (citing *Triestman v. United States*, 124 F.3d 361, 378-79 (2d Cir. 1997); *Miller v. Marr*, 141 F.3d 976, 978 (10th Cir. 1998); *In re Dorsainvil*, 119 F.3d 245, 248 (3d Cir. 1997).

> 3.    *The Actual Innocence Exception Allows this Court To Grant Discovery.*

A petitioner is entitled to discovery to support her claim of actual innocence.  *See O'Neal*, 199 F.Supp.2d at 1067; *Charles v. Baldwin*, 1999 WL 694716 (D. Or. 1999).  In *O'Neal*, Judge Aiken held that a discovery request for police, mental health, human services and medical records presented good cause where discovery was sought to develop petitioner's actual innocence claim in order to excuse an untimely petition.  *O'Neal*, 199 F.Supp.2d at 1067-68.  Similarly, in *Charles*,

Judge Stewart recognized that a habeas corpus petitioner "may seek discovery to establish why he should be able to present a claim in federal court despite a procedural default in state court." *Charles*, 1999 WL 694716, at *2.

>       a.       28 U.S.C. § 2254(e) Does Not Bar Discovery Where A Petitioner Seeks To
>                Establish Actual Innocence In Order To Waive Procedural Barriers To Her
>                Habeas Corpus Petition.

28 U.S.C. § 2254(e)(2) places a restriction upon a petitioner's right to seek an evidentiary hearing. 28 U.S.C. § 2254(e) (2006). Judge Aiken, in *O'Neal*, made clear that § 2254(e) does not apply to discovery requests that do not relate to the merits of the habeas corpus petition. *O'Neal*, 199 F.Supp.2d at 1067. Because O'Neal sought discovery only to prove actual innocence in order to overcome *procedural barriers* to his petition, § 2254(e) did not apply. *O'Neal*, 199 F.Supp.2d at 1067.

The *Schlup* gateway is not a constitutional claim itself; a petitioner raises actual innocence in order to excuse procedural barriers that would otherwise bar her constitutional claims. *Schlup*, 513 U.S. at 314-15. For this reason, § 2254(e) does not limit the discovery a petitioner may seek when invoking the *Schlup* actual innocence gateway. *See Cristin v. Brennan*, 281 F.3d 404, 414 (3d Cir. 2002) (§ 2254(e)(2) does not apply to evidentiary hearing on questions of procedural default); *Smith v. Wasden*, 2010 WL 672745 (D. Idaho 2010) (§ 2254(e)(2) does not apply to the question of whether discovery is available to prove actual innocence in order to prevent procedural default from barring claims).

   b.    Where A Petitioner Seeks To Establish Her Actual Innocence With Scientific Evidence, She Has Presented Good Cause And Therefore Should Be Granted Discovery.

When the Supreme Court established a petitioner's right to excuse procedural default with proof of actual innocence in *Schlup*, it specifically pointed to scientific evidence as relevant to establishing actual innocence. *Schlup*, 512 U.S. at 865 ("To be credible [an actual innocence] claim requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be *exculpatory scientific evidence*, trustworthy eyewitness accounts, or critical physical evidence . . ..") (emphasis added). Fourteen years after *Schlup*, the Supreme Court affirmed that for good cause, DNA testing could be available to a habeas corpus petitioner to prove actual innocence. *District Attorney's Office for Third Judicial District et al. v. Osborne*, 129 S.Ct. 2308, 2321-23 (2009) (holding no constitutional right to DNA testing).

Courts have held that good cause for discovery exists where a petitioner seeks scientific evidence in order to pass through the *Schlup* actual innocence gateway. *O'Neal*, 199 F.Supp.2d at 1065; *Cherrix v. Braxton*, 131 F.Supp.2d 756, 770-74 (2001); *Payne v. Bell*, 89 F.Supp.2d 967, 974 (W.D. Tenn. 2000). In *Cherrix*, the court confronted the issue of whether to allow a petitioner to retest DNA evidence using more advanced technology than was available at the time of his trial. *Cherrix*, 131 F.Supp.2d at 760-61. Reasoning that, "the DNA tests are reasonably necessary to serve as a gateway to allow claims that may be procedurally barred to be heard on the merits," the court granted Cherrix's motion for discovery. *Cherrix*, 131 F.Supp.2d at 769.

**B.    ROBERTS IS ENTITLED TO DISCOVERY TO PROVE HER ACTUAL INNOCENCE.**

"Good cause" exists in the present case because DNA retesting would allow Roberts to pursue an actual innocence exception to the procedural barriers. Roberts seeks evidence that, if

provided, would allow her to demonstrate that she is actually innocent of killing Jerri Lee Williams. If Roberts were able to demonstrate her actual innocence, she would be entitled to pass through the *Schlup* gateway to have her meritorious habeas corpus claims of ineffective assistance of counsel and actual innocence heard. However, without the discovery sought by this motion, Roberts' habeas corpus petition would be foreclosed by procedural default and the untimely filing of her petition.

Roberts has maintained her innocence of Jerri Lee Williams' murder. Though Roberts entered a guilty plea, the plea bargain that she accepted was entered into upon ineffective advice from counsel, and was not based on knowledge of crucial exculpatory evidence. The evidence that was unavailable to Roberts at the time of her plea includes the newly discovered evidence on which she seeks additional forensic tests:

1.    *Chest Swabs*

As indicated by the Lawless report, the Police Lab report does not explain that male DNA is present in the chest swabs taked from Williams' naked body. The state still possesses two unconsumed swabs that have never been tested and which may contain additional exculpatory forensic evidence.

This male DNA on the chest swabs is exculpatory because it tends to show that a male had sexual body-to-body or saliva-to-body contact with Williams' naked chest. The presence of male DNA on the chest tends to show the victim might not have bathed or worn clothes again after the contact with the male depositor. This is consistent with Williams' body being found naked after a sexual encounter with a male. There is a match between the male alleles on the chest swab and male alleles on the pillowcase. This information may connect the male chest depositor to the location where Williams' body was dumped. Again, this information is not present in the Police Lab reports.

PAGE 18 - MEMORANDUM IN SUPPORT OF MOTION FOR DISCOVERY ORDER

2.    *Fingernail Scrapings*

As indicated by the Lawless report, the Police Lab report does not explain that male DNA is present in the fingernail scrapings taken from the right hand of the victim.  The state still possessed fingernail clippings and other testing materials that can be re-examined to collect additional trace evidence.  Additional information may also be revealed by the left hand fingernails.

The presence of male DNA under the fingernails is exculpatory because it is consistent with defensive scratching.  The male who left his DNA under Williams' fingernails shares an allele with the male who left spermatozoa in Williams' vagina.  Again, this information is not present in the Police Lab reports.  The similar male alleles between the fingernail scrapings and the vagina may be consistent with Williams being raped or killed by a male prostitution customer.

Since Williams was a prostitute and none of the many male acquaintances who provided a profile could be matched, it is likely the male depositor was not someone she knew before the sexual encounter.  This newly discovered information is exculpatory because Williams could have scratched her male killer as she was being strangled, leaving DNA under her fingernails.

3.    *Pillowcase*

As indicated by the Lawless report, the Police Lab report does not explain that a male DNA is present on the three clippings taken from the pillowcase.  This pillowcase was found with Williams' dead body and police speculated it was used by Lisa Roberts to cover the victims face. The male DNA on the pillowcase has alleles in common with the chest swabs.  This information was exculpatory because it tends to show a male had contact with the pillowcase that was found next to the dead body of a prostitute.  This information also undercuts the theory that only Roberts could have handled the pillowcase and used it in connection with Williams' death.

***

In addition to the new evidence, the timing associated with the police theory of Roberts' guilt is suspect.  Roberts would have had to have taken Williams' body to the park, carried its 140 pounds out of a truck and into the grass, and still traveled to pick up Locke in East Portland by approximately 11 a.m. without raising any suspicion.  The body would had to have laid in the busy park, on a sunny May Saturday in Portland, from around 10 am to 3 pm without being seen by the many park visitors.  The more likely scenario is that Williams' picked up a prostitution customer while walking to Kathleen Loop's apartment.  That male left trace DNA on her naked body, strangled her to death, and dumped her in the park sometime closer to 3 pm.  The spermatozoa alone do not support this conclusion, but when combined with additional trace male DNA, the evidence that Williams physically encountered a male shortly before her death is persuasive.

Roberts' discovery request is reasonable and based on a rational relationship between the male DNA and the facts of the offense.  Discovery is sought by the present motion to perform specifically defined tests upon a particularized set of evidence for an identified purpose: to prove Roberts' actual innocence.  Roberts' discovery request is thus specific and tied to her purpose in requesting discovery, which constitutes good cause.  *See Bracy*, 520 U.S. at 908-09.  Additionally, the discovery that Roberts seeks is highly probative scientific testing, which the Supreme Court has highlighted as particularly relevant to a petitioner's ability to prove actual innocence.  *Schlup*, 513 U.S. at 322.  And while the evidence sought is exactly the type that could prove actual innocence, discovery should be granted regardless of whether Roberts is presently close to proving her actual innocence.  *See Pham*, 400 F.3d at 742.

PAGE 20 - MEMORANDUM IN SUPPORT OF MOTION FOR DISCOVERY ORDER

The technology exists through Y-STR, Mini STR, and non-routine processing to create a complete profile of the male depositor which could be compared to the database of offenders maintained by CODIS.  This DNA may match a person with a history of violent sex offense and murdering prostitutes who was in Portland on May 25, 2002.  The Police Lab was aware that the male depositor was a potential suspect and attempted to match partial DNA information taken from the spermatozoa to an Oregon DNA database. Lawless Report Ex. L.  Although a search did not return a match, the fact they attempted to find the male depositor shows the Police Lab thought this information was important to their investigation.  Had the Police Lab had the technology available to create a complete DNA profile of the male depositor during its initial forensic investigation, it surely would have done so.

Today, by itself, the presence of the male DNA and matching alleles on Williams' body does not conclusively prove beyond any doubt that Lisa Roberts is innocent.  This is why additional forensic testing and identifying the male contributor through the CODIS database is warranted.  Given the highly probative, exculpatory evidence discovered through the examination of the Police Lab's investigative notes and raw data, Roberts' request to investigate his material is reasonable and pursued in good faith.

There is not overwhelming evidence of Roberts' guilt in this case that contradicts Roberts' good faith effort to conduct new tests to identify the male DNA depositor.  The margin of circumstantial evidence against Roberts is not so great as to foreclose an erroneous conviction.  The state's circumstantial case was built upon unchallenged theories about cell phone towers, inconsistent statements by Roberts, and Terry Collins' statements about Roberts' propensity for

violence.  Well after her arrest, a jail house informant also made unsubstantiated claims that Roberts confessed.

The strongest evidence against Lisa Roberts is her obviously her guilty plea.  Guilty pleas by innocent persons are not unheard of.  Here, Roberts' own attorney, William Brennan, was involved in another murder case in Oregon that involved the false guilty plea of an innocent person.  Just like Brennan's client John Sosnovske, Lisa Roberts was strongly urged to plead guilty even though she had maintained her innocence over months of trial preparations.

Concerned about the weight of circumstantial evidence, defense counsel advised that a manslaughter plea was the correct choice.  Lisa Roberts followed her lawyer's advice based on his assessment of the evidence.  Neither Brennan, Roberts, or apparently even the prosecutor, was aware of exculpatory male DNA under the fingernails, on the pillowcase, and on the chest swabs from the victim's naked body.  These materials should be independently examined.

### C.    Roberts' Motion Requires An Independent Laboratory Test to Examine The Male DNA Evidence.

The Police Lab's forensic investigation of this case reveals notes and raw data indicating the presence of male DNA in several samples, but this information was not included in their reports. Because the Police Lab does not have the technical ability to conduct the recommended evidentiary tests necessary to create a complete DNA profile of the male contributor in this case, an independent lab should be used to conduct a new examination.  A more thorough explanation of the recommended tests (Y-STR, Mini-STR and non-routine evidence analysis) is included in the Lawless report.  According to the report, these advance techniques, refined since 2002, are necessary and most likely to yield a complete DNA profile of the male DNA contributor who left trace

evidence on the pillowcase and victim's body. The Police Lab does not have the personnel or equipment to perform these tasks.

An independent laboratory's analysis of the available DNA evidence may allow Roberts to prove her actual innocence. As explained in the Lawless report, Orchid-Cellmark in Dallas, Texas and DNA Diagnostics in Fairfield, Ohio are independent, reputable laboratories that provide the recommended services.

A comprehensive re-testing and analysis of trace male DNA evidence will allow the laboratory to compile a DNA profile to be compared against national offender databases. The DNA profile could provide a known match to a sex offender or person incarcerated for killing prostitutes. The DNA profile could lead to an individual who could be proved to have committed the homicide through statements or additional corroborating information. Identifying the male DNA contributor is crucial to supporting Roberts' proof of actual innocence in order to excuse procedural default and her habeas corpus petition's untimeliness.

## IV.    CONCLUSION

For the foregoing reasons, Roberts requests that this Court find that she has demonstrated good cause for discovery. Roberts respectfully requests that this Court grant her motion for discovery to independently test all available DNA evidence currently held by the Oregon Crime Laboratory related to the death of Jerri Lee Williams the manner outlined by the Lawless Report included as Exhibit L and also attached to Petitioner's Motion for Discovery.

RESPECTFULLY SUBMITTED this June 25, 2010.

*/s/ Alison M. Clark*
Alison M. Clark
Attorney for Petitioner