Alison M. Clark, OSB No. 080579
Email: alison_clark@fd.org
Federal Public Defender's Office
101 SW Main Street, Suite 1700
Portland, OR 97204
Tel: (503) 326-2123
Fax: (503) 326-5524

Attorney for Petitioner

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DIVISION OF PORTLAND

| | |
|---|---|
| **LISA MARIE ROBERTS,** | **Civ. No. 08-1433-HU** |
| **Petitioner,** | **BRIEF IN SUPPORT OF LEAVE TO AMEND PETITION AND HABEAS CORPUS RELIEF** |
| **v.** | |
| **MARK NOOTH,** | |
| **Respondent.** | |

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.    STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.      The Discovery of Jerri Lee Williams's Body at Kelley Point Park and
                Subsequent Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        B.      Williams Was Last Seen Alive on the Morning of May 25, 2002, on
                NE 82nd Avenue in Portland . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        C.      The State's Theory of Roberts's Guilt Centered on Cell Phone
                Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        D.      The Police Relied on the Statements of Terry Collins as Inculpating
                Roberts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        E.      The Oregon State Crime Lab's Forensic Reports Are Incomplete and
                Excluded Exculpatory Information About Male DNA . . . . . . . . . . . . . . . . . 9

        F.      The Prosecution, Mental Fitness, and Cell Tower Information
                Leading to the Guilty Plea Of Roberts . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        G.      Roberts's Post-Conviction and Appellate Litigation . . . . . . . . . . . . . . . . . . 13

VI.     ARGUMENT OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        A.      Roberts Should Be Granted Leave to Amend the Habeas Corpus
                Petition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        B.      Roberts's Amended Petition is Timely Under 28 U.S.C. §
                2244(d)(1)(B) and (D). *Lee v. Lampert*, 610 F.3d 1125 (9th Cir.
                2010) is Inapplicable to Roberts's Statutory Basis For Habeas Corpus

Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

C.    Roberts's Grounds for Relief Are Subject to the "Miscarriage of Justice" Exception to the Statute of Limitations Because the State Failed to Disclose Exculpatory Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . 21

D.    Roberts's Third Ground Should Be Granted Based on Counsel's Unreasonable Assessment of the State's Cell Phone Tower Theory. Undisclosed Exculpatory DNA Evidence Exacerbated Counsel's Ill-informed Advice to Plead Guilty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        1.    Counsel's Duty to Investigate and Request Expert Assistance as Necessary Is Integral to Providing a Constitutionally Adequate Defense . . . . . . . . . . . . . . . . . . . . . . . . . 23

        2.    A Reasonable Probability That Counsel's Errors Prejudiced the Case Outcome Should Be Determined in the Context of Other Trial Errors Such as a Brady Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        3.    Counsel Failed to Adequately Investigate and Therefore Fundamentally Misunderstood the Weakness of the State's Cell Phone Theory Purporting to Implicate Roberts in the Death of Williams . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

E.    Ground Four Should Be Granted Because the Failure to Disclose Exculpatory DNA Evidence Violated Roberts's Right to Due Process and Rendered Her Plea Involuntary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        1.    Roberts's Plea is Constitutionally Invalid Because It Was Predicated on Misinformation and Made Without Knowledge of Improperly Withheld Exculpatory Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        2.    The State Was Constitutionally Required to Disclose the Exculpatory Evidence to  Roberts to Use in Her Defense and to Prove Her Innocence . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        3.    The State's Failure to Disclose Exculpatory Evidence Constitutes Reversible Error If the Non-Disclosure Undermined the Fairness of the Proceedings . . . . . . . . . . . . . . . . . . . . 30

V.    PROCEEDINGS SOUGHT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

A.      This Court Should Grant Leave for Roberts to Renew a Discovery
        Motion Concerning the Exculpatory Evidence to Support the Brady
        Claims Underlying the Third and Fourth Ground for Relief . . . . . . . . . . . . . . . . 32

B.      This Court Should Hold an Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . . . . . 33

VI.   CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Aron v. United States*,
    291 F.3d 708 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Baylor v. Estelle*,
    94 F.3d 1321 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Bell v. Cone*,
    535 U.S. 685 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Blackledge v. Allison*,
    431 U.S. 63 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re Boshears*,
    110 F.3d 1538 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Boumediene v. Bush*,
    553 U.S. 723 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Bracy v. Gramley*,
    520 U.S. 899 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Brady v. Maryland*,
    373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Brady v. United States*,
    397 U.S. 755 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Bryant v. Arizona Attorney General*,
    499 F.3d 1056 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Carriger v. Stewart*,
    132 F.3d 463 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Conmar Corp. v. Mitsui & Co.*,
    858 F.2d 499 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Duncan v. Ornoski*,
    528 F.3d 1222 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Dung The Pham v. Terhune*,
    400 F.3d 740 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Ege v. Yukins*,
    485 F.3d 364 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Ellison v. Acevedo*,
    593 F.3d 625 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Foman v. Davis*,
    371 U.S. 178 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Haines v. Kerner*,
    404 U.S. 519 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hasan v. Galaza*,
    254 F.3d 1150 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Hein v. Sullivan*,
    601 F.3d 897 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Hendricks v. Calderon*,
    70 F.3d 1032 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Holland v. Florida*,
    130 S. Ct. 2549 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*James v. Giles*,
    221 F.3d 1074 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Jennings v. Woodford*,
    290 F.3d 1006 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Jones v. Cunningham*,
    371 U.S. 236 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Jones v. Gibson*,
    206 F.3d 946 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Jones v. Wood*,
    114 F.3d 1002 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Kennedy v. Dugger*,
   933 F.2d 905 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Kyles v. Whitley*,
   514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*Lee v. Lampert*,
   610 F.3d 1125 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 17, 22

*Love v. Jones*,
   923 F.2d 816 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*McCleskey v. Zant*,
   499 U.S. 467 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Moore v. Knight*,
   368 F.3d 936 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Ramirez v. Yates*,
   571 F.3d 993 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Sanders v. Ratelle*,
   21 F.3d 1446 (9th Cir. 1994 ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Schlueter v. Narver*,
   384 F.3d 69 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Schlup v. Delo*,
   513 U.S. 298 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Shannon v. Newland*,
   410 F.3d 1083 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Sierra v. Evans*,
   1998 U.S. App. LEXIS 25783 (10th Cir. Oct. 13, 1998) . . . . . . . . . . . . . . . . . . . . . . . 19

*Sims v. Livesay*,
   970 F.2d 1575 (6th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Spitsyn v. Moore*,
   345 F.3d 796 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Strickland v. Washington*,
   466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25, 32

vi

*Strickler v. Greene,*
    527 U.S. 263 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 30

*Styron v. Johnson,*
    262 F.3d 438 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Summerlin v. Schiro,*
    427 F.3d 623 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States ex rel. Shaw v. De Robertis,*
    755 F.2d 1279 (7th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Agurs,*
    427 U.S. 97 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Bagley,*
    473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Taylor,*
    716 F.2d 576 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Weintraub,*
    871 F.2d 1257 (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Valdovinos v. McGrath,*
    598 F.3d 568 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 31

*Williams v. Sims,*
    390 F.3d 958 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Willis v. Jones,*
    329 Fed. Appx. 7, 17 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Wims v. United States,*
    225 F.3d 186 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## FEDERAL STATUTES

28 U.S.C. § 2242 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

18 U.S.C. § 2244(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. § 2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## I.    INTRODUCTION

Petitioner Lisa Roberts is innocent of the manslaughter death of her girlfriend, Jerri Williams.  Had the state properly disclosed newly discovered exculpatory DNA evidence indicating that an unknown male killed Williams, Roberts would not have been convicted.  Roberts's plea to manslaughter was involuntarily entered because the state withheld the exculpatory evidence and trial counsel made an ill-informed plea recommendation.

Roberts now seeks habeas corpus relief under 28 U.S.C. § 2254.  Based on the facts and arguments submitted herein, this Court should grant Roberts's Motion for Leave to Amend her Petition.  Ground Three and Ground Four in the amended petition present timely, colorable claims that require relief and/or additional discovery and an evidentiary hearing.

## II.    PROCEDURAL HISTORY

On December 9, 2008, Lisa Roberts filed a *pro se* habeas corpus petition asserting three grounds for relief from her 2004 manslaughter conviction.  This Court granted Roberts's motion for appointment of counsel on December 16, 2008, and undersigned counsel formally entered an appearance on January 16, 2009.

Since Roberts's petition included a claim of innocence, counsel's assessment of the merits of the Petition involved an extensive review.  Through counsel, Roberts collected case files from her prior attorneys to reconstruct defense counsel's trial preparations, the basis of the state's case against Roberts, and critically, the circumstances under which she pled guilty to manslaughter at the last moment before her trial.

Roberts also sought records, through counsel, from the Oregon State Crime Lab to determine whether male DNA evidence and other forensic material recovered from the body of Williams

supported Roberts's claim of innocence. Subject to Respondent's approval, the Oregon State Crime Lab agreed to produce the reports.

On March 29, 2010, the Oregon State Crime Lab provided Roberts with the lab notes and unredacted forensic data collected during the forensic examination of the Williams's death. Roberts hired forensic DNA specialist Karen Lawless to review and explain the technical scientific information contained in the materials. The previously undisclosed notes and data revealed that the DNA of an unknown male was under the fingernails and on the chest of the victim's body. The pillowcase found next to the body also contained unknown trace male DNA. The lab reports created by the Oregon State Crime Lab at the time of Lisa Roberts's prosecution did not disclose that the additional contributor(s) were male. The reports also did not disclose that common alleles from the male DNA under the fingernails matched alleles found on the victim's chest area and vagina.

The Lawless Report was completed on June 24, 2010 and is included as Exhibit A. Immediately following its completion, on June 25, 2010, Roberts filed an Amended Motion for Discovery, requesting court orders that would allow her to conduct additional and independent forensic testing on the remaining samples and other forensic materials in possession of the Oregon State Crime Lab. Roberts explained that discovery was necessary to support her innocence claims and to identify the male contributor that had contact with Williams body before she died.

The Amended Motion for Discovery explained that the lab notes and other crime lab data showed that samples taken from Jerri Williams' body contained previously unknown DNA evidence. It was known to the Roberts's defense team during trial preparations that spermatozoa was found in the victim's vagina. The fingernail, chest, and pillow case DNA are exculpatory because taken singly and collectively, they rebut the prosecutions theory that the presence of spermatozoa was

unrelated to the victim's death.  The DNA on the chest tends to show recent body-to-body contact

with a male.  The DNA under the fingernails indicates a struggle by the victim.  The DNA on the

pillow case rebuts the state's theory that Lisa Roberts used the pillow case to cover the victim's face

after the strangulation.  The exculpatory trace DNA material from the fingernails, chest, and vagina

shared common alleles, which are trace genetic markers.  These common alleles may have been

deposited by the same male.

On July 13, 2010, this Court denied the Motion for Discovery.  On the basis of the recent

Ninth Circuit case *Lee v. Lampert*, 610 F.3d 1125 (9th Cir. Or. 2010) this Court posited that Roberts

must overcome procedural issues concerning her habeas corpus claims before this Court would

entertain substantive claims of innocence based on newly discovered forensic evidence.  R. 39.

The order permits Roberts to seek leave to renew her motion after the Court considers the statute

of limitations question.

Herein, Roberts explains that her petition is within the statute of limitations under 28 U.S.C.

§ 2244(d)(1)(D) because the factual predicate of the claims in her amended petition are based on

newly discovered exculpatory evidence that could not have been previously discovered through due

diligence.  Simultaneously with this brief, Roberts submits a Motion for Leave to Amend the Habeas

Corpus Petition, to which the proposed petition, as amended, is attached as an exhibit.  Based on the

amended grounds, this Court should grant the writ and order that her conviction be vacated.

III.    STATEMENT OF FACTS

    A.    **The Discovery of Jerri Lee Williams's Body at Kelley Point Park
            and Subsequent Investigation.**

On May 26, 2002, police detectives visited Roberts at the home she shared with Jerri Lee

Williams.  After confirming that she was acquainted with Williams, the police told Lisa Roberts that

Williams was deceased. According to police, Roberts appeared to be genuinely shocked. She "immediately broke down and began sobbing." Search Warrant Affidavit, Ex. B. She informed the police that Williams was her lover. She told the police who the family friends were who should be called to make funeral arrangements. After the police left, Roberts called mutual friends she shared with Williams, still crying, to inform them of Williams's death. Austria Report, Ex. C, p. 8.

According to police, Jerri Lee Williams's body had been found at Kelley Point Park in the northwestern corner of Portland at approximately 2:55 pm on the afternoon of Saturday, May 25, 2002. Christensen Report, Ex. D, p. 3.

Kelley Point Park is in a remote corner of the city, but is well used. It has a reputation as a vice location. Sentinel Article, Ex. E. The park sits at the confluence of the Willamette and Columbia Rivers and features a canoe/kayak launch, hiking trails and a beach area. Park Info, Ex. F. On Saturday, May 25, 2002, the weather was sunny and the high temperature was 81 degrees. Weather report, Ex. G. The park was busy that day, as indicated by the number of visitors encountered by police and their reports of seeing others.

Williams's body was clearly visible from the parking area, in stark contrast with the grass. The body was completely naked, lying on its side. The police estimated the body was found fifteen feet from the curbline of the parking lot. Wagner Report, Ex. H, p. 6, 7. The medical examiner estimated it was only 8 to 10 feet away. Medical Examiner Report, Ex. I, p. 4. A heavily soiled pillow case was found near the victim's right hand. A piece of what appeared to be a dog leash, and various other items were also recovered from the area. Wagner Report, Ex. H at p. 7, 8.

Two park visitors, Adam and Ann Cross, had parked their vehicle and unloaded their dog along the curb where the body was later located. They estimated they had parked at around 3 p.m.

and did not see the body and did not believe it was there before they went hiking. When they returned, they encountered the police crime scene and reported their observations. Wagner Report, Ex. H, p. 6. Many other park visitors were contacted at Kelley Point Park that Saturday afternoon according to the police reports. A man and a woman matching Williams's description were also seen arguing in the parking lot earlier in the day, but this could not be confirmed by Roberts's defense team. (Resp. Ex. 111, and Roberts Deposition, Resp. Ex. 112, p. 5).

Although the body was found naked and outdoors, the victim was not heavily soiled. Autopsy, Ex. J, p. 4, 5. Scattered abrasions spread over the lower thighs and knees, accompanied by dirt and grass, suggested that the body was pulled across the grass before it was abandoned. Autopsy, Ex J, p. 5. The medical examiner found that it had been "dumped" and the death did not likely occur at the park. Medical Examiner Report, Ex I, p. 2, 4. The body weighed approximately 140 pounds. Autopsy p. 3. Although the victim's arms reveal puncture sites for intravenous drug use, the toxicology report was negative. Autopsy, Ex. J, p. 1.

The medical examiner found that Williams died of homicidal strangulation. Medical Examiner Report, Ex. I, p. 3. The neck revealed abrasions and contusions. The right sternhyoid muscle and cartoid artery were deeply hemmoraged. The hyoid and thyoid cartilages were not broken. Autopsy, Ex J, p. 6.

### B. Williams Was Last Seen Alive on the Morning of May 25, 2002, on NE 82nd Avenue in Portland.

The police homicide investigation revealed that Williams had a history of prostitution. On the Saturday morning that she died, Williams called and spoke with her friend, Kathleen Loop, who had a room at the Madison Suites Apartments on Northeast 82nd Avenue in Portland, Oregon, between Fremont Avenue and Sandy Boulevard. This is a well-known vice area. Police were aware

that the 82nd Avenue apartment was associated with Williams.  On May 22, 2002, Williams had

planned to meet Kathleen Loop to spend the weekend on 82nd Avenue.  Search Warrant Affidavit,

Ex. B, p. 3.  Kathleen Loop confirmed that Williams was planning to meet her, but never arrived.

According to Roberts's statement to police, the last time she saw Williams alive, she dropped

her off at the McDonald's Restaurant at 3330 NE 82nd Avenue,  approximately a block away from

the Madison Suites Apartments at around 10 a.m.  Search Warrant Affidavit, Ex. B.

### C.      The State's Theory of Roberts's Guilt Centered on Cell Phone Records.

Roberts had plans on May 25, 2002 to pick up her ex-girlfriend's 14 year-old child, Jennifer

Locke.  They were scheduled to spend time together over the weekend while the ex-girlfriend, Terry

Collins, was supposed to be in Reno, Nevada.  Locke confirmed that Roberts picked her up on May

25, 2002.  She estimated that the time was between 1 p.m. and 2 p.m. in the afternoon but she was

not sure.  The cell phone call investigation by police suggests that Lisa Roberts picked up Locke

much earlier, at approximately 11 a.m.

The state's theory of Roberts's culpability is summarized in the Search Warrant Affidavit

seeking a warrant for the house that Roberts and Williams had shared.  The affidavit was prepared

for filing on or about August 15, 2002, almost three months after the homicide. Search Warrant

Affidavit, Ex. B.  The police were looking for Williams's cell phone, the items she was wearing

when she disappeared, and a sleeping bag.  Search Warrant Affidavit, Ex, B p. 19.  The search

recovered the sleeping bag, (this was tested by the Oregon State Crime Lab). No evidence was found

at the home linking Roberts to Williams's murder.

The state's theory was that Roberts and Williams had a difficult, unstable relationship.

Roberts also maintained contact with her ex-girlfriend, Collins.  Roberts was strictly forbidden from

allowing the daughter, Locke, to be around Williams. Collins detested Williams and Collins had physically attacked Williams in the past. Williams placed harassing calls to Collins.

A friend of Collins' named Julia Patterson claimed to have seen Collins' distinctive truck (borrowed for the weekend by Roberts) traveling eastbound on Marine Drive on Saturday, May 25 (which would be in the opposite direction of Kelley Point Park) someplace between NE 33rd Avenue and NE 122nd Avenue. She claimed to have immediately called Collins about seeing the truck. Phone records show that the call placed from Patterson to Collins was at 10:30 am. Search Warrant, Ex. B, at 7. The intersection of NE 33rd Ave and Marine Drive is 8 miles away from Kelley Point Park.

The identification of Roberts as the leading suspect in the death of Williams appears to have turned on the police examination of cell phone records. The police investigation attempted to identify the location of Roberts and Williams on May 25, 2002, at various times based on cell phone calls and the radio range of area cell phone towers. The subpoena supervisor at Verizon Wireless explained that this range varied between two and ten miles. A map created by the police showing the location of the residences and cell phone towers is attached. Cell Phone Map, Ex K.

Based on phone calls placed between Roberts's cell phone and home phone at approximately 5:30 a.m. on May 25, 2002, police speculated that Roberts was out of the house that morning and had been untruthful in reporting her whereabouts. The affidavit also provides a benign reason for Roberts to call her own cell phone since she used that method to retrieve voice mail messages. Search Warrant Affidavit, Ex. A, p. 9.

Williams was confirmed to have called and spoken with her friend Kathleen Loop before 9 a.m. The last call to Williams's cell phone was made at 11:42 a.m. The call went through and lasted

3 seconds.  The police theorized that based on cell tower information,  the call may have been placed near the residence Williams shared with Roberts. Search Warrant Affidavit, Ex. B,  p. 11.

Police further speculated that one of Roberts's cell phone calls bounced off a tower three miles west of Kelley Point Park.  This call was placed at 10:27 a.m. on May 25, 2002 to the home phone number of Terry Collins and Jennifer Locke.  This is almost the same time that Lisa Roberts was alleged to have been seen by Julia Patterson at 10:36 a.m., on Marine Drive at least 8 miles east of Kelley Point Park. Google Map, Ex. K.  The next five phone calls from Roberts connect to a cell tower even further east, at 13350 NE Rose Parkway between 10:40 a.m. and 10:45 a.m..  A call at 10:46 a.m. appears to have been made within a few blocks of Locke and Collins's house on NE Multnomah Street.  Search Warrant Affidavit, Ex. B, p. 9, 10.  Police speculate that the cell tower records show that between 12:00 p.m. and 3:57 p.m., Roberts was near her home at 7568 SE 65th Avenue.  *Id.*

Jennifer Locke was interviewed on May 29, 2002.  She reported receiving one call stating that Roberts was on her way to pick her up and another call approximately 45 minutes later.  Police confirmed that Roberts's cell phone called Jennifer Locke's home phone at 9:38 a.m. and 10:27 a.m.  Cell phone tower information also estimates that Roberts was in the vicinity of meeting Jennifer Locke sometime around 10:45 a.m.  Cell Phone Map, Ex. K.

Jennifer Locke stated that she and Roberts went to Roberts's home and stayed there all day.  Roberts believed that she took Locke to her home, but that they later went fishing in East Multnomah County in the afternoon and also drove by a swimming pool on 72nd Avenue.  Search Warrant Affidavit, Ex. B, p. 13.  In any case, Roberts was with Locke or on the way to get her from 10:36 a.m. on May 25, 2002, and for the remainder of that day.

Since Roberts was at a minimum, at least 8 miles from Kelley Point Park at 10:36 a.m., and was with Locke for the remainder of the day, the police theory requires that Roberts was in Kelley Point Park no later than approximately 10:15 a.m. Williams's body was not found in the park that Saturday afternoon until approximately 3 p.m.

### D. The Police Relied on the Statements of Terry Collins as Inculpating Roberts.

The Search Warrant Affidavit speculates Roberts's guilt was supported by the statements of Terry Collins. Collins claimed that Roberts once choked her during an argument and that Roberts knew "martial arts." Collins placed a recorded phone call to Roberts with police assistance during which Roberts said she remembered that happening. Search Warrant Affidavit, Ex. B, p. 14. The prosecution included menacing and harassment charges concerning Terry Collins in the indictment against Roberts. Resp. Ex. 102.

### E. The Oregon State Crime Lab's Forensic Reports Are Incomplete and Excluded Exculpatory Information About Male DNA.

The search warrant affidavit summarizes police conclusions based on DNA evidence collected in the case. Search Warrant Affidavit, Ex. B, p. 15-16. It was known to the parties at the time of the plea that spermatozoa was found in the victim's vagina. Krings Report, Ex. L. It was also established that Lisa Roberts and Jerri Williams lived together as a couple, likely shared possessions, and were in a sexual relationship. The search warrant affidavit emphasizes that Roberts's DNA was consistent with samples taken from the pillowcase. Search Warrant Affidavit, Ex. A, p. 16. The search warrant theorizes that the pillowcase could have been used by the killer (Roberts) to obscure the face of the victim while the body was being disposed because murderers "do not want to see the face of the victim." Search Warrant Affidavit, Ex. B, p. 18.

As part of the instant investigation, on March 18, 2010, Roberts requested copies of unredacted lab notes and the complete forensic files concerning her case. Godet Letter, Ex. M. The letter notes that Respondent consented to the disclosure. On March 25, 2010, the Oregon State Crime Lab responded that Roberts's counsel could pick up the materials after tendering $69.89 in processing fees. Banks Letter, Ex. N. An investigator working with Roberts's counsel collected the documents on March 29, 2010. (Godet Timesheet, Ex. O). These previously undisclosed records were examined by a forensic expert retained by Roberts.

Oregon State Crime Lab report does not reveal that unidentified male DNA was found on the pillowcase. It only states that DNA from more than one person is detected on the pillowcase. See Lawless Report, Ex. A, p. 7, and Krings Report, Ex. L. The lab notes (but not the written report) reveal the DNA from at least four different individuals and at least one male contributor with a "y" chromosomal allele. Only three cuttings from the pillow case were tested. The "heavily soiled" pillowcase may have been carried from the home by Williams as a useful sack, thus explaining the presence of Roberts's DNA and the dirty condition of the pillowcase. A matching set of sheets was not found in the search of Williams's and Roberts's residence.

The lab notes from the Oregon State Crime Lab (but not the written report) also show that male DNA was present under the fingernails of the right hand of the victim. See Lawless Report, Ex. A, p. 6; Krings Report, Ex. L. The Oregon State Crime lab report does not state that the DNA from a third person was male. Further, trace male alleles from the right hand fingernails are consistent with trace alleles in the vaginal swabs where the spermatozoa was detected. Matching alleles cannot conclusively connect the chest swabs to the pillowcase, the vaginal swabs, and the fingernails, but additional testing could yield this information.

Roberts's DNA was also recovered from the fingernails of Williams's body. The presence of Roberts's DNA is not necessarily consistent with Roberts strangling Williams to death as is implied by the Search Warrant Affidavit, Ex. B at p. 16. Roberts DNA could have been transmitted to the victim's fingernails during digital sex or through other contact. Roberts had sex with Williams on the night of May 24, 2002.

The lab notes (but not the written report) also reveal that male DNA was present on the swabs from Williams's naked chest. See Lawless Report, Ex A, p. 5. Since male alleles from the chest swabs match trace alleles from the vaginal swabs, this male depositor is possibly linked to Williams's death. Two swabs from the chest area apparently still exist and have never been tested. Lawless Report, Ex. A, Ex. 5. The male DNA swabbed from Williams naked chest could be subjected to further testing.

The male depositor was a person of interest in the forensic investigation. Using incomplete DNA information from the vaginal swabs, the Oregon State Crime Lab attempted to find a match in an Oregon DNA database. The search did not return an identification. In 2002, that Oregon database contained 32,570 profiles. As of 2008, that number had grown to nearly 100,000 profiles and is even larger today. The CODIS database, which can generally only be searched using a complete DNA profile, is nationwide and contains millions of comparative profiles. Lawless Report, Ex. A, p. 3, n. 5.

### F. The Prosecution, Mental Fitness, and Cell Tower Information Leading to the Guilty Plea Of Roberts.

Lisa Roberts was indicted for Williams murder and other related charges on August 26, 2002. Resp. Ex. 102. She was in custody throughout the proceedings. Over the course of the trial preparation for her defense, Roberts's counsel changed repeatedly at no fault of her own. After

Roberts's arrest, a female inmate made an unsubstantiated claim that Roberts had confessed to killing Williams. This caused Attorney Ken Walker to resign as counsel, due to a conflict of interest related to the inmate informant. Attorney Walker was replaced by Attorney Steven Smith.

Attorney Smith filed a motion to determine Roberts's mental fitness to proceed to trial. Trial Docket, Resp. Ex. 113, p. 8. Roberts was committed to the Oregon State Hospital for an evaluation. On March 2, 2004, Attorney Smith moved for leave to withdraw related to his opinion that Roberts was incompetent. On April 23, 2004, the Court found Roberts able to aid and assist.

The court appointed William J. Brennan as replacement counsel. Resp. Ex. 113, p. 9. Attorney Jane Claus was appointed to assist Brennan, but she declined the position. On June 30, 2004, Attorney Patrick Sweeney was appointed to replace Claus. A trial date of December 1, 2004 was scheduled.

On the intended trial date, Roberts entered a plea to the reduced charge of manslaughter. Attorneys for the State of Oregon later prepared an affidavit that was signed by William Brennan which explains the circumstances leading up to the plea. Brennan Affidavit, Resp. Ex. 111. Mr. Brennan explained that the critical evidence against Roberts was a cell phone call that appeared to have originated from the vicinity of Kelley Point Park. Brennan recalled that at the "last moment" before trial, cell phone evidence was developed that could "pinpoint" Roberts's location in the vicinity of Kelley Point Park.

Given Brennan's perception that this evidence would persuade the jury of Roberts's guilt, "the defense team believed the better option would be to try to make a deal on this case." Brennan admitted that Roberts was "very upset" about entering a plea. He stated she was "ready for trial and going forward with a trial" until almost the last moment. Brennan believes her decision to plead

guilty was informed and intelligent. Roberts testified at her state post-conviction hearing that she pleaded guilty because she was told to do so. Resp. Ex. 112, p. 14, 18.

Roberts's defense team did not consult a qualified cell tower expert. Trial counsel submitted a "Request for Pre-Authorization for Non-Routine Expense" seeking the assistance of Tom Gorton, an expert in the area of cell tower analysis. Attorney Patrick Sweeney, who filed the request, noted that "there are very few experts in this field." Funds Request, Ex. P. Mr. Gorton was never utilized by the Roberts team. According to a sworn affidavit, Sweeney may have briefly spoken to Gorton on the phone, but Gorton has no record or recollection of providing any assistance on the Roberts case. Gorton Affidavit, Ex. Q.

Roberts has now retained the assistance of a qualified expert to analyze the cell tower evidence in her case. Forensic technology expert Jeff Fischbach determined that the cell tower theory and data available to the parties did not support reliable and accurate conclusions about Roberts's location on the morning of May 25, 2002. Fischbach Affidavit, Ex. R.

### G. Roberts's Post-Conviction and Appellate Litigation.

No direct appeal was filed. At the beginning of 2005, Roberts attempted to contact Brennan regarding her case but did not reach him. This was near the time that Brennan took time away from his office for bereavement leave.

Roberts filed a post-conviction petition November 27, 2006, in Washington County Circuit Court. Resp. Ex. 106. Her post-conviction litigation argued that her plea was entered involuntarily due to the constitutionally defective assistance of counsel. At Roberts's deposition on May 3, 2007, she testified that she was completely innocent in the death of Williams. Resp. Ex. 112, p. 10. Post-conviction relief was denied. Resp. Ex. 124.

Petitioner's appeal of her post-conviction petition included the argument that her guilty plea to manslaughter was entered in violation of her constitutional rights due to ineffective assistance of counsel. Resp. Ex 124.  On April 9, 2008, the Oregon Court of Appeals affirmed the denial of post-conviction relief.  Resp. Ex. 130.  Roberts filed a Petition for Review in the Oregon Supreme Court which was denied on June 18, 2008.  Resp. Ex. 129.

Petitioner is presently in the custody of the Oregon State Corrections Division at  Coffee Creek Correctional Institution in Wilsonville, Oregon.

## VI.    ARGUMENT OF LAW

### A.    Roberts Should Be Granted Leave to Amend the Habeas Corpus Petition.

Roberts should be permitted to amend her *pro se* habeas petition. The proposed amended petition is attached to the Motion for Leave to Amend the Petition as an exhibit.  Federal Rule of Civil Procedure 15(a) states that a party may amend a pleading as a matter of course within 21 days, before a responsive pleading as filed.  After a responsive pleading, amendment to the pleading is allowed by leave of court.  The rule provides that "[t]he court should freely give leave when justice so requires."

Rule 15(a) "applies to habeas corpus actions with the same force that it applies to garden-variety civil cases." *James v. Giles*, 221 F.3d 1074, 1078 (9th Cir. Cal. 2000); see also 28 U.S.C. § 2242 (habeas petitions may be "amended or supplemented as provided in the rules of procedure applicable to civil actions").   The underlying purpose of Rule 15(a) "is to facilitate decision on the merits, rather than on technicalities or pleadings." *James*,  221 F.3d at 1077.

The opportunity to amend a habeas corpus petition is especially well-established when the litigant initially filed the petition *pro se*. *Id*. at 1126.  See also *Haines v. Kerner*, 404 U.S. 519,

521(1972) (holding that courts must liberally construe *pro se* pleadings). *Pro se* litigants should be permitted to amend their petition "unless it clearly appears from the complaint that the deficiency cannot be overcome by amendment." *James* at 1126. "The refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Foman v. Davis,* 371 U.S. 178, 182 (1962)(finding that in absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the opposing party, leave to amend should be "freely given").

Here, Roberts seeks leave to amend her *pro se* habeas corpus petition for the first time. Leave to amend is not sought for any improper purpose, but to facilitate a decision on the merits of her claims. Allowing the amendment is in the "interests of justice" because her claims, as amended, concern newly discovered exculpatory DNA evidence and Roberts is seeking leave within the one-year statute of limitations provided under 18 U.S.C. § 2244(d)(1)(D)(which provides a year to apply for relief following the date on which the factual predicate of the claim could have been discovered through due diligence). On Ground Three, Roberts's amended claim relies upon the newly discovered evidence to support her claim that she is innocent and was prejudiced by her attorney's ill-informed advice to plead guilty. In Ground Four, Roberts's claim explains that she was prejudiced by the state's failure to disclose the exculpatory DNA evidence.

There is no prejudice to Respondent. Roberts agrees and consents that Respondent should have the opportunity to respond to the amended petition. Further, the amendment would not unduly burden Respondent. Since this Court appointed counsel, Roberts has dedicated extensive time, resources, and the expense of forensic experts to thoroughly pursue her claims. In the course of this

review, Roberts discovered previously undisclosed DNA evidence that has never been considered on the merits by any court. In comparison, Respondent has only filed substantive pleadings once, on May 5, 2005 (Respondent's Response and Answer, R. 14 and 15), concisely requesting dismissal based on a statute of limitations defense. Respondent's opposition to Roberts's motion should not be well-taken.

The prejudice to Roberts from the denial of this motion would be substantial. Having discovered exculpatory evidence within the meaning of 18 U.S.C. 2244(d)(1)(D), Roberts is obligated to include this issue in the petition currently pending before this Court. All claims must be raised in a single habeas corpus petition rather than successive petitions when all grounds are available at the time of the first petition. *McCleskey v. Zant*, 499 U.S. 467(1991).

Amending the petition is also in the interest of judicial efficiency. Because Roberts has already submitted memoranda on the newly discovered evidence in the Motion for Discovery (R. 34) and regularly apprised the Court of case progress in motions for extension of time, the parties and the Court are familiar with the issues and well-positioned to resolve this litigation. Granting Roberts leave to amend is in keeping with the underlying purpose of Rule 15(a), "to facilitate decision on the merits" *James* at 1077. See also Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 17.2 n.16 (2009) (describing process by which appointed habeas counsel amends in light of the results of the post-filing investigation and discovery, citing *Love v. Jones*, 923 F.2d 816, 818 (11th Cir. 1991) (amended petition filed after magistrate appointed counsel to represent *pro se* petitioner); *United States v. Weintraub*, 871 F.2d 1257, 1259 (5th Cir. 1989) (amendment permitted after discovery revealed new information)).

Roberts has presented a sufficient basis for the amendment of her initial *pro se* filing in this

case, it is not being pursued for an improper purpose, and is not prejudicial to Respondent. Because leave to amend should be "freely given" under the Civil Rules and as allowed by Congress in 28 U.S.C. § 2242, this Court should grant Roberts's simultaneously filed Motion to Amend the Habeas Petition and order that the proposed Amended Petition be filed.

**B.     Roberts's Amended Petition is Timely Under 28 U.S.C. § 2244(d)(1)(B) and (D).  *Lee v. Lampert*, 610 F.3d 1125 (9th Cir. 2010) is Inapplicable to Roberts's Statutory Basis For Habeas Corpus Relief.**

Both Roberts's grounds for relief in this case are predicated on newly discovered evidence and are timely filed, as amended, within the statutory time limits in 28 U.S.C. § 2244(d)(1)(B) and (D). This Court requested that Roberts address equitable tolling problems presented by her original *pro se* petition in relation to *Lee v. Lampert*, *supra*. For the following reasons, Roberts's case does not require a tolling exception based on "actual innocence."

The AEDPA statute of limitations begins to run from the latest of several possible dates, including "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). Roberts's Third and Fourth Grounds, as presented in the amended petition, both rely on the factual predicate of a violation under *Brady v. Maryland* 373 U.S. 83 (1963). This information was not discovered and could not have been presented earlier because of a due process violation.

For Roberts's petition to meet the statute of limitations set forth in § 2244(d)(1)(D), it is "not necessary to decide whether [Petitioner] has proved all the elements of a *Brady* violation required to warrant habeas relief" *Willis v. Jones*, 329 Fed. Appx. 7, 17 (6th Cir.2009), citing *Strickler v. Greene*, 527 U.S. 263, 289-97 (1999). When the parties argue the merits, this Court will determine whether Roberts was prejudiced by the state's failure to disclose the material and whether it is

exculpatory. So long as the "factual predicate" of Roberts's claim is being presented within a year of its discovery through the exercise of due diligence, statute of limitations in § 2244(d)(1)(D) is satisfied.

"Due diligence" has been defined as "show[ing] some good reason why he or she was unable to discover the facts supporting the petition before filing the [petition]." *In re Boshears,* 110 F.3d 1538 (11th Cir. 1997)(citation omitted); *Schlueter v. Narver*, 384 F.3d 69, 74 (3d Cir. 2004) (to satisfy the standard, the "prisoner must exercise reasonable diligence under the circumstances"); *Moore v. Knight*, 368 F.3d 936, 940 (7th Cir. 2004)( § 2244 does not require "the maximum feasible diligence").

Several similar cases have interpreted due diligence under § 2244(d)(1)(D) as running from the time previously undisclosed scientific evidence held by the state was discovered. In *Willis v. Jones*, the Sixth Circuit found the petitioner "has shown due diligence [with respect to a *Brady* claim] because he had no reason to know that the state had not disclosed *Brady* evidence." Finding Willis was entitled to rely on the state's representation that it did not have impeaching evidence in its files, "due diligence did not require him to request the records before the state turned them over." 329 Fed. Appx at 16.

In *Ege v. Yukins*, 485 F.3d 364, 373-74 n.4 (6th Cir. 2007), a factual predicate under 2244(d)(1)(D) to challenge a prosecution expert witness's testimony did not exist until petitioner obtained a copy of a letter issued by another county's prosecutor that warned of the expert's unreliability. The Sixth Circuit found the discovery of a misleading state expert "may be analogized to cases where, for example, a DNA expert later admits to lying numerous times regarding test results, or a key eyewitness later admits to perjury in identifying a defendant." In such cases, "the

petitioner could not have been reasonably expected to discover the misconduct during pretrial discovery or trial." *Id*. See also *Sierra v. Evans*, 1998 U.S. App. LEXIS 25783, at *6-*7 (10th Cir. Oct. 13, 1998) (otherwise untimely petition was rendered timely by § 2244(d)(1)(D) because claim was based on newspaper reports of DEA chemist's admission that she lied about test results in numerous cases, and petitioner could not reasonably have been expected to have previously discovered chemist's misconduct through pretrial discovery or cross-examination at trial).

"The requirement of diligence is only meaningful [. . .] when facts exist that would excite the inquiry of a reasonable person." *Conmar Corp. v. Mitsui & Co.*, 858 F.2d 499, 504 (9th Cir. 1988). "The mere fact that . . . it was possible for appellant to ascertain [the factual predicate of his claim] is not dispositive" because "[t]he statute does not require the maximum feasible diligence, only 'due,' or reasonable, diligence" *Wims v. United States*, 225 F.3d 186, 190 n.4 (2d Cir. 2000).

The mere fact that Roberts's earlier attorneys could have requested or moved to compel disclosure of the complete and unredacted laboratory notes and records does not mean they lacked diligence. Trial counsel had no reason to doubt the completeness of the Oregon State Crime Lab reports at the time of their investigation. *Bracy v. Gramley*, 520 U.S. 899, 909 (1997) (Supreme Court "presume[s] that public officials have 'properly discharged their official duties'") (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996)).

Until Roberts was appointed habeas counsel to conduct a thorough and lengthy review of all the case materials, she had no way to acquire the previously withheld exculpatory information or to even know that such information could assist her case. Even after counsel was appointed, voluminous records were examined and forensic experts were consulted before the exculpatory DNA evidence was identified. On or about March 29, 2010, Roberts received the previously undisclosed

lab notes and data indicating male DNA on the fingernails, chest swabs, and pillowcase. This information is highly technical and assistance of a forensic expert was required to interpret the data.

On May 27, 2010, Roberts advised the Court that she had "what appeared to be" the complete and unredacted forensic records and laboratory notes for Roberts's case. R. 30. Counsel informed this Court that she was consulting with a qualified expert to evaluate their contents. After receiving a forensic report from the forensic expert on June 24, 2010, Roberts promptly filed a Motion for Discovery on June 25, 2010, to permit additional investigation to identify the male depositor. R. 34 and 35. Roberts has now timely sought leave to amend her petition raising the two grounds factually predicated on the undisclosed *Brady* material.

Due to the highly technical nature of DNA evidence and the special skills necessary to interpret the Oregon Crime Lab records, the date the forensic expert's report was complete, on June 24, 2010, is the "date on which the factual predicate of the claim[ . . .] presented could have been discovered through the exercise of due diligence." § 2244(d)(1)(D). Alternatively, the date the evidence supporting the due process claim was received from the Oregon Crime Lab, March 29, 2010, is the operative date under § 2244(d)(1)(D). Godet Timesheet, Ex. O. In either case, Roberts filed her Motion for Leave to Amend her Petition raising the *Brady* material in support of two grounds for relief within one year of discovery and complied with the time limits of the AEDPA.

Alternatively, Roberts's statute of limitations began to run when the state-created impediment to filing (the failure to disclose exculpatory evidence as required by due process), was removed. 28 U.S.C. § 2244(d)(1)(B). The majority of § 2244(d)(1)(B) "impediment" cases concern claims that the state directly interfered with the actual filing of the habeas petition (see *Shannon v. Newland*, 410 F.3d 1083, 1087 (9th Cir. 2005). Some circuits have entertained § 2244(d)(1)(B) as

encompassing *Brady* violations. *See Williams v. Sims*, 390 F.3d 958, 960 (7th Cir. 2004). *But see Ramirez v. Yates*, 571 F.3d 993, 1001 (9th Cir. 2009)("[Petitioner] is entitled to the commencement of a new limitations period under § 2244(d)(1)(B) only if [he was] altogether prevented from presenting his claims in any form, to any court").

The impediment to Roberts's discovery of the exculpatory DNA material was removed on March 25, 2010, when the Oregon State Crime Lab notified Roberts that the materials were available to be picked up upon receipt of $69.89 in administrative fees. Banks Letter, Ex. N. Through counsel, Roberts paid the fees and picked up the materials on March 29, 2010. Godet Timesheet, Ex. O.

Roberts's grounds for relief as presented in the amended petition are timely and should be considered on their merits.

C. **Roberts's Grounds for Relief Are Subject to the "Miscarriage of Justice" Exception to the Statute of Limitations Because the State Failed to Disclose Exculpatory Evidence.**

Under exceptional circumstances such as a *Brady* violation, the statute of limitations may be equitably tolled when the prisoner "has been pursuing his rights diligently," and "some extraordinary circumstance stood in his way." *Bryant v. Arizona Attorney General*, 499 F3d 1056, 1061 (9th Cir. 2007) (citing inter alia, *Spitsyn v. Moore*, 345 F.3d 796, 799 (9th Cir. 2003)).

The showing of a miscarriage of justice permits the petitioner to have her claims considered on the merits even if they would otherwise be procedurally barred. *Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997) (*en banc*). "Habeas 'is at its core an equitable remedy.'" *Boumediene v. Bush*, 553 U.S. 723 (2008)(citing *Jones v. Cunningham*, 371 U.S. 236, 243 (1963)).

In *Holland v. Florida*, 130 S. Ct. 2549, 2560 (2010), the Supreme Court held that the same

statute at issue here, 28 U.S.C. § 2244(d), is subject to equitable tolling. The principle of stare decisis requires this Court to follow *Holland* to read it in harmony with the miscarriage of justice gateway articulated by the Supreme Court in *Schlup v. Delo,* 513 U.S. 298, 315 (1995)(providing that "actual innocence" provides a gateway through limitations on second or successive habeas petitions).

*Lee v. Lampert,* supra, which is currently being challenged through a petition for rehearing en banc, must also be read in combination with *Holland. Lee* concerns whether there is a *per se* "actual innocence" exception to the statute of limitations for habeas relief. The *Lee* panel provided that in "extraordinary circumstances," § 2244(d)(1) is subject to equitable tolling. Roberts does not concede that *Lee* has been correctly decided, but the timeliness of her petition does not turn on its actual innocence formulation.

Roberts is entitled to equitable tolling based on the extraordinary circumstance and miscarriage of justice engendered by a *Brady* violation, in addition to the equitable remedies available to an innocent person. *Holland* reiterated that "equitable principles" – which must include miscarriages of justice – "have traditionally 'governed' the substantive law of habeas corpus, for we will not construe a statute to displace courts' traditional equitable authority absent the 'clearest command.'" *Holland*, 130 S. Ct. at 2560. Evidence that "serves only to undercut the evidence presented at trial" can satisfy the miscarriage of justice standard. *Carriger*, 132 F. 3d at 477. Accordingly, a showing of *per se* "actual innocence" is not required for equitable tolling to apply. Roberts reserves the right to challenge the application of *Lee* to the timeliness of her petition.

**D.    Roberts's Third Ground Should Be Granted Based on Counsel's Unreasonable Assessment of the State's Cell Phone Tower Theory.  Undisclosed Exculpatory DNA Evidence Exacerbated Counsel's Ill-informed Advice to Plead Guilty.**

Roberts's Third Ground for Relief, as revised and submitted with the Motion for Leave to Amend the Petition provides:

> Petitioner's conviction is illegal and contrary to the Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States because Petitioner is innocent of manslaughter and entered an involuntary plea in violation of her right to due process and the effective assistance of counsel.

Counsel failed to adequately investigate the cell phone tower evidence and then gave out ill-informed advice, counseling Roberts to plead guilty to manslaughter.  Counsel's poor advice rendered Roberts's plea involuntary.  Considered with the exculpatory DNA evidence that should have been provided for Roberts's defense, there is a reasonable probability that counsel's performance prejudiced the outcome of Roberts's case.  As explained in greater detail in the Fourth Ground, counsel understandably failed to consider unknown exculpatory DNA evidence.  The combination of the *Brady* violation and counsel's ill-informed assessment of the cell phone tower evidence prejudicially skewed his advice to his client.  Roberts's plea was involuntary because it was entered in reliance on counsel's strong advice concerning the unsubstantiated cell tower theory.

**1.    Counsel's Duty to Investigate and Request Expert Assistance as Necessary Is Integral to Providing a Constitutionally Adequate Defense.**

As the Supreme Court held in *Strickland v. Washington,* 466 U.S. 668, 691 (1984), "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  "Pretrial investigation and preparation are the keys to effective representation of counsel." *United States v. Taylor*, 716 F.2d 576, 581 (9th Cir. 1983). "[C]ounsel

must, at a minimum, conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client." *Hendricks v. Calderon*, 70 F.3d 1032, 1036 (9th Cir. 1995) citing *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994 ). See also *Baylor v. Estelle*, 94 F.3d 1321, 1324 (9th Cir. Cal. 1996)(failure of trial counsel to follow up on exculpatory report regarding semen samples constituted ineffective assistance of counsel); *Sims v. Livesay*, 970 F.2d 1575, 1480-81 (6th Cir. 1992)(counsel was ineffective where counsel knows of a potentially exculpatory gun residue report yet counsel fails to investigate adequately).

Evidence that undercuts the prosecution's case and indicates innocence can come in the form of expert testimony. In cases in which the prosecution introduces an expert witness who plays a pivotal role in the case, trial counsel may have a duty to present the testimony of an defense expert witness. *Duncan v. Ornoski*, 528 F.3d 1222, 1235 (9th Cir. 2008) ("Although it may not be necessary in every instance to consult with or present the testimony of an expert, when the prosecutor's expert witness testifies about pivotal evidence or directly contradicts the defense theory, defense counsel's failure to present expert testimony on that matter may constitute deficient performance."). *See also Ellison v. Acevedo*, 593 F.3d 625, 634 (7th Cir. 2010) ("If the need for an expert was clear and one was reasonably available, counsel should at least consult with one.")

A reviewing court is highly deferential to counsel's performance, generally indulging a presumption that under the circumstances, the challenged action might be considered "sound trial strategy." *Bell v. Cone*, 535 U.S. 685, 698 (2002). Counsel's strategic decisions are not owed deference if they are made without the benefit of necessary expert assistance. "[A]ttorneys have considerable latitude to make strategic decisions about what investigations to conduct once they have gathered sufficient evidence upon which to base their tactical choices[, but u]ntil a reasonable

investigation is conducted, counsel is not in a position to make critical strategic decisions or settle

on a trial strategy." *Jennings v. Woodford*, 290 F.3d 1006, 1014 (9th Cir. 2002).

> **2.** ***A Reasonable Probability That Counsel's Errors Prejudiced the Case Outcome Should Be Determined in the Context of Other Trial Errors Such as a Brady Violation.***

A petitioner is not prejudiced by deficient performance unless "there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." *Strickland,* 466 U.S. at 694. The quantum of whether an attorney's performance was

prejudicial by a "reasonable probability" is one "sufficient to undermine confidence in the outcome"

but is "less than the preponderance more-likely-than-not standard." *Summerlin v. Schiro*, 427 F.3d

623, 640-643 (9th Cir. 2005).

In considering whether attorney error prejudiced the outcome, the cumulative impact of other

trial errors should be taken into account. *Valdovinos v. McGrath*, 598 F.3d 568, 581 n. 4 (9th Cir.

2010)(finding that *Brady* violations negate the strength of a prejudice determination under

*Strickland*). "[A] verdict or conclusion only weakly supported by the record is more likely to have

been affected by errors than one with overwhelming record support." *Strickland,* 466 U.S. at 696.

> **3.** ***Counsel Failed to Adequately Investigate and Therefore Fundamentally Misunderstood the Weakness of the State's Cell Phone Theory Purporting to Implicate Roberts in the Death of Williams.***

In his affidavit explaining Roberts's guilty plea, trial counsel states:

> The State had been trying to get certain information regarding the cell towers, particularly the cell tower in west Vancouver, Washington. It was known all along that petitioner had made a call that was bounced off of that cell tower, but what was not known or provable until the last moment was that the location of the call could be pinpointed as to the direction it came from when the cell tower received the signal from the cell phone and the cell phone representative could testify to this information. I knew this to be correct because my investigators had found the same

thing just about at the same time. Therefore, the District Attorney could and would have put petitioner close to Kelly Point Park at a point in time reasonably close to the time the victim was killed.

Resp. Ex. 111.

Trial counsel did not reasonably investigate or consult an expert in reaching his conclusion about the strength of the state's cell phone theory or whether the "pinpointed" call direction information was well-founded.

According to trial counsel's files, a Pre-authorization for Non-Routine Expense was submitted related to the cell tower investigation. This request was for eight hours of expert consultation from Thomas S. Gorton, an engineer with expertise in telecommunications. Funds Request, Ex. P. Gorton was never used by the defense as a consultant. According to his affidavit, he does not have any record or recollection of ever being involved in the Roberts's case. Gorton Affidavit, Ex. Q.

Had counsel consulted with an expert, he would have understood that the state did not have the ability to "pinpoint" Roberts or reliably prove the direction from which Roberts placed a call on the morning of May 25, 2002. Forensic technology specialist Jeff Fischbach was retained by Roberts to examine all of the trial file records concerning the cell tower theory. He concluded that the state could not pinpoint whether a call originated from Kelley Point Park. Fischbach Affidavit, Ex R. Roberts could have been anywhere within at least 10 miles of the tower. The data necessary to reliably determine what direction a call came from within the radio range of the Kotobuki Way tower was not considered. Fischbach found that "the forensic conclusions drawn by the police and the defense are not well-supported and of doubtful accuracy."

Cell phone tower networks are complex and cannot be easily understood without specialized

technical knowledge. Without expert assistance on a matter of such crucial importance to the case, counsel was unable to offer constitutionally adequate advice. Having failed to consult with a qualified expert, counsel was ill-equipped to evaluate the strength of the defense case relative to the facts that exculpated Roberts. Counsel's reported understanding of the evidence "pinpointing" the direction a call came from reveals a deep misunderstanding about the reliability and limitations of cell phone towers in locating callers. The state's conclusions regarding Roberts's cellphone location on the morning of May 25, 2010 was based on weak inferences and would not have withstood the scrutiny of a jury trial.

Counsel's unreasonable failure to consult an expert should be considered in the context of the exculpatory DNA evidence that should have been disclosed, but was not. When counsel made decisions about the cell tower and determined that a guilty plea was the best choice, he did not have the benefit of the undisclosed exculpatory DNA evidence. The non-disclosure of the Brady material exacerbated counsel's error.

Roberts's guilty plea was involuntary because it was based on the unreasonable and ill-informed advice of counsel. Counsel's advice was prejudicial because there is a reasonable probability that she would have not pleaded guilty and been acquitted had counsel conducted a reasonable investigation into the reliability of the cell tower evidence. Considered together with the exculpatory DNA evidence, the case against Roberts was rebuttable and weak.

According to trial counsel, Roberts had maintained her innocence and was prepared for a trial. Under his strong advice of counsel that the cell tower evidence destroyed her chances for an acquittal, Roberts reluctantly agreed to enter a plea. Roberts's decision to plead guilty was involuntary because it was predicated on bad advice about a plea being "the better option," rendered

in ignorance of the cell tower evidence and exculpatory DNA evidence. This Court should not have

confidence in the outcome of these proceedings and should grant the Third Ground for Relief.

**E.      Ground Four Should Be Granted Because the Failure to Disclose Exculpatory DNA Evidence Violated Roberts's Right to Due Process and Rendered Her Plea Involuntary.**

Roberts's Fourth Ground for Relief, as revised and submitted with the Motion for Leave to

Amend the Petition provides:

> Petitioner's convictions are illegal and contrary to the Fifth, Sixth, and Fourteenth
> Amendment to the Constitution of the United States, in that the state unlawfully
> withheld exculpatory DNA evidence in violation of the constitutional principals
> articulated in Brady v. Maryland, 373 U.S. 83 (1963) and its progeny. Due to the
> failure to disclose this exculpatory evidence, Petitioner's plea was entered
> involuntarily.

*1.      Roberts's Plea is Constitutionally Invalid Because It Was Predicated on Misinformation and Made Without Knowledge of Improperly Withheld Exculpatory Evidence.*

Material misrepresentations by the prosecutor, court, or defense counsel can vitiate the

validity of guilty. In *Blackledge v. Allison*, 431 U.S. 63, 75 (1977), the Supreme Court stated:

> In administering the writ of habeas corpus . . . the federal courts cannot fairly adopt
> a *per se* rule excluding all possibility that a defendant's representations at the time
> his guilty plea was accepted were so much the product of such factors as
> misunderstanding, duress, or misrepresentation by others as to make the guilty plea
> a constitutionally inadequate basis for imprisonment.

See also *Brady v. United States*, 397 U.S. 755, 775 (1970) (determination concerning validity of plea

requires inquiry into possible misrepresentations and commitments made to defendant by his

counsel).

The failure to disclose material exculpatory evidence in Roberts's case rendered her plea

involuntary. The material value of this undisclosed information is powerful and would have caused

Roberts to be acquitted. The exculpatory DNA evidence from the Williams's fingernails shows that

she died after a struggle with a male. The male fingernail DNA rebuts the state's theory that the spermatozoa found in the victim's vagina was unrelated to her death. Matching male alleles are present in the vaginal swab sample and fingernail sample. The chest swab DNA is exculpatory because it shows that the victim likely had body-to-body contact with a male or his saliva before she died. The victim was likely naked when the DNA was deposited on her chest, and stayed naked until her body was found, having never washed or put on clothing that could wipe away the male DNA evidence. The pillowcase DNA rebuts the prosecution's vivid theory that the heavily soiled pillowcase found with the body was placed over Williams's head by Roberts to obscure her face. The male who had sex with Williams before she died and strangled her may have had contact with the pillowcase. Although the Oregon State Lab report indicated the presence of other DNA contributors in reviewing the samples, it did not identify the other contributors as male. It did not reveal the matching allele information.

A guilty plea entered without the knowledge of this exculpatory evidence was involuntary. The state violated Roberts's right to due process by failing to disclose the exculpatory DNA evidence.

> **2.** ***The State Was Constitutionally Required to Disclose the Exculpatory Evidence to Roberts to Use in Her Defense and to Prove Her Innocence.***

In *Brady*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The Court has since held that the duty to disclose such evidence is applicable even though there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and that the duty

encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985). Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682. Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). In order to comply with *Brady*, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in this case, including the police." *Kyles* at 437.

"There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. at 281-82. A due process violation is at issue even if the *Brady* violation resulted from inadvertence rather than deliberate prosecutorial misconduct. Inadvertence does not excuse a *Brady* violation.

> **3.    *The State's Failure to Disclose Exculpatory Evidence Constitutes Reversible Error If the Non-Disclosure Undermined the Fairness of the Proceedings.***

In considering whether Roberts was prejudiced by the state's failure to disclose the exculpatory DNA evidence, the question is whether the error undermines confidence in the outcome of the proceedings. "The question is not whether the defendant would more likely than not have received a different verdict with the [undisclosed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

A number of circuits have concluded that prosecutorial misconduct lends itself to a "reasonable probability" standard in answering this question. E.g., *Styron v. Johnson*, 262 F.3d 438,

454 (5th Cir. 2001); *Jones v. Gibson*, 206 F.3d 946, 959 (10th Cir. 2000); *Kennedy v. Dugger*, 933 F.2d 905, 914 (11th Cir. 1991); cf. *United States ex rel. Shaw v. De Robertis*, 755 F.2d 1279, 1281 n.1 (7th Cir. 1985) ("To carry this burden, [a petitioner] must show that it is at least likely that the misconduct complained of affected the outcome of his trial -- i.e., caused the jury to reach a verdict of guilty when otherwise it might have reached a verdict of not guilty.") Although the Ninth Circuit has not explicitly adopted the "reasonable doubt" formulation, it has found "the touchstone" of a *Brady* claim centers on the fairness of the proceedings. *Hein v. Sullivan*, 601 F.3d 897, 914 (9th Cir. Cal. 2010).

"A court must consider the materiality of the *Brady* violations collectively rather than item by item." *Valdovinos v. McGrath*, 598 F.3d at 577 (9th Cir. Cal. 2010)(citing *Kyles* 514 U.S. at 436-37). Here, the failure to disclose each element of the exculpatory DNA evidence singly and collectively prejudiced Roberts within the meaning of *Brady*.

Had the exculpatory DNA information been disclosed, the state's forensic theories would have been rebutted. It is also possible that investigators would have continued a forensic examination of the case, pursued other leads, and produced a more likely suspect. Williams was most likely killed by a prostitution customer who picked her up on 82nd Avenue before she reached Kathleen Loop's apartment. Forensic materials in possession of the state may still be able to identify the male DNA contributor.

By withholding the forensic evidence indicating that a male had physical, violent, body-to-body contact with Williams before she died, and that the pillowcase also contained male DNA, the state deprived Roberts of due process. The Oregon State Crime Lab's failure to disclose exculpatory DNA evidence so undermined the fairness of the proceedings that this Court cannot have confidence

in the outcome.

## V.    PROCEEDINGS SOUGHT

### A.    This Court Should Grant Leave for Roberts to Renew a Discovery Motion Concerning the Exculpatory Evidence to Support the Brady Claims Underlying the Third and Fourth Ground for Relief.

Rule 6(a) of the Rules Governing Section 2254 Cases states that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." "Good cause" under Habeas Rule 6(a) exists "where specific allegations before the court show reason to believe that the petitioner may, if facts are fully developed, be able to demonstrate that he is . . . entitled to relief . . . ." *Bracy v. Gramley*, 520 U.S. at 908-09 (quotation omitted).

In habeas cases, discovery extends to the testing or re-evaluation of forensic evidence. In *Jones v. Wood*, 114 F.3d 1002, 1009 (9th Cir. 1997), the Ninth Circuit granted discovery when testing of blood samples was essential to supporting an ineffective assistance of counsel claim, in that it would demonstrate prejudice under the *Strickland* standard. In *Dung The Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2005), the Ninth Circuit held that the denial of a discovery request for the laboratory notes of the prosecution's forensic expert was an abuse of discretion because that evidence was "essential to the full development of Pham's *Brady* claim" and "may well contain favorable, material information that would tend to exculpate Pham." A petitioner "need not demonstrate that he will ultimately prevail on his underlying claim" to receive discovery. *Id.*

Roberts should be permitted to renew a motion for discovery in order to further develop the newly discovered exculpatory evidence and better establish her right to relief in the Third and Fourth Grounds of her petition.

**B.      This Court Should Hold an Evidentiary Hearing.**

If this Court has factual questions about the failure to disclose the exculpatory evidence or the diligence of Roberts's trial counsel in investigating the forensic DNA reports, an evidentiary hearing should be held. See *Hasan v. Galaza*, 254 F.3d 1150, 1154 n.3 (9th Cir. 2001)("Because there is no evidence in the record from which it can be determined when with the exercise of due diligence Hasan could have discovered the [subject] relationship . . . (or any other factual predicate to support the prejudice prong of his ineffective assistance of counsel claim), this case must be remanded for further factual findings on that issue.")  See also *Aron v. United States*, 291 F.3d 708(11th Cir. 2002) (holding that prisoner was entitled to evidentiary hearing on issue of whether he exercised due diligence in discovering pertinent facts).  In this case, this Court should not make factual findings adverse to Roberts without conducting a hearing.

**VI.      CONCLUSION**

For the reasons stated herein, Roberts should be granted leave to amend her petition and the amended petition should be granted.  In lieu of deciding the merits of the petition, Roberts should be permitted to renew her motion for discovery so that she may more fully develop her claims.  This Court should not make factual findings regarding due diligence without first holding an evidentiary hearing.


RESPECTFULLY SUBMITTED this September 7, 2010.

*/s/ Alison M. Clark*
Alison M. Clark
Attorney for Petitioner