Steven T. Wax, OSB No. 85012
Federal Public Defender
Email: steve_wax@fd.org
Alison M. Clark, OSB No. 080579
Email: alison_clark@fd.org
Federal Public Defender's Office
101 SW Main Street, Suite 1700
Portland, OR 97204
Tel: (503) 326-2123
Fax: (503) 326-5524

Attorneys for Petitioner

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **LISA MARIE ROBERTS,**<br><br>Petitioner,<br><br>v.<br><br>**MARK NOOTH,**<br><br>Respondent. | No. 3:08-cv-01433-MA<br><br>**SUPPLEMENTAL MEMORANDUM CONCERNING ADDITIONAL EXCULPATORY DNA EVIDENCE IN SUPPORT OF EMERGENCY RELEASE AND CONTINUING DISCOVERY** |

Lisa Roberts, through counsel Alison M. Clark, submits the following supplemental memorandum to the Court concerning additional DNA results containing exculpatory DNA evidence. As reported to this Court at Docket No. 91, an April 12, 2013, Oregon State Crime Lab (herein after referred to as Crime Lab) report revealed the DNA of Brian Tuckenberry under the fingernails from the left hand of Jerri Williams (Docket No. 91, Exhibit A). The parties

subsequently agreed that the lab should do additional testing to see if Tuckenberry's DNA appears on other forensic exhibits and to perform additional reviews using Y-STR technology.

Y-STR analysis involves the examination of DNA on the Y chromosome. Since the Y chromosome is found in males only, Y-STR analysis is highly suited for samples (like several of the exhibits in Roberts' case) where the female DNA may be at high levels. Y-STR analysis ignores the female DNA so that it does not interfere with the typing results of the male component. Because most of the samples were taken from the body of a female victim in this case, Y-STR is helpful in distinguishing the male DNA contributors. Y-STR test results can be used to match Y-Chomosome information in existing male DNA samples, but do not supply data that can be uploaded or searched in a DNA database. (Lawless DNA Report, Docket No. 35, Exhibit L, p. 2).

The presence of blood or any other DNA on fingernail samples is forensically significant, especially in a strangulation case. *See e.g. Colbert v. Harry*, No. 09-CV-13736, 2011 WL 6090236 *5 (E.D. Mich. Dec. 7, 2011) ("The medical examiner, however, indicated that the victim had been strangled to death, and petitioner's DNA had been found underneath the victim's fingernails . . . the victim fought for her life by scratching him."). In a strangulation case with a female victim, her DNA is necessarily present in overwhelming amount while "the male perpetrator's component will generally comprise a tiny fraction of the DNA present." *See* Dept. of Justice, National Institute of Justice, DNA for the Defense Bar at 14 (June 2012). For this reason, "the fingernail scrapings from a female victim who has scratched a male assailant may benefit from Y-STR analysis," which only targets the male "Y" chromosome. *Id.*

Prior to April, 2013, the Crime Lab had not yet adopted Y-STR technology and such examinations could not have been performed in Oregon. (Kaplan Letter dated 5/6/13, Docket No.

111, Exhibit A.) Fortunately, a Y-STR testing program was implemented by the lab during the same time that additional reviews were requested by the parties in this case.

On May 14 and 15, 2013, the Crime Lab issued its findings (Exhibit A, attached) which contain new profoundly exculpatory revelations:

**1.    BRIAN TUCKENBERRY'S DNA:**

In addtion to locating Brian Tuckenberry's DNA on fingernail clippings from the left hand (Kaplan Report, 4/12/13 at Docket No. 91), the Crime Lab has now discovered:

a.    Brian Tuckenberry's DNA was identified as a potential contributor to the vaginal sample ("cannot be excluded as a minor contributor") using conventional DNA amplification methods.  (Kaplan Report 5/14/2013, Exhibit A, p. 2.)

b.    Brian Tuckenberry's DNA is consistent with Y-STR results taken from the victim's vaginal samples.  (Kaplan Report 5/15/2013, Exhibit A, p. 7.)

c.    Brian Tuckenberry's DNA has been confirmed through Y-STR results to be on two separate fingernails on the left hand fingernail samples. (Kaplan Report 5/15/2013, Exhibit A, pp. 9-10).

**2.    ED MILLS' DNA:**

Based on its most recent findings reported on May 14 and May 15, 2013, the lab has now contradicted its findings from earlier lab reports issued in 2002 and 2013 that excluded Ed Mills as a DNA contributor in the forensic samples in this case.  The Crime Lab has now discovered:

a.    Ed Mills' DNA was identified as a potential contributor to the vaginal sample ("cannot be excluded as a minor contributor") using conventional DNA amplification methods. (Kaplan Report 5/14/2013, Exhibit A, p. 2.)

b. Ed Mills' DNA is consistent with Y-STR results taken from the victim's vaginal samples. (Kaplan Report 5/15/2013, Exhibit A, p. 7.)

c. Ed Mills' DNA is consistent with Y-STR results taken from two fingernails the victim's right hand. (Kaplan Report 5/15/2013, Exhibit A, p. 8.)

d. Ed Mills' DNA cannot be excluded from an additional fingernail using Y-STR results taken from the victim's right hand. (Kaplan Report 5/15/2013, Exhibit A, p. 9.)

e. Ed Mills' DNA cannot be excluded from Y-STR results taken from the victim's left hand. (Kaplan Report 5/15/2013, Exhibit A, p. 11.)

### 3. THE IDENTIFICATION OF MILLS AND TUCKENBERRY CONTRADICT LAB RESULTS FROM 2002.

On August 7, 2002, the Crime Lab issued a report on its findings with respect to DNA samples taken in connection with the Williams homicide investigation. Forensic Scientist Mary Krings performed the tests and wrote the report. It included a review of DNA from the vaginal samples and DNA from the right and left hand fingernails of the victim. Based on new forensic work performed by the Crime lab in 2013, the following findings from 2002 are no longer true:

a. **Contradicted:** In 2002, Ed Mills was excluded as a contributor to the vaginal sample. (Krings Report 8/7/2002, Exhibit B, p. 2.)

b. **Contradicted:** In 2002, the DNA of Williams, Roberts, and "a third individual" was located on the victim's right hand, but the "third individual" was not identified as male. (Krings Report 8/7/2002, Exhibit B, p. 2.)

c.  **Contradicted:**  In 2002, no male DNA of any kind was located on the victim's left hand.  (Krings Report 8/7/2002, Exhibit B, p. 2.)  The lack of male DNA is verified through lab notes that show only "XX" female chromosomes in the left hand samples.

**4.  THE DNA RESULTS SHOW THAT ED MILLS LIED TO POLICE:**

Ms. Roberts has located excerpts from the police reports and other discovery in this case that contain information about Ed Mills.  The Underhill Affidavit (Docket No. 111, Exhibit B, p. 34), also references and relies upon statements made by Ed Mills to support the theory of Ms. Roberts' guilt.  Mills' statements to police now appear to contain material falsehoods.

According to police reports prepared during the Portland Police Bureau's original investigation, "WILLIAMS was apparently going to [Ed] MILLS' residence on the day that she was last seen alive."  Police Report, Exhibit C.  This information was apparently related to police by Kathleen Loop, a friend of Williams who lived on 82nd Avenue at the Madison Suites Hotel.  During her own police interview, Lisa Roberts confirmed that Williams had made plans to spend the weekend away from home.  According to the detective report of Detective Austria regarding his interview of Roberts:

> The next morning they got up and WILLIAMS got ready and put a bag of clothes together for the weekend. ROBERTS stated that WILLIAMS wanted to go to MILLS's house.  ROBERTS stated that originally WILLIAMS was supposed to go camping with Dennis PRATHER, but PRATHER cancelled because he had to go to the hospital. ROBERTS stated that she drove WILLIAMS in COLLINS truck to MILLS's house.  In the truck WILLIAMS did not say what she was going to do. ROBERTS explained that she got to the McDonalds at NE 82nd Avenue and NE Fremont Street.  ROBERTS watched as WILLIAMS got out of the truck with her black bag of clothes and approach the front door to McDonalds. When ROBERTS saw WILLIAMS grab the front door, ROBERTS left the area.  ROBERTS

remembered the time being between 0900 and 0915 hours. ROBERTS remembered seeing WILLIAMS cell phone on her hip.

Police Report, Exhibit D.

Edward Mills was interviewed by police about his relationship with Williams and whether he was supposed to see her the weekend she died:

> After leaving COLLINS' residence, Detective M. Larson and this detective went to 3620 NE 82nd Avenue (Madison Suites Motel) to contact EDWARD MILLS. MILLS is a friend of WILLIAMS, and WILLIAMS would often stay with him on the weekends. MILLS had gone to Aberdeen to visit family during the weekend that WILLIAMS' body was found. MILLS was interviewed and he provided the following information:
>
> MILLS stated that he had met WILLIAMS several months back when she used to live at the Madison Suites Motel. MILLS stated that at the time, she was attending a drug rehab program and he would pick her up after the program and bring her back home. MILLS stated that the last time he had seen WILLIAMS was on either Thursday or Friday when he picked her up from the rehab and took her home. He remembered that on Saturday morning, WILLIAMS called him and asked him if he could come and pick her up. MILLS stated that ROBERTS got on the phone and also asked MILLS to come and pick WILLIAMS up.
>
> MILLS stated that ROBERTS wanted him to pick her up because ROBERTS and WILLIAMS were arguing, and ROBERTS had no way to bring WILLIAMS over. MILLS stated that WILLIAMS sounded okay on the phone but that he couldn't pick her up because he had to go to work. Detective Larson asked MILLS if there was any plans that he and WILLIAMS had made to have WILLIAMS spend the weekend with him. MILLS stated there were no plans because he knew he was going to be gone for the weekend in Aberdeen. MILLS stated that WILLIAMS never-did show up on that day and he had not spoken to her since that morning. MILLS then left on Sunday to go to Aberdeen to spend some time with his family. MILLS, who works at the Madison Suites as a handyman, told the manager, PATEL, that he would be back on Monday if he had his truck fixed.
>
> MILLS was asked to describe the relationships that WILLIAMS had with him and any other males. MILLS stated that he only knew of WILLIAMS being with a guy, that he knew only as FRANK JR. MILLS stated that FRANK JR. used to be WILLIAMS' boyfriend and he would often drink with her. MILLS stated that he knew WILLIAMS and ROBERTS had a relationship and that they often argued. He did not have any information that indicated the arguments were physical. MILLS

> himself stated that he has never had sex with WILLIAMS. She has simply come over and spent nights at his residence when WILLIAMS gets into arguments with ROBERTS. WILLIAMS would also stay over at this residence when ROBERTS has her kids over. MILLS was asked if he had any information about WILLIAMS' involvement in prostitution, and MILLS stated that she hasn't been involved in prostitution for a long time.
>
> MILLS stated that when he returned on Tuesday from Aberdeen, he was contacted by the manager PATEL and told that WILLIAMS was found dead. MILLS contacted ROBERTS on the phone and ROBERTS told him that WILLIAMS had been strangled and found nude at a park.
>
> MILLS was asked if he had any other information that would be helpful to the investigation. MILLS stated that he did recall that on Saturday around Noon, WILLIAMS had still not shown up. He recalled receiving a phone call from ROBERTS who was looking for WILLIAMS. ROBERTS told MILLS that she had dropped WILLIAMS off at the McDonald's to get something to eat. In addition, MILLS stated that his contact with WILLIAMS in public is very limited. He recalls going to eat with her at a restaurant maybe once or twice but other than that, they never went out together. MILLS stated that they had never gone camping or fishing together. Detective Larson asked MILLS if he would consent to swabs for DNA standards. MILLS consented and signed the Search By Consent form and oral swabs were taken from him. Refer to the Special Report by Detective M. Larson for the submittance of these swabs. MILLS had no further information to add and this interview was concluded.

Police Report, Exhibit E.

Mills lied about having sex with Jerri Williams. He had information about how the victim died (that she was found nude in a park) that he may have actually known from having committed the offense himself or being involved with the person who did. Contrary to his explanation that Williams could not stay with him for the weekend, he did not leave for his visit to Aberdeen until Sunday. Kathleen Loop also thought that Jerri had plans to come and visit him on Saturday.

Unfortunately Mr. Mills cannot be interviewed again regarding why he mislead police because he died in 2007.

**CONCLUSION**

The exculpatory DNA evidence discussed herein supports Ms. Roberts' habeas claims and shows that the lab reports and at least one of the witness statements from 2002 contains false information. Given the impact that this evidence could have had on the investigation of Ms. Williams' homicide and the advice given to Ms. Roberts by her lawyers about maintaining her plea of not guilty, these new developments seriously undermine confidence in the process by which Ms. Roberts was found guilty of manslaughter.

Respectfully submitted on May 24, 2013.

    */s/ Steven T. Wax*
Steven T. Wax

    */s/ Alison M. Clark*
Alison M. Clark
Attorneys for Petitioner