IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LISA MARIE ROBERTS,                          3:08-cv-01433-MA

               Petitioner,          OPINION AND ORDER

    v.

NANCY HOWTON,

              Respondent.


STEVEN T. WAX
Federal Public Defender
ALISON M. CLARK
Assistant Federal Public Defender
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204

     Attorneys for Petitioner

FREDERICK M. BOSS
Deputy Attorney General
ANDREW HALLMAN
SAMUEL A. KUBERNICK
Assistant Attorneys General
Department of Justice
1162 Court Street N.E.
Salem, Oregon 97301-4096

     Attorneys for Respondent

MARSH, Judge

1 -- OPINION AND ORDER

Petitioner, an inmate at Coffee Creek Correctional Facility, brings this habeas corpus proceeding pursuant to 28 U.S.C. § 2254. For the reasons set forth below, petitioner's Fourth Amended Petition (#173) is granted in part, and denied in part.

## BACKGROUND

On May 25, 2002, at approximately 2:55 p.m., the naked body of Jerri Lee Williams was found at Kelley Point Park in Portland, Oregon. The body was located in a downward sloping area, 15 feet from the curb of the parking lot, in some foliage and bushes. See Pet.'s Supp. Exh. to Reply (#230). According to the investigating officers, the body was visible from the parking lot and from the driver's side of a vehicle in the parking lot (later identified as belong to Adam and Anne Cross). Response in Opposition to Emergency Motion for Release (#111) (hereinafter "Response"), Att. I to Exh. B at 95 & 312. There was no evidence indicating that the body had been dragged. A pillowcase was found near the body. Former Deputy Medical Examiner Duane Bigoni estimated Williams' time of death to be 11:40 a.m. Response, Exh. B at 5. Deputy Medical Examiner Cliff Nelson performed an autopsy and determined that Williams died from manual strangulation. Dr. Nelson noted contusions on Williams' right tricep and right inner thigh.

On August 16, 2002, petitioner was arrested for the murder of Williams. Petitioner was indicted on charges of intentional Murder (O.R.S. 163.115(1)(a)), Assault in the Fourth Degree, Harassment

(two counts), and Menacing. Based upon a determination that petitioner was unable to aid and assist in her defense, petitioner was committed to the Oregon State Hospital (OSH) for treatment and evaluation. Approximately six months later, the trial court held an aid and assist hearing, and concluded petitioner was competent to proceed to trial.

Attorneys William Brennan and Patrick Sweeney were appointed to represent petitioner in 2004. On December 1, 2004, petitioner pled guilty to Manslaughter in the First Degree. At the plea hearing, petitioner admitted that she caused the death of Williams by strangulation. Petitioner was sentenced to a 180-month term of imprisonment, and three years post-prison supervision. The remaining counts in the indictment were dismissed.

Petitioner did not file a direct appeal. Almost two years later, petitioner filed a petition for state post-conviction relief. The trial court denied the petition, the Oregon Court of Appeals summarily affirmed, and the Oregon Supreme Court denied review.[1]

---

[1] The resolution of this proceeding is highly fact extensive, rendering it necessary for this court to review the voluminous record in this case and compile a detailed factual background. Neither party provided the court with a comprehensive summary of the facts. See Response to Fourth Amd. Pet. (#212) at 1; Pet.'s Reply Memo. in Support (#221) at 2. Similarly, the parties' factual and legal arguments are scattered throughout multiple pleadings rendering the resolution of this case more difficult.

## I.   THE PROSECUTION'S CASE

The police believed that petitioner killed Williams at home, placed her body in a sleeping bag (with a pillow case over her head), transported her body in a pickup truck, and dumped the body at Kelley Point Park.  See Response, Att. I to Exh. B at 28; Transcript Designation (#17), TR Vol. 4 at 290-94; Motion for Immediate Release (#156) (hereinafter "Motion for Release"), Exh. L, TR at 223-24.   The prosecution's case was premised upon circumstantial evidence, including a volatile "love triangle" between petitioner, Williams, and Terry Collins; petitioner's history of domestic violence; incriminating statements made by petitioner; and witness statements and cell phone tower evidence purporting to pinpoint petitioner near Kelley Point Park the morning of the murder.  See e.g. TR Vol. 4 at 313-321 & 333-35. Additionally, there was DNA evidence linking petitioner to the crime scene.

### A.   "Love Triangle" & History of Domestic Violence

Petitioner was in a romantic relationship with Terry Collins for approximately eight years.  They lived together as a couple. During the course of their relationship, Collins introduced petitioner to Williams.  Williams, also known as "Foxy," had a history of prostitution and drug use.  Petitioner and Williams became romantically involved, creating conflict between the three women.  Collins and petitioner argued about Williams and, during

one such argument, petitioner choked Collins to unconsciousness by wrapping her arm around Collins' neck (characterized by the police as a carotid artery hold). Response, Att. I to Exh. B at 223, 234-35 & 246. Collins' daughter, Jennifer Locke, also recalled a time when petitioner choked her mother to unconsciousness. Id. at 247.

On September 2, 2001, Collins punched and grabbed Williams around the neck at a restaurant. Id. at 174, 228-29 & 547-54. During the assault, Collins allegedly screamed "Bitch, I'll kill you if you don't leave my wife alone." Id. at 551 & 553. Collins was arrested and charged with Assault IV and Menacing. Id. at 550 & 554-55. The following morning, petitioner lured Williams into her truck, drove her to a different location, and repeatedly punched Williams in the face because petitioner was angry that Collins had been arrested. Id. at 174, 229, 234, 427-28 & 564; TR Vol. 4 at 312-18. According to petitioner, this is the only time she was violent toward Williams. Id. at 174, 275 & 454. Several acquaintances, however, told police otherwise.

Curtis Fields, with whom petitioner and Williams once lived, reported to police that he had noticed "choke marks" on Williams' neck, and had seen petitioner slam Williams against the wall and hit her on multiple occasions. Id. at 189 & 214. According to Kathleen Loop and Dennis Plather, Williams told them that fights with petitioner often became physical. Id. at 187 & 191; Motion for Release, Exh. U at 22.

Petitioner's feelings for Collins continued after their breakup, and petitioner became frustrated with Collins' involvement with other women (including "Naomi" and "Jueles"). <u>See</u> Response, Att. I to Exh. B at 198, 214, 930-38, 946-47, 964, 971-80, 1078, 1095 & 1104. Petitioner's frustration is reflected in her journal entries. <u>Id.</u> at 467-68 & 518-22; <u>see also</u> Exh. B at 44. Approximately one week before Williams' murder, Collins told petitioner that she was going to Reno to visit her girlfriend Jueles. Response, Att. I to Exh. B at 198 & 1095. Collins agreed to allow Locke to stay with petitioner provided Williams was not present. <u>Id.</u> at 172, 178, 198, 241 & 257. Williams was angry about having to leave for the weekend. <u>Id.</u> at 176 & 345-46.

On May 24, 2002, the day before the murder, petitioner drove Collins to the airport in Collins' red Mazda pickup. Petitioner kept the truck for her use while Collins was out of town. <u>Id.</u> at 173, 198, 346 & 409. Before going to the airport, they stopped at the Farmhouse Restaurant. According to Collins, petitioner was quiet and appeared upset. Williams repeatedly called petitioner because she was angry that petitioner was with Collins. <u>Id.</u> at 176, 198, 241, 346-47 & 421. At the end of one such call, petitioner stated that both Collins and Williams were "bitches." <u>Id.</u> at 198. However, according to petitioner, she and Williams made love that evening and/or the following morning. <u>Id.</u> at 177, 275 & 426-27.

6 -- OPINION AND ORDER

On Saturday May 25, 2002, the day Williams was murdered, petitioner picked up Locke for the weekend. Id. at 173, 177 & 242. The following day, the police came to petitioner's home and advised her that Williams was dead. Id. at 171-72 & 443. Petitioner did not inquire into the manner of Williams' death and, upon being informed that it was a homicide, never inquired into how Williams was killed or where she was found. Id. at 173, 414 & 456. According to Locke, after the police left, petitioner called a friend and asked for a gun and two bullets. Id. at 203; see also Att. I to Exh. B at 137-39 & 462.

On May 28, 2002, petitioner picked up Collins from the airport. Petitioner did not tell Collins that Williams was dead, and asked Locke and Julia Patterson (a friend of Collins) not to mention it to Collins. Id. at 200-01, 203 & 205; Motion for Release, Exh. U at 28. On that same day, petitioner told Ed Mills (a friend of Williams) that Williams had been strangled and found nude in a park. Response, Att. I to Exh. B at 206. Police found this suspicious because they believed the manner in which Williams was killed had not been made public.[2] Response, Exh. B at 34-35. ///

---

[2] According to petitioner, a grievance counselor that came to her home on May 26, 2002, informed her Williams had been strangled. Response, Att. I to Exh. B at 458 & 465; see also Motion for Release, Exh. L, TR at 203-04; and Pet.'s Exhs. to Memo. in Support of Pet. (#222), Exh. 15.

**B.   Petitioner's Statements Before and After the Murder**

**1.   Threats to Harm Williams**

According to Collins, petitioner stated on several occasions that she would "take care" of Williams, and put her "six feet under."   Response, Att. I to Exh. B at 197, 229-30 & 1104. Petitioner allegedly made this type of statement just days before Williams' death.  Id. at 197-98.  Similarly, Locke recalled a time when her mother and petitioner were talking about the need to keep Williams away from Locke.   During that conversation, petitioner allegedly stated that she would take care of the problem, even if she had to strangle her.  Id. at 248-49.

Pam Larkin, a friend of Collins, reported to police that she overheard petitioner say on two occasions that she would "take care of Foxy."  Id. at 140.   Larkin recounted a conversation at the Farmhouse Restaurant approximately one month before the murder. According to Larkin, petitioner looked at her from across the table and said "you will help Terry help me, if I do something stupid," and then flipped out a knife.  Id. at 141-42.

**2.  Prior Kidnapping Scheme**

Curtis Fields and his son-in-law, Daniel Miller, told police that on at least five occasions, petitioner asked for help to find some guys to abduct someone.  Id. at 214-16 & 343; Motion for Release, Exh. L, TR at 84-85.  Petitioner wanted the person to be taken to a secluded area so that she could do bodily harm to her.

Response, Att. I to Exh. B at 343.   Miller stated that petitioner did not identify the person to be kidnapped, but indicated that she wanted the person to be tied up and blindfolded, put in the trunk of a car, driven to somewhere off of Marine Drive, and left with only her socks on.  Id. at 216.  Fields identified the person to be kidnapped as "Naomi" (who was living with Collins at the time). Id. at 214.   Miller recalled that the last conversation was in April, 2002.  Id. at 216.

### 3.  Solicitation to Kill

While confined at OSH for the aid-and-assist evaluation, petitioner became acquainted with Sarah Ater (a patient incarcerated for solicitation and conspiracy to commit murder and arson).  Response, Att. G to Exh. B, TR at 33; see also Att. I to Exh. B at 617-21.  Ater testified that petitioner talked to her on two occasions seeking help to find someone to kill a man. Response, Att. G to Exh. B, TR at 37-48.   According to Ater, petitioner told her that she was innocent, that she was fearful of going to prison, and that a man who knew information about her relationship with Williams needed to die.  Id. at 37-48 & 61; and Att. I to Exh. B at 619-20.

Ater explained that petitioner was "very concerned about making sure that this person, a man, would not be around to . . . testify or provide any other information."  Response, Att. G. to Exh. B, TR at 39.  Petitioner identified the man to be killed as

Williams' boyfriend, and said that he killed Williams.  Response, Att. I to Exh. B at 620.  After her release from OSH, petitioner wrote a letter to Ater stating: "[S]till looking for that help, your crazy friend, Lisa."  Response, Att. G. to Exh. B (#117), TR at 70, and Att. I to Exh. B at 622.

### 4.  Admission to Marrissa Johnson

While confined at the Multnomah County Detention Center, petitioner allegedly made statements to fellow inmate Marrissa Johnson.  According to Johnson, petitioner told her that she had accidentally strangled Williams during an argument (using a cloth or cord), and took the body in a truck to a park.  Response, Att. I to Exh. B at 285; Motion for Release, Exh. L, TR at 133-34.  Johnson admitted to police that she had seen television coverage of the murder, but stated that the television was quickly turned off.[3]  Response, Att. I to Exh. B at 285 & 305; Motion for Release, Exh. L, TR at 132.

## C.  Petitioner's Travel Route

Key to the prosecution's case was the placement of petitioner near Kelley Point Park (west of Interstate 205) at the approximate time of Williams' death.  The prosecution found petitioner's statements regarding her route of travel, and her assertion that

---

[3] The District Attorney's Office entered into an agreement with Johnson regarding her sentence for Robbery in the Second Degree in exchange for Johnson's cooperation.  Response, Att. I to Exh. B at 287-89 & Motion for Release, Exh. L, TR at 129-30.

the closest she came to Kelley Point Park was I-205 and Marine Drive, to be contrary to physical data, scientific testing, and witness accounts. Response, Exh. B at 15.

**1.  The Starting Point**

Petitioner and Williams lived at 7865 N.E. 65th Avenue, Portland, Oregon.  At approximately 8:00 a.m. on May 25, 2002, Williams called her friend Kathleen Loop to say that she was coming to see her at the Madison Suites Motel (located at 3620 N.E. 82nd Avenue).  Response, Att. I to Exh. B at 172, 186 & 244.  Williams told Loop she first was going to the Fremont McDonald's (located at 3330 NE 82nd Avenue).  Motion for Release, Exh. U at 22.  According to petitioner, sometime between 9:00 and 9:30 a.m., she and Williams drove to 82nd and Fremont, where she dropped Williams off near the McDonald's.  Response, Att. I to Exh. B at 172, 177, 254, 411 & 437-38.

The prosecution was suspicious that petitioner provided seemingly inconsistent statements regarding Williams' plans for the weekend.  Petitioner originally stated that Williams was going to get something to eat, and then walk two blocks to the Madison Suites to meet Dennis Plather (with whom she planned to go camping).  Id. at 172.  Petitioner later told police that the camping trip had been cancelled, and Williams intended to spend the weekend at the Madison Suites with Ed Mills (a handyman at the

motel, and a friend with whom Williams once lived).  Id. at 172,
177, 185-86, 241-42, 255-57, 410-11, 422-24, 428 & 460.

The prosecution also was suspicious that petitioner provided
inconsistent statements regarding what she saw Williams doing after
petitioner dropped her off on 82nd Avenue.  Petitioner originally
stated to police that she last saw Williams walking toward the
Madison Suites.  Id. at 173; Pet.'s Reply Memo. in Support, Exh. 20
at 1.  However, petitioner later stated that she saw Williams
approach the front door of the McDonald's Restaurant.  Response,
Att. I to Exh. B at 177, 258 & 430.  According to Kathleen Loop and
Ed Mills, Williams never showed up at the Madison Suites.  Id. at
244-45.

**2.  Path of Travel to Locke's Home**

On at least two occasions, petitioner explained to police her
travel route from 82nd and Fremont to Locke's home at 18451 N.E.
Multnomah (estimating that she arrived in approximately 45
minutes).  Id. at 262 & 438.  On August 6, 2002, petitioner
explained her route from 82nd to Locke's home as follows: (1) she
"hit" I-205, proceeded northbound and missed the I-84 exit to The
Dalles; (2) got off at Marine Drive; and (3) went straight up a
road between some warehouses to Sandy Boulevard, "hit" 181st Avenue,
and proceeded to Locke's house.  Id. at 261-64.  In describing her
route, petitioner told police she did not know the location of
Kelley Point Park.  Id. at 268.  When advised of its location, she

stated that the closest she came to the park would have been at I-205 and Marine Drive.  Id. at 270.

On August 16, 2002, Detective Austria provided petitioner a Thomas Guide to aid in their discussion.  Id. at 431; Pet.'s Exhs. Motion for Release, Exh. L, TR at 120-22.  With the aid of a map, petitioner recited her path of travel as follows: (1) she headed north on 82nd and took Sandy Boulevard to I-205 heading south; (2) missed the I-84 exit to The Dalles; (3) turned around at Stark and Washington, and proceeded north on I-205; (4) missed The Dalles exit again; (5) continued north on I-205 to either Airport Way or Marine Drive, got lost in some parking lots, and took a shortcut to Marine Drive heading east; and (6) took a numbered street she couldn't remember, passed by some warehouses and house boats, eventually hit 181st and proceeded to Locke's house.  Response, Att. I to Exh. B at 432-37; Motion for Release, Exh. L, TR at 120-22. Petitioner again stated that the closest she came to Kelley Point Park would have been I-205 and Marine Drive.  Response, Exh. B at 13 & 15; Att. I to Exh. B at 449.

In an attempt to trace petitioner's path of travel, the prosecution obtained her telephone records.  The call detail records indicate that on the morning of the murder, petitioner called Locke at 9:38 a.m.; Locke called petitioner at 10:27:19 a.m.; and petitioner made a second phone call to Locke at 10:27:59 a.m.  Response, Att. I to Exh. B at 759.  Of particular interest to

the police was petitioner's second call to Locke which connected to a cell phone tower located at 2001 Kotobuki Way, Vancouver, Washington (approximately three miles from Kelley Point Park). Id. at 19, 808-810 & 813; & Exh. B at 13. Assuming that the closest and/or strongest cell tower would pick up petitioner's call, the prosecution believed that this demonstrated that petitioner was at or near Kelley Point Park at 10:27:59 a.m., and that she had lied when she stated that the closest she came to Kelley Point Park was I-205 and Marine Drive. See Response, Exh. B at 22; Motion for Release, Exh. L, TR. at 96- 106, 184-85 & 219.

The prosecution also considered petitioner's proximity to Kelley Point Park (and west of I-205) to be supported by a statement from Julia Patterson. Patterson, a friend of Collins, told police that she saw Collins' red pickup truck traveling eastbound on Marine Drive between N.E. 33rd and 122nd. Response, Att. I to Exh. B at 204. Thinking it odd that the truck was being driven while Collins was in Reno, Patterson immediately called Collins. Id. Telephone records show that this call was made at approximately 10:36 a.m., and routed initially to a cell phone tower located at 6455 N.E. Columbia Blvd. (west of I-205). Id. at 706, 743 & 746.

Petitioner provided police no explanation for Patterson's sighting of Collins' truck traveling eastbound on Marine Drive. Id. at 414. However, petitioner opined that it was *not* peculiar

that her 10:27:59 a.m. telephone call to Locke was routed to the Kotobuki Way cell tower in Vancouver. Petitioner explained that it is "just like if [she] were at the armory [-] one side of the building it said Portland [and] you go to the other side and it comes in Vancouver." Id. at 459.

According to then Assistant District Attorney Rodney Underhill, an employee of Verison Wireless opined that petitioner's 10:27:59 a.m. telephone call had, in fact, been placed near Kelley Point Park. Michael Bethers, Special Agent in the Criminal Justice Division of the Oregon Department of Justice, agrees with this conclusion. Bethers opines that although "cell phone tower data cannot *pinpoint* a person's exact location, such data does provide useful, accurate information about a person's general whereabouts during a given time frame, as well as information about where a person was *not* likely located during a particular time period." Bethers Dec. (#216) at ¶¶ 5 & 11. Bethers concludes that petitioner's call detail records refute her assertion that she did not travel west of I-205:

> Records received from Verizon . . . show that there were two significant calls on Petitioner's cell phone records on May 25, 2002 at approximately 10:27 am. There was an incoming call at 10:27:19 from Jennifer Locke to petitioner. Receiving this call, petitioner's phone connected with cell tower 106, located at 415 E. 13th St. in Vancouver, WA. Forty seconds later at 10:25:59, petitioner called Jennifer Locke. Petitioner's phone connected with cell tower 5, located at 2100 Kotobuki Way in Vancouver, WA. Cell tower 5 is about three miles from where Ms. Williams' body was discovered. Towers 5 and

106 are approximately 1.3 miles apart, with Tower 5 being east of Tower 106.[4]  *For Petitioner's statement that she was not west of I-205 on the day of Ms. Williams' murder to be accurate, the call to Locke would have had to bypass or "defeat" numerous other cell towers between petitioner's purported location at the time of the call and the Kotobuki Way and E. 13th St. towers.*  From my knowledge of cell phone systems, tower data, the number of cell tower sites available in the relevant geographic area, and what is well accepted in the field of [call detail records], *it is not possible for a telephone call to bypass or "defeat" that many other towers.*

Id. at ¶ 7 (record citations omitted, emphasis added).

### 3.  Petitioner's Arrival

Petitioner estimated that she picked up Locke between 10:00 and 11:00 a.m.  Response, Att. I to Exh. B at 177 & 262.  This approximation is consistent with Locke's estimate that petitioner arrived 15 to 25 minutes after petitioner's last call to her.[5]  Id. at 201 & 247.

At 11:42 a.m., a three-second telephone call was made to Williams' cell phone, which connected to a cell tower located near petitioner's home.  Response, Exh. B at 23-24 & Att. I to Exh. B at 21; but see Att. I to Exh. B at 695.  The prosecution opined that

---

[4] This is incorrect.  Tower 106 is east of Tower 5. Teesdale Dec. (#157) at 23 & Exh. A.  According to petitioner, this fact undermines the State's theory that petitioner was further west when she received Locke's call.  Pet.'s Factual Memo. (#168) at 38-39.

[5] Locke told police that she telephoned her mother once or twice between 1:00 and 2:00 p.m., while waiting to be picked up by petitioner.  Response, Att. I to Exh. B at 201 & 247. However, telephone records reflect that the last time Locke spoke to her mother was at 10:42 a.m.  Id. at 706.

this call coincided with Locke and petitioner's return to petitioner's home. Response, Exh. B at 24. Williams' cell phone was never found. Motion for Release, Exh. L, TR at 157.

D. **DNA Evidence**

Police collected evidence from the scene of the murder, including the pillowcase found near Williams' body. Response, Att. B to Exh. B at 3. Additional evidence was collected in a postmortem examination of Williams, including vaginal swabs, breast swabs, and fingernail clippings. Response, Att. I to Exh. B at 476-79. The evidence was submitted to the Oregon Department of State Police Forensic Laboratory. Sperm was detected on the vaginal swabs, and the evidence was forwarded to the State Police Forensic Laboratory DNA Unit for analysis. Id. at 476-79. On July 22, 2002; a DNA sample from the spermatozoa was searched against the Oregon State Police Forensic DNA database, but no match was found. Response, Att. B to Exh. B at 131-34.

On August 7, 2002, Forensic Scientist Mary Krings issued a report, which included the following findings:

> 1. DNA from more than one person was detected on both the sperm fraction of the **vaginal swabs** (Exhibit 6.4), and the **breast swab** (Exhibit 6.8). The major profile is consistent with coming from Jerri Williams. Ed Mills, Daniel Miller, Curtis Fields, [and] Lisa Roberts . . . are all excluded as contributors to the minor profile(s). The minor profile(s) has been compared to profiles stored in the Oregon State Police databases. No matches were found at this time; however, the minor profile(s) is below the threshold for entry into the database or for making a more conclusive determination.

2.    DNA from more than one person was detected on the
**right hand fingernails** (Exhibit 6.9).   The female DNA
foreign to Jerri Williams is consistent with coming from
**Lisa Roberts**.   The estimated frequency of occurrence of
an unrelated individual in a random population exhibiting
this STR profile is

     1 in 459 million Caucasians
     1 in 4.49 billion in African Americans
     1 in 4.45 billion in Hispanics

     DNA from a third individual is also present at
     levels too low to make a conclusive determination.

3.    No DNA foreign to Jerri Williams was detected on the
left hand fingernails (Exhibit 6.10).

4.    DNA from more than one person was detected on the
**pillowcase** (Exhibits 7.2-7.4).   Jerri Williams and **Lisa
Roberts** cannot be excluded as major contributors of the
DNA to this exhibit.   The number of unrelated individuals
in a random population who also could have been major
contributors to this exhibit is

     1 in 529,000 in Caucasians
     1 in 5,760,000 in African Americans
     1 in 1,180,000 in Hispanics.

Ed Mills, Daniel Miller, Curtis Fields . . . are all
excluded as major contributors to the mixture.   The minor
profile(s) is below the threshold for entry into the
database or for making a conclusive determination.

Response, Att. I to Exh. B at 497-98 (emphasis added).

Police opined that the spermatozoa in Williams' vagina could

have been deposited 48 hours or more prior to her death, and

believed that its presence was not necessarily suspect because

Williams had a history of prostitution.   Motion for Release, Exh.

L, TR at 177-81 & 197-200.   The presence of petitioner's DNA under

Williams' fingernails could be explained by petitioner's statements

18 -- OPINION AND ORDER

to police that she and Williams had sex the night before her murder. Id. at 150.

However, police considered the presence of petitioner's DNA on the pillowcase highly suspect because there was no evidence that Williams took the pillowcase with her when she allegedly departed for 82nd Avenue. Therefore, its presence at the crime scene supported the prosecution's theory that petitioner had brought it with her when she transported Williams' dead body to the park. Id. at 182. However, Williams' DNA was not found on the sleeping bag seized from petitioner's home, or the fibers and swabs taken from the red Mazda pickup truck. See Response, Att. I to Exh. B at 34, 179, 492 & 499; Motion for Release, Exh. L, TR at 156-57.

II. **NEW EVIDENCE**

Petitioner offers new evidence in the instant proceeding to prove that she is actually innocent, and that Brian Tuckenberry (an Oregon Department of Corrections inmate) is the murderer. Petitioner asserts that this new evidence "debunk[s] the State's theory that Ms. Williams was killed before 10:27 a.m." and the State's reliance upon "a telephone call bouncing off a cell tower in Vancouver, Washington," to prove that petitioner was near Kelley Point Park. Pet.'s Reply Memo. in Support (#221) at 1-2. Petitioner's new evidence includes the following.

///

///

19 -- OPINION AND ORDER

A.   **A Different Suspect**

1.   **Discovery of Brian Tuckenberry's DNA**

In April and May, 2013, additional DNA analysis was performed using new Y-STR technology.[6]  On May 15, 2013, Forensic Scientist Maria Kaplan issued a report concluding that the Y-STR profiles obtained from Williams' vaginal swabs and left fingernail clippings were consistent with the Y-STR profiles of Brian Tuckenberry. Pet.'s Supp. Memo. (#130), Exh. A at 4-12.  The Report provides:

>   1.   The Y-STR profiles obtained from the sperm found in the **vaginal swabs** are a mixture of at least three individuals.  The predominant contributor mixtures are both consistent with the Y-STR profiles of **Brian Tuckenberry** and **Edward Mills**."
>
>   2.   The Y-STR profiles obtained from the **right hand fingernail clippings** are a mixture of multiple people.  The major contributor matches the Y-STR profile of **Edward Mills**. Due to low levels of DNA, the minor contributors could not be identified.
>
>   3.   The Y-STR profiles obtained from the **left hand fingernail clippings** are a mixture consistent with two contributors.  The major contributor matches the Y-STR profile of **Brian Tuckenberry**.  Due to low levels of DNA, the minor contributor could not be identified.

Id.

---

[6] Polymerase Chain Reaction (PCR)-based Y-Chromosome Short Tandem Repeat (Y-STR) typing involves the examination of the DNA on the Y chromosome.  It is highly suited for DNA samples that are mixtures or where the female portion is at high levels. Pet.'s Memo. in Support of Discovery (#35), Exh. L at 2.

### 2.  Brian Tuckenberry's Criminal History of Violence

Brian Tuckenberry currently is serving a 111-month sentence pursuant to his plea of no contest to charges of Sex Abuse in the First Degree and Burglary in the First Degree. Motion for Release, Exh. F. at 30-33. Tuckenberry committed those offenses on June 12, 2010, when he broke into the home of his former girlfriend, Rhiannon Miller. Id. at 57-61.

Miller had been in a long-term relationship with Tuckenberry, and worked for him as a prostitute. Id. at 34-36; Pet.'s Exhs. to Memo. in Support, Exh. 9 at ¶ 1. Miller told police that Tuckenberry raped her while her children slept in another room. Tuckenberry held her down by putting his forearm across her neck. Motion for Release, Exh. F at 59.

Previously, in April 2010, Miller had accused Tuckenberry of strangling her. Id. at 34-38 & 82-99. Miller told police that Tuckenberry punched her in the back of the head, and then grabbed her throat with both hands strangling her until she thought she was going to die. Id. at 85; Pet.'s Exhs. to Memo. in Support, Exh. 9 at ¶ 1. In a recent declaration submitted to this court, Miller explains Tuckenberry's violent nature and his propensity to strangle women during sexual intercourse:

> 3.  During the course of my relationship with Mr.
> Tuckenberry, he emotionally, physically, and sexually
> abused me on a routine basis. * * * These assaults
> happened so often during the course of our relationship

that it became almost routine and Mr. Tuckenberry would not hesitate to assault me in front of others.

4.  I remember the first time that I had sexual intercourse with Tuckenberry.  During sex, Tuckenberry grabbed my throat and started choking me and said that "blonde girls like to be choked."  * * * Sometimes when he choked me during sex he went too far and I thought I would pass out.

5.  I recall one particular incident that happened around the time that we went to St. Louis. * * * Mr. Tuckenberry blew up with no warning, threw me down on the bed . . . [and] said to me: "*I'll do you like I did the others.*"

6.  Tuckenberry has threatened to kill me on many other occasions . . . .

Pet.'s Exhs. to Memo. in Support, Exh. 9 (emphasis added); see also

Exh. 6 at 3.

Tuckenberry's criminal history includes allegations of

violence against other women, including assault and promoting

prostitution.  See Motion for Release, Exhs. F & U at 2-5; Teesdale

Dec. (#145), Att. A-L.  Of particular relevance are the allegations

of Andrea Bunch:

1.  I first met Brian Tuckenberry in 2004 when he worked at the drive-through window at McDonald's at NE 82nd Avenue near Madison High School.  We were together for seven years and he abused me the whole time.  Three to four weeks after I met Tuckenberry he quit his job at McDonald's.  I understand he worked there for about a year. * * * *

2.  In 2004, Tuckenberry was selling drugs and picking up females and having them prostitute. * * * Tuckenberry would control the girls by giving them cocaine, alcohol, and hitting them.

* * * * *

5. * * * Tuckenberry told me what he had done to others.  He said he would hit the women and if they didn't fall he would kick them in the belly.  He also told me that he had sent some of his victims to the hospital with broken arms, fractured legs and broken ribs.

* * * * *

7.  Tuckenberry would hit me on both sides of my head and in places where others couldn't see the abuse. He fractured both sides of my jaw, but would not allow me to go to the hospital. * * * At other times he has hit me hard enough on both sides of my head to knock me unconscious. * * *

* * * * *

9.  In 2009, * * * I tried to leave Tuckenberry.  I had a bag packed but Tuckenberry said *"I will choke you and kill you like I did the other bitch."* * * *

10.  During sex Tuckenberry would pull my head back by my hair and use both hands around my throat and would squeeze my neck, choking me.  I would tell him no, but he would not stop.  I would have trouble breathing and I was afraid that he might kill me.  The choking during sex would get worse throughout the relationship to the point it would be hard to breathe.  I would be close to passing out and he would carry on with the choking until he climaxed.

Pet.'s Exhs. to Memo. in Support, Exh. 8 (emphasis added).

### 3.  **Tuckenberry's Connection to Jerri Williams**

According to Andrea Bunch, "[t]he Madison Suites was a place to drink and get drugs."  Id., Exh. 8 at ¶ 14.  Tuckenberry once lived at the Madison Suites Motel, and when he moved out he frequently visited friends who still lived there.  Id. & Exh. 9 at ¶ 14.

23 -- OPINION AND ORDER

Aaron Williams, Jerri Williams' son, confirms that Tuckenberry lived at the Madison Suites Motel in early 2001. Id., Exh. 5 at ¶¶ 2-3. Tuckenberry was a pimp and part of the "82nd Street Gang." The gang operated on 82nd Avenue between Fremont and Flavel Streets, and "generally ran the Madison Suites." Id. at ¶¶ 3-4. Aaron Williams accuses Tuckenberry of harassing Jerri Williams and trying to force her to prostitute for him:

> 5.   From the time that we first moved into the Madison Suites in early 2001, Brian Tuckenberry tried to recruit my mom to be one of his prostitutes. * * * I told Brian to back off but he was very persistent in an annoying way because he wanted to add my mom to his roster.  It was clear that Brian was pissed off that my mom would not do what he wanted. * * *
>
> 6.   Brian's attempts to get my mother to be his prostitute carried on from early 2001 up until approximately the end of July 2001, when I returned home to find Brian with my mom in the corner with his hands on her shoulders.  I don't know exactly what he said to her but it was obvious that he was again trying to get her to prostitute. * * *

Id. at ¶¶ 5-6; see also Exh. 9 at ¶ 13.

Several other witnesses provide relevant information about Tuckenberry's connection to Williams, as well as his familiarity with Kelley Point Park.  Loop recalled that Williams left the Madison Suites on the Thursday before her death with a man she knew only as "Brian."[7]  Response, Att. I to Exh. B at 195.  An employee at the Fremont McDonald's identified Tuckenberry as being part of

---

[7] However, Loop told investigator that the "Brian" to whom she was referring has since died.  Teesdale Dec. (#149) at ¶ 4.

the unsavory "morning crowd" at the restaurant.   Teesdale Dec.
(#157) at ¶ 29.  A former girlfriend of Tuckenberry recounts a time
when she and Tuckenberry visited Kelley Point Park and parked in
the north parking lot (where Williams' body was found).   Pet.'s
Exhs. to Memo. in Support, Exh. 7 at ¶¶ 2-6.

Finally, petitioner offers evidence to support the conclusion
that Williams was strangled in the same manner as were Miller and
Bunch, and not from behind the back (as petitioner had done to
Collins).  Dr. Michael T. Propst, a forensic pathologist, examined
photographs of Williams, and opines that the assailant strangled
Williams from the front using both hands.[8]  Pet.'s Supp. Exhs.
(#187), Exh. Y at 5-7.  Additionally, Dr. Propst opines that the
bruises on Williams' right thigh depict finger marks - strongly
suggestive of sexual assault or rape.  Id. at 7-8.  Based upon his
examination of the evidence, Propst concludes that (1) Williams'
body was dumped in the location it was found; (2) the assailant was
probably male; and (3) if the assailant was female she would have
incurred visible injuries as a result of the altercation.  Id. at
8-9.

///

///

---

[8] Petitioner offers evidence that her finger was in a splint
to support the conclusion that she was unable to choke Williams
with both hands.  Motion for Release, Exh. T; Response, Att. I to
Exh. B at 224, 229 & 385-86.

**B.    Cell Phone Tower Evidence**

Petitioner offers the expert reports of Jeff Fischbach and Manfred Schenk to refute the prosecution's theory that (1) the connection of petitioner's cell phone call to the Kotobuki Way tower demonstrates she was near Kelley Point Park; and (2) the wire transfer information reflects that she was heading in an easterly direction away from Kelley Point Park and toward I-205.

Jeff Fischbach, a forensic technologist, addresses the reliability of the prosecution's theory as follows:

8.    Kelley Point Park is approximately 3.4 miles southwest of the 2100 Kotobuki Way cell tower. The Kotobuki Way tower * * * is approximately 55 feet tall. This height suggests an engineered-intent to cover a significant area, or "footprint."

9.    The height of a tower generally affects the size of the area it covers. * * * Towers like the Kotobuki Way area generally cover an area that makes identifying a discrete location where a particular call originated much more difficult.

10.    The 10:27 call from the cell phone linked to Lisa Roberts could have been made from anywhere within the range of the Kotobuki Way cell phone tower, which could have had a range of at least 10 miles on a day with clear weather. A call could have reached the cell tower from beyond this range, especially if call load caused a call to relay from another tower.

11.    To identify where a call may have originated, it is necessary to examine the network of cell towers systematically, rather than only looking at the signal of a particular tower received. * * * A dense metropolitan area such as Portland has numerous cell phone towers. * * * Even if the Kotobuki Way tower is the closest tower to the park, this is not reliable proof that a call originated from that discrete area.

12. * * * Pinpointing a call as originating from a
particular park within a portion of a city is virtually
impossible, especially given the number of variables
presented in this case involving tower height and lack of
certain crucial records.

* * * * *

15. Based on my expertise and review of the evidence in
this case, the cell tower information did not pinpoint
whether a call originated from Kelley Point Park or
reliably identify the direction from which a particular
call was made.

Brief in Support of Leave to Amend (#42), Exh. R at 3-5.

Manfred Schenk, Chief Technology Officer of Cherry Biometrics,

Inc., opines that the tower to which a cell phone call connects

also may be affected by the cell phone provider's proprietary

software (which takes into account factors wholly unrelated to

whether a tower has the strongest measurable signal).[9]   Pet.'s

Exhs. to Memo. in Support, Exh. 22 at 1-2.

Lastly, petitioner offers evidence to support her assertion

that it was not peculiar that her 10:27:59 a.m. call connected to

the Kotobuki Way tower.   See Response, Att. I to Exh. B at 459.

Petitioner's co-worker, James Pederson, told a defense investigator

that a large number of his calls made in the vicinity of the

National Guard Armory (located at 10000 NE 33rd Drive) often were

listed on his phone bill as coming from Vancouver.   Teesdale Dec.

---

[9] Mr. Schenk's reports do not contain a recitation of his
qualifications as an expert.   See United States v. Eady, 2013 WL
4680527 *1 n.3 (D.S.C. Aug. 30, 2013) (questioning his
qualifications as an expert).

(#145) at 26-27.  Petitioner also offers her own cell phone records from April 12, 2002, to May 5, 2002, which include multiple calls connecting to a Vancouver tower.  Id. at 27-28; see Bethers' Dec. (#216) at 5 (addressing tower connection of petitioner's calls from Camp Withycombe rather than the armory).

## C.   Time of Death

As noted above, the prosecution estimated Williams' time of death to be 11:40 a.m.  Former Oregon Medical Examiner William Brady opined that the time of death was "later in the morning." Motion for Release, Exh. J.  Forensic Pathologist Propst now estimates the time of death to be between 11:55 a.m. and 12:55 p.m. Motion for Release, Exh. E. & Supp. Exhs. (#187), Exh. Y at 1-4. Petitioner contends that the observations of several park visitors supports Dr. Propst's opinion that Williams' estimated time of death was later than that theorized by the prosecution.

### 1.   Blue Van (12:00 p.m.)

Between 12:00 and 12:35 p.m., two park visitors (Guy Turner and Melanie Cooke) saw a blue Chevy van driving on the back paths of the park.  Pet.'s Renewed Motion to Unseal (#206) at 3-4.  Both witnesses told police that this was uncommon and that the driver looked suspicious.  Turner stated that the driver was male, approximately 20 to 30 years old, 5'8" tall, 150 pounds, with shoulder-length dark hair.  Response, Att. I to Exh. B at 85;

Pet.'s Audio/Video Exhs. (#226), Exh. 13.  Aside from this general description, neither witness was able to identify the driver.

Petitioner suggests that the van may have been used to dump Williams' body at the park.  Pet.'s Reply Memo. in Support at 11. Two former residents of the Madison Suites recall seeing a blue van at the motel.  Pet.'s Exhs. to Memo. in Support, Exh. 21 at 2.

### 2.  Man and Woman Arguing (1:00 p.m.)

The Tindall family visited the park on May 25, 2002, at approximately 1:00 p.m.  They parked in the north parking lot where Williams' body was found.  Teesdale Decs. (#145) at 14 & (#157) at ¶ 6.  Norma Tindall called the police two days after the murder to report that she had seen a man and a woman arguing in the park, and was concerned that the woman may have been Williams.  According to the police report, Norma Tindall could not provide a description of the woman.  She told police the man was white, approximately 6' tall, and 200 pounds.  The man and woman were in separate cars, and the woman had her face in her hands.  Response, Att. I to Exh. B at 109.  Norma Tindall later told defense counsel that the woman had brown hair, the man had black hair, and the man was pacing around a car with different-colored doors.  Teesdale Dec. (#145) at 13.

In 2013, petitioner's habeas investigator interviewed Norma Tindall, her husband Everett, and her son Jeff.  The Tindalls recalled that the woman at the park had dark shoulder-length hair (similar to Williams'), and she was in the car with different-

colored doors. Teesdale Decs. (#149) at ¶ 13 & (#157) at ¶¶ 9 &
11. The man was in his thirties, and looked Italian or Hispanic.
The man's car may have been a Jeep. The man appeared hostile and
seemed to be waiting for the Tindalls to leave. Teesdale Decs.
(#149) at ¶ 14 & (#157) at ¶¶ 9-14. Ultimately, the Tindalls were
unable to identify either the woman or man (despite being shown
pictures of Williams and 16 people "known to have been in contact
with the victim close in time to her death, new suspects, or
criminal associates of those suspects"). Teesdale Dec. (#157) at
¶¶ 15-21.

### 3. Williams' Body (2:30-3:00 p.m.)

Anne and Adam Cross told police that they arrived at Kelley
Point Park on May 25, 2002, between 2:30 and 3:00 p.m. They parked
their car in the north parking lot approximately 50 feet from where
Williams' body was found. Response, Att. I to Exh. B at 95, 127,
166-67; Teesdale Dec. (#145) at 25. Adam Cross was driving the
car, and Anne Cross was the passenger. Response, Att. I to Exh. B
at 166.

Mr. Cross originally told investigating officers at the crime
scene that upon exiting their car, they walked to the back of the
car and headed toward a path on the north end of the parking lot.
Id. at 95 & 167. Mr. Cross stated that he wasn't paying any
attention to anything in front of the vehicle. Id. at 167. Mrs.
Cross similarly told police that her focus was on the dog in the

backseat of the car.  Id.  When they returned to their car it was inside the crime scene tape.  Teesdale Dec. (#149) at ¶ 16.

However, after viewing a video of the crime scene in 2014, which shows the proximity of Williams' body to their car, both Mr. and Mrs. Cross are now certain they would have seen the body had it been present when they parked their car.  Second Supp. Exhs. to Reply Memo. (#232), Atts. 1 & 2; Supp. Exhs. to Reply Memo., Att. 1.

## D.  Other Suspects

Based upon the presence of Ed Mills' DNA on vaginal swabs taken from Williams, petitioner suggests Mills should be considered a suspect.  Petitioner also suggests that Alex Shanks (aka Joe), Charles Evans, Jr. (aka Frank Jr.), Tyson Nettles, and Dennis Plather should be considered suspects in the murder.  These individuals are implicated primarily by the sighting of a car with different-colored doors at the Madison Suites Motel, and a car of a similar description at Kelley Point Park.  Petitioner speculates that one of the suspects may have been the man arguing with the woman in the park.[10]

///

------

[10] When interviewed by police on May 28, 2002, petitioner stated she could only think of three men who might have killed Williams – Frank, Joe and Arnett.  She could not explain why they might do this, but stated that Williams "used to run drugs to Mexico for these guys."  Response, Att. I to Exh. B at 178.

### 1. Ed Mills

Ed Mills was a handyman at the Madison Suites and met Williams when she lived at the motel. Response, Att. I to Exh. B at 205. After Williams moved from the motel, she occasionally would stay with Mills. Id. at 186, 195, 205-06, 213 & 243. Williams visited Mills on the Thursday and Friday before her murder. Id. at 186, 190, 195, 205 & 421. Mills told police that both petitioner and Williams knew that Williams could not stay with him that weekend due to his plans to leave town. Id. at 206 & 243. Mills did not leave town until Sunday. Id. at 206.

Mills told police that he never had sex with Williams. Id. This statement proved false in light of new DNA analysis concluding that sperm taken from Williams' vaginal swabs was consistent with Mills' Y-STR profile. Aaron Williams identified Mills as one of his mother's regular "Johns." Pet.'s Exhs. to Memo. in Support, Exh. 5 at ¶ 8.

### 2. Alex Shanks

Prior to her death, Williams allegedly was involved in a conspiracy with Alex Shanks (aka "Joe") to transport drugs to or from California in different cars. Response, Att. I to Exh. B at 178; Motion for Release, Exh. U at 12, 21 & 25; Teesdale Dec. (#145) at 12. Alex Shanks registered cars in Williams' name, including one which was registered to Williams after her death. Motion for Release, Exh. U at 10-25.

Kathleen Loop told investigators that days before Williams'
murder, a small black man named "Alex" drove a car, with different
colored doors, to the Madison Suites.  Motion for Release, Exh. U
at 22.   However, when Loop was shown pictures of 17 "people of
interest," she was unable to identify the man driving the car.
Teesdale Dec. (#157) at ¶ 3.  According to a defense investigator,
Shanks admitted he took a car to Williams the week before her
death.   Motion for Release, Exh. U at 21.    Both Shanks and
Tuckenberry are "known to be from Mississippi," and were customers
of the Fremont McDonald's.[11]   Id. at 24; Pet.'s Exhs. to Memo. in
Support, Exh. 12 at 2; Teesdale Dec. (#157) at 13-14.   Shanks has
been excluded as a contributor to the DNA obtained from Williams'
vaginal swabs.  Response to Renewed Motion for Release (#183), Att.
A at 1.

### 3.  Charles Evans, Jr.

Charles Evans, Jr. was Williams' former "boyfriend," with whom
Williams lived for a short period of time.  Response, Att. I to
Exh. B at 206, 213 & 277.  Evans may have been the father of some
of Williams' children, and may have been involved in drug activity
with Williams.  Id. at 178, 186, 206 & 277; Teesdale Dec. (#149) at

---

[11] In the month before Williams' death, Shanks was being
investigated by the U.S. Attorney's Office and the Multnomah
County Sheriff for his involvement in the drug conspiracy.
Motion for Release, Exh. U at 10-20.  Shanks was aware that a co-
conspirator was cooperating with the authorities.  Id. at 12-14.

2-3.   Loop told an investigator that a week before Williams'
murder, Williams' "ex" and the father of her children, gave
Williams $350.00 and agreed to pay for a car.   Motion for Release,
Exh. U at 22; Teesdale Dec. (#149) at 2-3.   Evans may have been the
small black man Loop saw driving the car with the different-colored
doors.   Teesdale Dec. (#157) at ¶¶ 3-4.

### 4.   Dennis Plather

Plather had a sexual relationship with Williams.   Plather
lived five minutes from Kelley Point Park and refused to provide a
DNA sample.[12]   Teesdale Dec. (#145) at 16-17.   Petitioner contends
that Plather's statements concerning the cancelled camping trip
with Williams were inconsistent.

Norma Tindall originally identified the man arguing with a
woman in the park as a white man with dark shoulder-length hair.
Petitioner suggests this might be Dennis Plather.   Teesdale Dec.
(#145) at 17.

### 5.   Tyson Nettles

Williams placed a telephone call to Tyson Nettles on May 1,
2002.   Teesdale Dec. (#149) at 4; Motion for Release, Exh. H at
673.   Nettles was a customer at the Fremont McDonald's and often
came into the restaurant with two or three black men.   Teesdale

---

[12] Petitioner called Plather on May 25, 2002, at 10:40:23,
immediately after her call that connected to the Kotobuki Way
tower.   Response, Att. I to Exh. B at 808; Motion for Release,
Exh. L, TR at 101.

Dec. (#149) at ¶ 7.   Nettles has a violent criminal history, including attempted rape and strangulation.  Teesdale Dec. (#149) at ¶ 6.   Nettles has been excluded as a contributor to the DNA mixture obtained from Williams' vaginal swabs, breast swabs, and right hand fingernail.   Response to Renewed Motion for Release, Att. A at 2.  Petitioner suggests that Tuckenberry may have been one of the black men who came to the restaurant with Nettles given the fact that Tuckenberry was a morning customer.   Teesdale Decs. (#149) at ¶ 8 & (#157) at ¶¶ 28-29.

## DISCUSSION

In her Fourth Amended Petition, petitioner alleges that she was denied effective assistance of counsel, the prosecution failed to disclose exculpatory evidence, and she is actually innocent. Each of petitioner's claims raises distinct procedural and substantive issues that I address separately.

## I.    INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner alleges that trial counsel rendered ineffective assistance of counsel by failing to conduct an adequate investigation into three areas: (1) the reliability of the prosecution's cell tower evidence; (2) the witnesses at the Fremont McDonald's "who identify Jerri Williams and Brian Tuckenberry as persons who frequented the restaurant in the mornings," and witnesses at the Madison Suites Motel; and (3) the witnesses at Kelley Point Park "who describe an altercation in the early

afternoon near the location where Ms. Williams' body was found and who provide[d] other information." Fourth Amended Petition at 4-5.

The proper resolution of petitioner's ineffective assistance claims requires this court to address (1) whether the untimeliness of the petition and the procedural default of the claims are excused by a colorable showing of actual innocence; (2) whether the procedural default of the claims is excused under the reasoning in Martinez v. Ryan, 132 S.Ct. 1309, 1318-19 (2012); (3) the proper scope of review; and (4) whether new evidence may be considered in support of the claims.

## A. Colorable Claim of Actual Innocence

Petitioner's ineffective assistance of counsel claims are untimely and procedurally defaulted. See 28 U.S.C. §§ 2254(b)(1) & 2244(d)(1); Findings and Recommendation (#47), *withdrawn* by Order (#70) & Order (#73) (addressing untimeliness of petition). The untimeliness of the petition and the procedural default of available state remedies may be excused upon a colorable showing of actual innocence. McQuiggin v. Perkins, 133 S.Ct. 1924, 1928 (2013); House v. Bell, 547 U.S. 518, 536-37 (2006); Schlup v. Delo, 513 U.S. 298, 314-15 (1995).

A colorable claim of actual innocence in this context does not by itself provide a basis for relief, but rather serves as a gateway through which petitioner must pass in order to have her constitutional claims considered. McQuiggin, 133 S.Ct. at 1928;

Schlup, 513 U.S. at 315.  The gateway showing requires petitioner to demonstrate that "in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" House, 547 U.S. at 537 (quoting Schlup, 513 U.S. at 327); McQuiggin, 133 S.Ct. at 1928 & 1932. Ultimately, the question is whether petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." Schlup, 513 U.S. at 316; House, 547 U.S. at 537.

To be credible, a colorable claim of actual innocence requires petitioner to support her allegations of constitutional error with "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." Schlup, 513 U.S. at 324; House, 547 U.S. at 537.  In assessing the adequacy of petitioner's showing, I consider all of the evidence, old and new, incriminating and exculpatory, and I am not bound by the rules of admissibility.  Schlup, 513 U.S. at 327-28; House, 547 U.S. at 538.

A gateway showing of actual innocence may be established despite the fact that the petitioner entered a guilty plea. See Bousley v. United States, 523 U.S. 614, 624 (1998); Vosgien v. Persson, 2014 WL 555152 *4 (9th Cir. Feb. 13, 2014); Griffin v. Johnson, 350 F.3d 956, 961 (9th Cir. 2003); Jaramillo v. Stewart,

340 F.3d 877, 883 (9th Cir. 2003); see also Smith v. Baldwin, 510
F.3d 1127, 1140 (9th Cir. 2007)(assuming that gateway actual
innocence exception applies in guilty plea context).    In such
circumstances, however, the petitioner must prove her actual
innocence of the charge to which she pled, as well as any more
serious charges that were dismissed as a result of the plea
bargain.  Bousley, 523 U.S. at 624; United States v. Benboe, 157
F.3d 1181, 1184 (9th Cir. 1998); Jaramillo, 340 F.3d at 883.
Petitioner's admission at the plea hearing that she strangled
Williams does not preclude a colorable showing of actual innocence,
but it is a factor that I consider.    See Doe v. Menefee, 391 F.3d
147, 168-69 (2nd Cir. 2004); Ruiz v. Gonzalez, 2009 WL 3233558 *2
n.5 (C.D Cal. Oct. 2, 2009).

      Considering all of the evidence (both old and new), and with
due regard to its reliability, I conclude that petitioner has made
a colorable showing of actual innocence sufficient to overcome the
untimeliness of the petition, and the procedural default of her
first ground for relief.    While the prosecution's unchallenged
circumstantial evidence may have convinced a reasonable juror of
petitioner's guilt, I conclude that it is more likely than not that
no reasonable juror would find petitioner guilty of intentional
murder or manslaughter, beyond a reasonable doubt, in light of the
totality of the evidence, including the following newly presented
evidence:

(1) a report concluding that the DNA on Williams' vaginal swabs and fingernail clippings is consistent with the Y-STR profiles of Ed Mills and Brian Tuckenberry (an ODOC inmate);

(2) Tuckenberry's extensive history of violence against women, including strangulation during intercourse;

(3) Tuckenberry's harassment of Williams and his connection to the Madison Suites Motel and the Fremont McDonald's;

(4) compelling photographs showing finger marks on Williams' neck and right thigh suggesting that she was strangled from the front and sexually assaulted;

(5) the fact that Williams' body was dumped, not dragged to its final resting place;

(6) expert opinions that diminish the weight of the prosecution's historical cell tower analysis;

(7) the lack of evidence that petitioner was near Kelley Point Park at the estimated time of death (approximately 11:40 a.m. or later), as well as evidence supporting a later estimated time of death; and

(8) the fact that there were multiple visitors to the park, but no one saw Williams' body until approximately 2:55 p.m.

## B.  **Cause and Prejudice**

Petitioner also argues that her procedural default should be excused based upon her showing of cause and prejudice.  In Martinez v. Ryan, the Supreme Court held that "[i]nadequate assistance of counsel at initial review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."  132 S.Ct. at 1315.  In order to satisfy Martinez, a habeas petitioner must show (1) the underlying

ineffective assistance of trial counsel claim is substantial; (2) the petitioner had ineffective counsel during the state collateral proceeding; (3) the state collateral proceeding was the initial review proceeding for the claim; and (4) state law required the petitioner to bring the claim in the initial review proceeding. Trevino v. Thaler, 133 S.Ct. 1911, 1918 (2013); Clabourne v. Ryan, 2014 WL 866382 *10-*12 (9th Cir. Mar. 5, 2014); Dickens v. Ryan, 740 F.3d 1302, 1319 (9th Cir.), *motion to vacate den.*, 2014 WL 940701 (9th Cir. 2014); Miles v. Ryan, 713 F.3d 477, 494 (9th Cir. 2013). In addressing the application of Martinez, I consider each of the alleged incidents of ineffective assistance separately. Cf. Dickens, 740 F.3d at 1320-21 (evaluation of procedural default is done on a claim-by-claim basis).

For the reasons set forth in the merits section of this opinion, I conclude that trial counsel was ineffective for failing to adequately investigate or hire an expert to evaluate the cell tower evidence. Based upon this same reasoning, I conclude that petitioner's procedural default of this claim is excused under Martinez because (1) the claim is substantial; (2) post-conviction counsel's failure to raise this claim constituted ineffective assistance of counsel; (3) Oregon's post-conviction procedure is the initial review proceeding; and (4) Oregon law requires that an ineffective assistance of trial counsel claim be raised on post-

conviction.[13]  However, petitioner's claims that trial counsel was ineffective for (1) failing to investigate witnesses at the Fremont McDonald's and Madison Suites Motel; and (2) failing to investigate witnesses at Kelley Point Park are not substantial, and post-conviction counsel's failure to raise the claims did not constitute ineffective assistance of counsel.[14]

## C.  **Scope of Review & New Evidence**

This court's scope of review and its ability to consider new evidence in support of petitioner's ineffective assistance of counsel claims are governed by 28 U.S.C. §§ 2254(d) & (e)(2), and the Supreme Court's holding in Cullen v. Pinholster, 131 S.Ct. 1388 (2011).  In applying these rules, I consider the discrete incidents of ineffective assistance.

///

///

---

[13] In concluding that post-conviction counsel failed to raise the claim, I note that the cell tower issue was discussed during the post-conviction proceeding, but not raised in the formal petition.  Resp. Exh. 105 at 3; Exh. 112 at 14-15; Exh. 121 at 3-4; see O.R.S. 138.550(3)(all grounds for relief must be asserted in original or amended petition).

[14] In the briefing, respondent's counsel states that if this court determines petitioner's procedural default of ground one is excused, he will seek leave to respond to the merits.  Response to the Fourth Amd. Pet. at p. 8 n.7.  However, at the status conference held on January 13, 2014, counsel was advised that no further briefing would be permitted absent a motion for leave to file a sur-reply.  No such motion was filed.

• **Failure to Investigate Cell Tower Evidence.** This is a new ground for relief that is procedurally defaulted. Because <u>Martinez</u> excuses the procedural default, I consider new supporting evidence.[15] My standard of review is *de novo*. <u>Dickens</u>, 740 F.3d at 1321; <u>Amado v. Gonzalez</u>, 734 F.3d 936, 944 (9th Cir. 2013).

• **Failure to Investigate Witnesses at the Fremont McDonald's and the Madison Suites Motel.** These are new grounds for relief that are procedurally defaulted. The default is *not* excused under <u>Martinez</u>. I assume, without deciding, that I may consider new evidence based on petitioner's colorable showing of actual innocence. <u>But see Lewis v. Wilson</u>, 423 Fed. Appx. 153 *5 (3rd Cir. Apr. 8, 2011). My standard of review is *de novo*.

• **Failure to Adequately Investigate Witnesses Who Described Altercation at the Park.** This ground for relief was raised in petitioner's formal petition for post-conviction relief and adjudicated on the merits.[16] <u>See Harrington v. Richter</u>, 131 S.Ct. 770, 784-86 (2011). The claim was procedurally defaulted on appeal. Resp. Exhs. 124 & 128. Because no reasoned decision was provided by the state court, I conduct an independent review of the record, but apply the deferential standards of 28 U.S.C. § 2254(d).[17] <u>Murray v. Schriro</u>, 2014 WL

---

[15] <u>Cf</u>. <u>Miles</u>, 713 F.3d at 494-95 (*assuming* new evidence may be considered upon satisfying <u>Martinez</u>, evidence did not establish sentencing counsel was deficient); <u>Dickens</u>, 740 F.3d at 1332 (criticizing the majority for circumventing § 2254(e)(2) by "apparently" permitting petitioner who satisfies <u>Martinez</u> to an evidentiary hearing) (Callahan, dissenting); <u>see also Lopez v. Ryan</u>, 678 F.3d 1131, 1137 (9th Cir. 2013)(questioning, but declining to decide whether <u>Martinez</u> excuses PCR counsel's failure to develop the factual basis of the defaulted claim (the subject of § 2254(e)(2)).

[16] <u>See</u> Resp. Exhs. 105 at ¶ 7(A)(1), Exh. 106 at 2, & 122 & 123.

[17] Petitioner now alleges that *multiple* witnesses at the park should have been interviewed (i.e., Everett, Jeff, *and* Norma Tindall). The addition of Everett and Jeff Tindall does not alter my conclusion that the claim was adjudicated on the merits.

(continued...)

998019 *18 & *39 (9th Cir. Mar. 17, 2014).  I do not
consider new evidence.  Pinholster, 131 S.Ct. at 1398.

• **Failure to Investigate Witnesses at the Park Who
Provided "Other Information."**  This is a new ground for
relief that is procedurally defaulted.  The default is
*not* excused under Martinez.  I assume, without deciding,
that I may consider new evidence based on petitioner's
colorable showing of actual innocence.  My review is *de
novo*.

D.   **The Merits**

A claim of ineffective assistance of counsel requires
petitioner to prove that counsel's performance fell below an
objective standard of reasonableness, and that there is a
reasonable probability that, but for counsel's unprofessional
errors, the result of the proceeding would have been different.
Bell v. Cone, 535 U.S. 685, 695 (2002); Williams v. Taylor, 529
U.S. 362, 390-91 (2000); Strickland v. Washington, 466 U.S. 668,
687-88 (1987).

To prove deficiency of performance, petitioner "'must show
that counsel's representation fell below an objective standard of
reasonableness.'"  Taylor, 529 U.S. at 390-91 (quoting Strickland,
466 U.S. at 688).  The test is highly deferential, evaluating the
challenged conduct from trial counsel's perspective at the time,
and not through the distorting lens of hindsight.  Strickland, 466

---

[17](...continued)
Cf. Dickens, 740 F.3d at 1318 (new factual allegations ordinarily
do not fundamentally alter claim for exhaustion purposes).

U.S. at 689-90; Pinholster, 131 S.Ct. at 1403; Miles, 713 F.3d at 486.

In the guilty plea context, the prejudice prong requires a petitioner to show that there is a reasonable probability that, but for counsel's errors, she would not have pled guilty and would have insisted on going to trial. Hill v. Lockhart, 474 U.S. 52, 59 (1985); Lafler v. Cooper, 132 S.Ct. 1376, 1384 (2012). When the alleged error is a failure to investigate, the resolution of the prejudice inquiry "will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea." Hill, 474 U.S. at 59. "This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial." Id. This prediction is made objectively, "without regard for the 'idiosyncrasies of the particular decisionmaker.'" Id. at 60 (quoting Strickland, 466 U.S. at 695).

**1. Cell Tower Evidence**

Petitioner contends that trial counsel William Brennan rendered ineffective assistance of counsel when he advised her to plead guilty based upon nothing more than the prosecutor's representation that he had new evidence that would "pinpoint" petitioner's location near Kelley Point Park. Petitioner argues that because Brennan failed to review the purported evidence, and

failed to consult with an expert, he was ill equipped to evaluate the strength of the prosecution's case.

As outlined above, the case against petitioner was circumstantial, and was premised upon the theory that petitioner killed Williams at home and then dumped her body at Kelley Point Park.  The defense team was keenly aware that the prosecution was going to rely upon cell tower evidence to demonstrate that petitioner was near Kelley Point Park reasonably close to Williams' estimated time of death.  See e.g. Response, Exh. B at 13; Att. I to Exh. B at 19; Motion for Release, Exh. L, TR at 95-106.  Co-counsel Patrick Sweeney anticipated the need for an expert and sought pre-authorization for expert expenses.  Brief in Support of Motion to Amend (#42), Exh. P.  Additionally, Brennan moved to suppress the prosecution's cell tower evidence.  Resp. Exh. 108, Motion in Limine at 1-5.

According to District Attorney Rod Underhill, less than 30 days before trial, he had a telephone conversation with Randy Walters, an employee of Verizon Wireless.  Walters told Underhill that based on a preliminary review of the call data "code," which permits a cell phone technician to decipher cell strength and cell tower signal direction, he believed that the Kotobuki Way tower data was not an aberration based on the signal strength of the tower, but instead may show that petitioner was in the vicinity of

Kelley Point Park, and heading in an easterly direction away from the park.  Response, Att. I to Exh. B at 24.

"Some time after this conversation," Underhill met with the defense team to share this information.  According to Underhill, the defense investigator's body language seemed to suggest that he was not surprised by this new evidence.  Id. at 25.  Defense Investigator Don Geistlinger, however, disputes this characterization, explaining that "[t]he defense had not worked up this issue in anything more than a preliminary way."  Motion for Release, Exh. W at 4.

In an affidavit offered at the state post-conviction proceeding, however, Brennan attests that the defense team *had* analyzed the cell tower evidence, and agreed with the prosecution's conclusion that the direction from which petitioner's call came from could be pinpointed, placing petitioner near Kelley Point Park:

> * * * It was known all along that petitioner had made a call that was bounced off of that cell tower, but what was not known or provable until the last moment was that the location of the *call could be pinpointed as to the direction it came from when the cell tower received the signal from the cell phone* and the cell phone representative could testify to this information.  *I knew this to be correct because my investigators had found the same thing just about at the same time.*  Therefore, the District Attorney could and would have put petitioner close to Kelley Point Park at a point in time reasonably close to the time the victim was killed.  *This was something they were not really able to do until this point,* but after it became apparent that this evidence would be offered to a jury, the defense team believed

that the better option would be to try to make a deal on
this case, and petitioner, though very upset, agreed.

Basically, everything that could have been done for
petitioner was done.  Given all the evidence that was
before me, there seemed to be a good possibility that
petitioner could and would be convicted of Murder.  There
was a lot of circumstantial evidence that, if believed by
a jury, could have led to that result.

Resp. Exh. 111 at 4 (emphasis added); see also Att. E to Exh. B at

8-9.

Both Geistlinger and co-counsel Patrick Sweeney disagree with

Brennan's assessment that their investigation was complete.

Sweeney states that while the defense team spent considerable time

studying the telephone records and cell tower evidence, "more could

have been done."  Motion for Release, Exh. X at 2 & 4.  For

example, Sweeney does not recall anyone on the defense team

receiving the underlying documentation (the "code") relied upon by

Walters in making his preliminary assessment.  Id. at 2-3.

Further, although the expert contacted by Sweeney advised him "of

the variables that are involved in this type of analysis," and that

he could "support the defense theory that calls bounce from tower

to tower looking for available air space and stronger signals," no

expert was retained.  Brief in Support of Motion to Amend (#42),

Exhs. P & Q; Motion for Release, Exh. X at 2.

It is well settled that there are no specific guidelines,

technique, or approach that a trial attorney must satisfy in order

to render constitutionally sufficient assistance.  Harrington, 131

S.Ct. at 788; Pinholster, 131 S.Ct. at 1403. A decision motivated by reasonable strategic concerns, and based upon a thorough investigation of the relevant law and facts deserves a heavy measure of deference. Strickland, 466 U.S. at 690-91; see also Pinholster, 131 S.Ct. at 1403 (counsel should be presumed to have made all significant decisions in the exercise of reasonable professional judgment).

However, "counsel cannot be said to have made a tactical decision without first procuring the information necessary to make such a decision." Reynoso v. Giurbino, 462 F.3d 1099, 1112 (9th Cir. 2006). Indeed, "'[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence.'" Hinton v. Alabama, 134 S.Ct. 1081, 1088 (2014) (quoting Harrington, 131 S.Ct. at 778). The relevant question is whether counsel made a reasonable decision that rendered consultation with an expert unnecessary. Harrington, 131 S.Ct. at 788; Wiggins v. Smith, 539 U.S. 510, 523 (2003).

Petitioner relies upon the affidavits of Forensic Technologist Jeff Fischbach and Manfred Schenk to support her assertion that had Brennan conducted a reasonable investigation or consulted with an expert, he would have understood that the prosecution could not *pinpoint* petitioner's location or the *direction* from which her call was made. Indeed, in the instant proceeding, respondent's expert

agrees that cell phone tower data cannot pinpoint a person's exact location.  Bethers Dec. (#216) at ¶ 5.

According to Fischbach and Schenk, the prosecution's cell tower analysis did not take into account variables including (1) the height of the tower (which suggested an engineered intent to cover a significant area); (2) call load (which may cause a call to relay from another tower); (3) the network of cell towers (rather than the signal of one particular tower); and (4) the cell phone provider's proprietary software.  Contrary to respondent's protestations, there is no evidence in the record to support the conclusion that these variables were not known to experts in the field in 2004.  See e.g., Brief in Support of Motion to Amend, Exh. P; Motion for Release, Exh. U at 26.

It is difficult to evaluate the reasonableness of an attorney's investigation ten years after the fact, particularly given the fact that Brennan has died and cannot explain any strategic reasons for his actions.  However, the state record demonstrates that the defense team understood the importance of the cell tower evidence, studied the underlying call records themselves, and had been advised that many variables may impact the ability to track a caller's path of travel or precise location. Despite this knowledge, Brennan failed to retain an expert to evaluate the technical call data "code" relied upon by the Verizon

technician, or to make an independent evaluation of the information then available.

Instead, Brennan concluded on the eve of trial that Verizon employee Randy Walters accurately evaluated the "electronic wizardry" involved with cell tower analysis, that "changed the complexion of the case dramatically." TR 5 at 355; Resp. Exh. 111 at 4. Brennan's reliance upon the prosecution's expert is particularly troubling in light of the fact that District Attorney Underhill describes Randy Walters' code analysis as *preliminary.*"

Accordingly, and based upon my *de novo* review of the state court record, I conclude that Brennan's conduct fell below an objective standard of reasonableness. Brennan's assessment of the evidence, and his failure to retain an expert, was not based upon a reasonable investigation or understanding of the evidence. Despite the critical importance of the cell tower evidence, Brennan failed to take reasonable steps to collect the relevant data and independently evaluate the reliability of the Verizon technician's preliminary analysis before advising his client to plead guilty to manslaughter.

Further, there is a reasonable probability that, but for counsel's deficient conduct, petitioner would not have pled guilty and would have insisted on going to trial. It is undeniable that petitioner faced a far greater sentence if she proceeded to trial on the charge of murder. However, according to Brennan, Sweeney,

and Geistlinger, petitioner was prepared to go to trial. Motion
for Release, Exhs. W & X ; Resp. Exh. 111 at 4. Sweeney attests
that the decision to plead guilty was "a complete 180 - a U-Turn in
the planned defense." Motion for Release, Exh. X at 4. At the
state post-conviction proceeding, petitioner explained that her
decision to plead guilty was prompted by the prosecution's "new"
cell tower evidence. Resp. Exh. 112 at 14-15. Brennan's
statements at the plea hearing confirm petitioner's recollection:

> [U]p until yesterday at noon the defense did have every
> idea of trying this case and all preparations had been
> made to do so. However, we were furnished some
> information concerning the telephone call that was made
> at approximately 10:27 a.m. on May 25, 2002 that
> reflected off of the [Kotobuki] Way cell tower over in
> Vancouver, Washington. And based on an interpretation of
> what the evidence and reports were...and it was through
> no fault of the State or the defense...we both tried to
> talk to Randy Walters who was not allowed by his legal
> department to give us the appropriate information or
> interpretation of what was going on with this electronics
> wizardry that was the piece of the jigsaw puzzle, as it
> were, that certainly changed the complexion of the case
> dramatically. And based on that information and a number
> of talks both here in your jury room and up at the jail
> with the client between myself and Mr. Sweeney and
> actually Mr. Geislinger who has assisted in this case,
> the decision was made to try and resolve it. And that's
> why we're doing this at such a late date. And with that,
> I think we're ready to proceed with the entry of the
> plea.

TR Vol. 5 at 355-56.

More importantly, from an *objective* standpoint, a thorough
evaluation and development of the technical cell tower evidence
likely would have changed Brennan's recommendation to plead guilty

given the otherwise circumstantial nature of the case against petitioner. Similarly, the presentation of expert testimony at trial, concerning the variables impacting the reliability of cell tower evidence to pinpoint a caller's location, likely would have changed the outcome of the trial. See Hill, 474 U.S. at 59. Accordingly, petitioner has demonstrated that she suffered prejudice as a result of counsel's deficient performance. Habeas relief is warranted on this ground for relief.

### 2. Witnesses at the Fremont McDonald's & Madison Suites Motel

Petitioner contends that trial counsel was deficient in failing to investigate persons present at the Fremont McDonald's and the Madison Suites. Petitioner argues that because she told police that she drove Williams to the Fremont McDonald's, and that Williams planned to go to the Madison Suites Motel, witnesses at both locations should have been interviewed. Petitioner notes that "11 years after the crime," habeas counsel's investigation revealed three McDonald's employees, one or more of whom could identify Williams, Tuckenberry, Shanks, and/or Nettles as part of McDonald's unsavory "morning crowd." See Teesdale Decs. (#149) at 4 & (#157) at 11-15.

A defense lawyer's duty to investigate and prepare a defense does not require that every conceivable witness be interviewed. Crittenden v. Ayers, 624 F.3d 943, 967 (9th Cir. 2010); Hendricks

v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). Counsel's performance "must be examined according to what was known and reasonable at the time the attorney made his choices" and not through the distorting lens of hindsight. Hendricks, 70 F.3d at 1036; Strickland, 466 U.S. at 689-90; Pinholster, 131 S.Ct. at 1403. A defendant is prejudiced by counsel's failure to interview witnesses if there is a reasonable probability that, but for counsel's errors, she would not have pled guilty and would have insisted on going to trial. Hill, 474 U.S. at 59; Lafler, 132 S.Ct. at 1384.

Petitioner acknowledges that in 2002, trial counsel would not have known to focus on Tuckenberry. However, she argues that the discovery that Williams interacted with an unsavory morning crowd at McDonald's, coupled with withheld Brady information about Tuckenberry in a 2003 Investigation Report, would have provided counsel "a direct link between Tuckenberry and Williams." Pet.'s Factual Memo. at 40-41.

I disagree. Petitioner has failed to demonstrate that trial counsel was deficient in failing to conduct the interviews, or that there is a reasonable probability that but for counsel's omissions, she would not have pled guilty. Without the aid of hindsight (prompted by new DNA evidence identifying Tuckenberry), petitioner's assertion that additional interviews would have led to

the identification of Tuckenberry, and ultimately to his connection
to the murder, is unconvincing and speculative.

Similarly, the fact that McDonald's employees recently
identified Shanks and Nettles as part of the "morning crowd," does
not demonstrate that counsel was deficient in failing to interview
the McDonald's employees in 2002, or that petitioner suffered
prejudice thereby (particularly given the fact that petitioner has
failed to demonstrate more than a speculative connection between
these men and Tuckenberry or the murder).  Petitioner similarly has
not demonstrated she was prejudiced by trial counsel's failure to
interview additional witnesses "associated with" the Madison Suites
Motel (such as Cathleen Phillips and Miki Hall who recall seeing a
blue van at the motel).[18]  Accordingly, based upon a de novo review,
I conclude that petitioner has failed to demonstrate that trial
counsel was ineffective for failing to investigate these witnesses.

### 3.  Witnesses at the Park

I review petitioner's claim that trial counsel was ineffective
for failing to interview witnesses who saw an altercation at the
park under the deferential standards of 28 U.S.C. § 2254(d), based
upon an independent review of the record, and without consideration
of new evidence.  However, even on a de novo review, and

---

[18] See Pet.'s Exhs. to Memo. in Support, Exh. 21.

considering petitioner's new evidence, habeas relief is not warranted.

Petitioner identifies only the Tindall family as witnesses to the altercation in the park. In preparation for trial, defense counsel did interview Norma Tindall, and determined that she was unable to make a positive identification of either the man or woman. Resp. Exh. 111 at 3; & Response, Att. I to Exh. B at 109. In more recent interviews, the Tindalls remain unable to identify the man or woman despite being shown pictures of Williams and 16 suspects/persons of interest. See Teesdale Dec. (#157) at ¶¶ 14-21.

Although the identity of the man and woman arguing in the park and the presence of a car with different-colored doors pose interesting questions, their connection to the murder remains speculative. Because of this tenuous connection, petitioner has failed to demonstrate that counsel's failure to conduct additional interviews of witnesses to the altercation fell below an objective standard of reasonableness, or that she suffered prejudice. The state court's rejection of this claim is not (1) contrary to, or an unreasonable application of clearly established Federal law; or (2) based upon an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(1) & (2).

Petitioner's assertion that defense counsel was deficient in failing to interview other witnesses at the park also fails under

both prongs of <u>Strickland</u>.   To the extent that petitioner is referring to witnesses who saw a blue van in the park, the assertion that the van may have been used to dump Williams' body is speculative.   The statements of Mr. and Mrs. Cross, as to whether they would have seen the body if it was present when they parked their car in the north parking lot at approximately 2:30 p.m., are conjecture.   Accordingly, petitioner has failed to demonstrate that trial counsel was deficient in failing to investigate these witnesses, or that there is a reasonable probability that, but for counsel's deficient performance, she would not have pled guilty.

In sum, petitioner is entitled to habeas relief on the basis that trial counsel was ineffective for failing to adequate investigate, or hire an expert to evaluate, the cell tower evidence.   However, habeas relief is denied as to all remaining claims of ineffective assistance of counsel.

## II.   **BRADY VIOLATION**

In her second ground for relief, petitioner alleges that the prosecution unlawfully withheld exculpatory evidence falling into three categories:   (1) evidence concerning where she was when Williams was killed; (2) who had contact with Williams prior to her death; and (3) the State's interest in Tuckenberry in 2003.   Fourth Amended Petition at 6-7; Pet.'s Reply Memo. in Support at 19. Petitioner represents to the court that the suppression of this evidence was discovered by inspecting prosecution and police files

produced pursuant to this court's June 2013 discovery orders.
Pet.'s Memo. in Support of Release (#169) at 22-23.

## A.    **Procedural Obstacles**

Respondent does not specifically address the procedural
obstacles to this court's consideration of petitioner's <u>Brady</u> claim
(arguing instead that, regardless of any procedural arguments, the
claim lacks merit).  Response to Fourth Amd. Pet. at 2; <u>see also</u>
Response to Motion for Release (#111) at 2 & 10; Response to
Renewed Motion for Release at 6-7.  In her Answer to the Fourth
Amended Petition, however, respondent concedes that "[i]t does not
appear that petitioner has any of the usual or normal remaining
state remedies on the issues she raises in this habeas corpus
proceeding."  Answer (#180) at 2; <u>see also</u> Minutes of Proceedings
(#144) (waiving exhaustion as to claims raised in Third Amended
Petition).  In light of this concession, I conclude that respondent
has expressly waived exhaustion and/or exhaustion is excused
because there is no available state remedy.  <u>See</u> 28 U.S.C. §
2254(b)(1)(B)(i) & (b)(3); <u>but see</u> O.R.S. 138.550(3) (allowing
successive post-conviction petition under limited circumstances).[19]

_____

[19] If ground two is properly treated as being procedurally
defaulted (due to petitioner's failure to raise it at the first
post-conviction proceeding), the default is excused by her
colorable showing of actual innocence.  <u>Schlup</u>, 513 U.S. at 314-
15; <u>see also</u> <u>Henry v. Ryan</u>, 720 F.3d 1073, 1082-83 (9th Cir.
2013), *petition for cert. filed* (Mar. 31, 2014) (state's
suppression of exculpatory evidence may constitute cause to
(continued...)

Because the claim has not been adjudicated on the merits, my review is de novo. Dickens, 740 F.3d at 1321; Amado, 734 F.3d at 944. I assume, without deciding, that I may consider petitioner's new evidence based upon her colorable showing of actual innocence, and/or because petitioner was diligent in developing the new factual basis of this claim (rendering § 2254(e)(2) inapplicable). But see Gonzalez v. Wong, 667 F.3d 965, 979-80 (9th Cir. 2011)(staying and abeying adjudicated Brady claim to enable state court to consider new evidence and to satisfy holding in Pinholster). This claim is timely pursuant to 28 U.S.C. § 2244(d)(1)(D) and, in the alternative, untimeliness is excused based upon petitioner's colorable showing of actual innocence.

**B.    The Merits**

Pursuant to the Supreme Court's holding in Brady v. Maryland, 373 U.S. 83, 87 (1963), prosecutors are constitutionally obligated to disclose evidence favorable to an accused that is material either to guilt or to punishment. Kyles v. Whitley, 514 U.S. 419, 432 (1995); Amado, 734 F.3d at 948; Jones v. Ryan, 733 F.3d 825, 837 (9th Cir. 2013). In order to succeed on a Brady claim, petitioner must demonstrate that (1) the evidence is favorable, either because it is exculpatory or impeaching; (2) the evidence

---

[19](...continued)
excuse procedural default if it is the reason for the failure to develop facts in state court).

was suppressed by the prosecution, either willfully or inadvertently; and (3) the evidence is material to her guilt or innocence. United States v. Sedaghaty, 728 F.3d 885, 899 (9th Cir. 2013); Henry, 720 F.3d at 1080; United States v. Kohring, 637 F.3d 895, 901-02 (9th Cir. 2011). There is no Brady violation if the government provides the defendant with the core Brady materials, and the defendant fails to show that additional materials would have made a difference at trial. Amado, 734 F.3d at 950.

I assume for purposes of this proceeding that Brady applies in the guilty plea context. See Sanchez v. United States, 50 F.3d 1448, 1453 (9th Cir. 1995) (applying Brady in guilty plea context); Smith, 510 F.3d at 1148 (same); Gladwell v. DeCamp, 2012 WL 5182804 *7, n.5 (D.Or. Oct. 16, 2012) (assuming without deciding that Brady applies in guilty plea context); but see United States v. Ruiz, 536 U.S. 622, 633 (2002) (Constitution does not require government to disclose material *impeachment* evidence prior to entering into a plea agreement in which the defendant waives the right to receive such evidence).[20]

The test for materiality in the guilty plea context is an objective one: "[W]hether there is a reasonable probability that but for the failure to disclose the *Brady* material, the defendant

---

[20] Because my review of this claim is *de novo*, I need not determine whether the application of Brady in the guilty plea context is "clearly established Federal law" under 28 U.S.C. § 2254(d)(1).

would have refused to plead and would have gone to trial."
Sanchez, 50 F.3d at 1454; Smith, 510 F.3d at 1148. This, in turn,
requires the court to consider the likely persuasiveness of the
withheld information. Sanchez, 50 F.3d at 1454. Materiality is
defined in terms of the suppressed evidence considered
collectively, not item by item. Kyles, 514 U.S. at 436; Sedaghaty,
728 F.3d at 900; Kohring, 637 F.3d at 902.

### 1.  Where Petitioner Was When Williams was Killed

Petitioner alleges that the following evidence was withheld in
violation of Brady: (1) evidence related to the time of death;
(2) evidence related to cell tower location information;
(3) evidence derived from individuals who were present at Kelley
Point Park; (4) evidence regarding the date that a sleeping bag was
placed in petitioner's truck; and (5) evidence that Locke stated
she looked at her clock at 10:11 a.m., approximately 15 minutes
before petitioner arrived. Fourth Amended Petition at 6.

### a.  Estimated Time of Death

Petitioner's proximity to Kelley Point Park at the approximate
time of Williams' death was critical to the prosecution's case. In
an affidavit submitted to this court, District Attorney Underhill
attests that Deputy Medical Examiner Bigoni estimated Williams'
time of death to be 11:40 a.m. Response, Exh. B at 5. However,
Deputy Bigoni's written report does not include this estimate.

Response, Att. I to Exh. B at 540-45.  Petitioner concludes that the prosecution suppressed evidence of Bigoni's estimate.

Defense experts Brady and Propst estimated Williams' time of death to be (1) "later in the morning;" and (2) between 11:55 a.m. and 12:55 p.m., respectively.  In light of the mild discrepancy between Bigoni's estimate and that of the defense experts, and because there is no assertion that the prosecution suppressed Bigoni's written report – which contained the underlying data used to make his estimate – petitioner has failed to demonstrate that any withheld evidence was material.

b.  Cell Tower Evidence

Petitioner contends that the prosecution suppressed notes of a September 19, 2003, conference call between Underhill and Tim Navratil regarding the reliability of cell tower evidence.  Pet.'s Memo. in Support (#221) at 22-23.  Notes from that conference, allegedly not disclosed to the defense, provide as follows:

> - SW Moody – Near water.  Tower broadcast signal up. Will bounce on water. big body of water can go 40 miles.
> - Kotobuki would be strongest signal.
> - Map of different cell sites in area.  Strongest cell site will pick up.  Generally 3 cell sites will pick up that connection.
> - Engineer dept. w/ all cell sites.  In most cases each call will be in a triangle.

Motion for Release, Exh. U at 26.

Petitioner argues that these notes cast doubt on the prosecution's theory that petitioner could be pinpointed near

Kelley Point Park.   Fourth Amended Petition at 8; Pet.'s Reply
Memo. in Support at 23. Petitioner's argument oversimplifies the
issue.

The state record discloses that both the prosecution and the
defense were aware of the fact that many variables may impact the
reliability of cell tower evidence.  Indeed, the very reason trial
counsel was ineffective is that, despite his knowledge of these
variables, he did not retain an expert to evaluate the relevant
call data records to determine if any variables were at play in
this case.   Accordingly, even if the notes are exculpatory or
impeaching, they contain information reasonably known to the
defense.   Hence, petitioner cannot demonstrate that there is a
reasonable probability that, had she been provided the notes, she
would have insisted on going to trial.

    c.   Witnesses at Kelley Point Park

Petitioner alleges that "[r]eview of the newly discovered
police file reveals that the state interviewed numerous people who
were at Kelley Point Park on May 25, 2002," but that "only a
handful of reports of those interviews were provided to the
defense." Fourth Amended Petition at 9.  This claim fails because
petitioner fails to identify any report or piece of evidence
allegedly suppressed by the prosecution, and has failed to
demonstrate that the evidence was material.

///

d.  Sleeping Bag

According to police reports, investigators interviewed Locke on May 29, 2002, and August 23, 2002. The first report reflects that on May 29, 2002, Locke stated that a sleeping bag was in petitioner's truck when petitioner picked her up on Saturday morning, May 25, 2002. Response, Att. I to Exh. B at 202; see also Att. I to Exh. B at 24. The police report documenting the August 23, 2002 interview indicates that Locke again stated that she noticed the sleeping bag in the truck when petitioner picked her up on Saturday. Id. at 248.

However, petitioner alleges that the prosecution suppressed handwritten notes of the May 29, 2002 interview that reflect Locke made inconsistent statements as to whether she noticed the sleeping bag in the truck on Saturday or Sunday. Pet.'s Factual Memo. at 52; Motion for Release, Exh. U at 27 & 29. This discrepancy is relevant because the prosecution originally theorized that petitioner transported Williams' dead body to the park in the sleeping bag.

On September 22, 2003, several months before petitioner's guilty plea, Forensic Scientist Elaine Kitano issued a DNA report concluding that Williams could be excluded as a donor of the DNA on the sleeping bag. Response, Att. I to Exh. B at 499-500. Hence, before petitioner entered a guilty plea, the relevance of the sleeping bag had been discounted. Consequently, evidence that

63 -- OPINION AND ORDER

Locke made an inconsistent statement as to whether she saw the sleeping bag in the truck on Saturday or Sunday, while favorable due to its impeachment value, is not of sufficient import to be material.

e.   Petitioner's Arrival at Locke's House

The police questioned Locke twice about what time petitioner arrived at her house on the day of the murder. Petitioner contends that an undisclosed handwritten note of one interview indicates that Locke stated that approximately 15 minutes before petitioner arrived, she looked at the clock and it read 10:11 a.m. Fourth Amended Petition at 9.

The interview to which this information pertains was conducted on August 23, 2002. The police report summarizing that interview provides as follows:

> On Saturday, LOCKE stated that she got up around 0700 hours, and called ROBERTS both on her cell phone and home phone. * * * LOCKE stated that between 0800 and 0830 hours, she got a hold of ROBERTS and ROBERTS told her that she would be coming by in approximately 30 minutes. LOCKE stated that it was a fairly long phone call between she and ROBERTS, but that she was expecting ROBERTS in 30 minutes. LOCKE then called her mother. LOCKE stated that she fell asleep and was awoken by another phone call from ROBERTS. LOCKE stated that ROBERTS called her from her cell phone and told her that she would be by in approximately 10 minutes. LOCKE stated that ROBERTS showed up approximately 15 minutes later.

Response, Att. I to Exh. B at 247. The undisclosed handwritten note includes the additional information that "living room clock said 1011." Motion for Release, Exh. U at 30.

64 -- OPINION AND ORDER

The handwritten note arguably is exculpatory because Locke, Collins, and Patterson originally estimated the events surrounding petitioner's arrival to be later in the day than telephone records ultimately reflected. Early in the prosecution, however, the telephone records revealed this time discrepancy, and the prosecution theorized that petitioner arrived at Locke's home at approximately 10:47. See Response, Att. I to Exh. B at 20; Motion for Release, Exh. L, TR at 105-06. Moreover, the typed police report indicates that Locke stated petitioner arrived 25 minutes after Locke's last call to Collins. The last time Locke spoke to her mother was at 10:35 a.m. Response, Att. I to Exh. B at 201 & 706. Petitioner makes no assertion that she was unaware of the telephone records. Accordingly, there is no reasonable probability that, but for the suppression of the handwritten note, petitioner would not have pled guilty.

**2.  Who had Contact with the Victim**

a.  DNA Minor Profiles

Petitioner alleges that the prosecution failed to disclose two unnumbered lab notes indicating that Ed Mills could not be excluded as a contributor of DNA on two exhibits. Fourth Amended Petition at 7. This allegation concerns a yellow Post-it note on an August 7, 2002, forensic laboratory report, and a "conversation log." Motion for Release, Exh. D at 2 & 4.

The Post-it note pertains to conclusions 2 and 4 of Mary Krings' 2002 report that DNA levels on the right hand fingernail clippings and pillowcase were too low to make a conclusive determination as to a donor:

> 2.    DNA from more than one person was detected on the **right hand fingernails (Exhibit 6.9)**. The female DNA foreign to Jerri Williams is consistent with coming from Lisa Roberts. * * * ***DNA from a third individual is also present at levels too low to make a conclusive determination.***
>
> 4.    DNA from more than one person was detected on the **pillowcase (Exhibits 7.2-7.4)**. Jerri Williams and Lisa Roberts cannot be excluded as major contributors of DNA to this exhibit. * * * **Ed Mills . . . [is] excluded as [a] major contributor[] to the mixture.** ***The minor profile(s) is below the threshold for entry into the database or for making a conclusive determination.***

Id., Exh. D at 2 (emphasis added).

The yellow Post-it note contains the words "minor profiles" and provides that as to conclusions 2 and 4 of the report, "Ed Mills not excluded." The same conclusion is reiterated in a document titled "CONVERSATION LOG 5/23/03 Rod Underhill visit to office:"

> The DNA types on the pillowcase are a mixture that includes at least one male. The DNA types from the pillowcase and the fingernails include ***a type that is below the reporting threshold,*** but that may include Ed Mills.

Id., Exh. D at 4 (emphasis added).

The fact that Ed Mills could not be excluded as a DNA contributor of the minor profiles is not "material" evidence given the fact that the minor threshold levels were too low in 2002 to make a conclusive determination. The evidence does not become material by virtue of the fact that more advanced DNA testing methods used in 2013 were able to identify Mills as a major contributor to the DNA detected on the right hand fingernail clippings.[21] See Pet.'s Supp. Memo., Exh. A at 8.

Further, given the fact that (1) Williams was a known prostitute; (2) she was known to have been at Mills' home on the Thursday and Friday before her murder; (3) Mills has been identified by Williams' son as one of her regular "Johns;" and (4) defense counsel knew male DNA was found on Williams' body, there is no reasonable probability that, but for the failure to disclose the notes, petitioner would have refused to plead and would have gone to trial. Additionally, I agree with respondent's contention that petitioner was provided with the core Brady material, in the form of the raw data relied upon by the forensic laboratory, to make her own determination.[22]

---

[21] In the 2013 report, the Y-STR profiles taken from the DNA found on the pillowcase were "insufficient for comparison purposes." Pet.'s Supp. Memo., Exh. A at 11.

[22] For this same reason, I reject petitioner's contention that the omission from the lab reports that DNA on several samples was male supports her Brady claim. Petitioner concedes
(continued...)

b.    Breast Swabs

To date, the DNA taken from breast swabs of the victim have not yielded any identifying profiles. See Response, Att. I to Exh. B at 497; Pet.'s Supp. Memo., Exh. A at 8.    Petitioner contends that a handwritten note by Detective Austria stating that the DNA found on Williams' breast "is probably saliva," and a "fairly recent deposit" is highly exculpatory.    Fourth Amended Petition at 7.

I agree that this evidence is exculpatory, and would support the theory that Williams was sexually assaulted and her naked body was immediately discarded.    However, before the entry of her plea, petitioner was aware of the fact that DNA was found on the breast swabs, and was provided the raw data to determine that the DNA was male.    Response, Att. I to Exh. B at 497; Pet.'s Factual Memo. at 48.    While the handwritten note that the deposit is fairly recent supports theory that Williams was sexually assaulted, given petitioner's knowledge of the existing DNA evidence at the time of her plea, there is no reasonable probability that had this notation been disclosed, she would have insisted on going to trial.

///

///

---

[22](...continued)
that she was provided raw lab notes referencing the male DNA. Pet.'s Factual Memo. at 48.

C.   **The State's interest in Tuckenberry in 2003**

Petitioner alleges that the prosecution suppressed "exculpatory evidence that it had an interest in Brian Tuckenberry in this case in 2003." Fourth Amended Petition at 7. The basis of this allegation is a 2003 Investigative Report documenting a complaint by Madison High School student Sanovia Tollivan. Motion for Release, Exh. U at 2-5. Petitioner explains the discovery of this report as follows:

> The police file provided to Ms. Roberts on August 30, 2013, includes a section on [the] investigation of Brian Tuckenberry subsequent to the DNA testing this spring. However, a different folder of the recently produced Portland Police File also includes a report regarding incidents that occurred in 2002-2003 in which Tuckenberry harassed and made death threats against at least one woman. The report described Tuckenberry hanging around on 82nd near Madison High School, located 2 blocks from the McDonald's on 82nd and Fremont. Defense knowledge of this information could have led to an intense investigation of Tuckenberry in 2003.

Pet.'s Factual Memo. at 53.

In support of petitioner's contention that the 2003 Investigation Report was suppressed, she offers the affidavit of a Federal Public Defender Investigative Intern. Pet.'s Exhs. to Memo. in Support, Exh. 14. The Investigative Intern explains that the report was located amongst documents compiled by police in 2002-04, and entirely separate from the materials compiled in 2013. Id., Exh. 14 at ¶¶ 4-17. She states that the 2003 Investigation

Report is not in the materials received from petitioner's trial attorneys. Id. at ¶ 16.

Additionally, the Investigative Intern states that the police file contained a 2-page print out of a map depicting an area of Portland that includes the addresses of both Sanovia Tolliver and Tuckenberry's then-girlfriend Ashley Davis. Id. at ¶¶ 23-24. The printout was generated on December 4, 2004, three days after petitioner entered her guilty plea. Id. at ¶¶ 20-21. The printout was located "between the D.A.'s copy of Roberts' Draft Motion to Suppress Search by Patrick Sweeney dated October 21, 2004 and cell tower and phone call maps that were likely created by the State to be used as Exhibits for trial." Id. at ¶ 22 (citations omitted).

Respondent asserts that the foregoing documents were not suppressed by the prosecution, explaining that "[t]he only reason that the 'newly disclosed police reports include a report on Tuckenberry threatening and harassing a woman near the McDonald's on 82nd Ave and Fremont in 2002-2003' is because the Portland Police are *now* aware that Tuckenberry's DNA was found in samples taken from the victim's fingernails and vagina, and because, in the course of this habeas proceeding, petitioner requested all prosecution and police investigation files related to Tuckenberry." Response to Fourth Amd. Pet. at 13.

Assuming that the file location of the 2003 Investigation Report, and the Portlandmaps.com search performed on December 4,

2004, supports the conclusion that the report was suppressed, I nevertheless conclude that the report is neither exculpatory nor material.  The content of the 2003 Investigative Report is determinative of this Brady claim.  The report documents a 2003 complaint by high school student Sanovia Tolliver.  The report provides in relevant part:

> The reason for TOLLIVER's (CO) request to talk to me via Mrs. Harry [Madison High School counselor] is a threat that TUCKENBERRY (A1) made to her while she was at the 82nd Av. MAX platform in early October 2002.  She said she doesn't know why (A1) often times seems to be at the same places she is, and doesn't know why he was at the MAX platform on this occasion.  During their contact, TOLLIVER (CO) said that (A1) said to her, "I'm going to come into your house, put a gun in your mouth, and shoot you in front of your family if you don't get rid of all your little boyfriends."  *(CO) also said that one of her friends named "Ashley" said recently to her to "watch out" for TUCKENBERRY (A1).*  She said that she last saw TUCKENBERRY (A1) in December 2002.

Motion for Release, Exh. U at 4.

Tolliver's friend "Ashley", presumably is Ashley Davis, a long-time girlfriend of Tuckenberry.  See Pet.'s Exhs. to Memo. in Support, Exh. 14 at ¶ 24.  Petitioner's habeas investigators interviewed Ashley's mother on January 9, 2014.  Ms. Davis provided the following information:

1.  Ashley met Tuckenberry in 2002 when she was 16 years old and a student at Madison High School. Ashley met him at the MAX station by Lloyd Center.

2.  After meeting Mr. Tuckenberry, Ashley dropped out of high school.  There were times when Ms. Davis would return home to find runaway kids in her

basement that had been brought in by Mr.
Tuckenberry and Ashley.

3.    Ms. Davis was aware that Mr. Tuckenberry and her
      daughter were hanging out with a group of young
      people on 82nd Avenue, at the 82nd Avenue MAX
      platform.  Many of the women in the group were
      prostituting and some were working as strippers.

4.    Tuckenberry and Ashley had an apartment off S.E.
      82nd and Stark.

Pet.'s Exhs. to Memo. in Support, Exh. 12; see also Exh. 7 at ¶¶ 9-
12 & Teesdale Dec. (#145), Att. I.  In light of the foregoing, it
is reasonable to conclude that the 2003 Investigation Report
depicts Tuckenberry's harassment of a young woman as part of his
criminal activity in compelling prostitution.   See e.g. Pet.'s
Exhs. to Memo. in Support, Exh. 8 at ¶ 2.

     As noted above, petitioner acknowledges that trial counsel had
no reason to focus on Tuckenberry in 2002.  Had the report been
turned over, the same would be true.  In 2002, the allegations in
the report would have appeared to both the prosecution and the
defense as wholly unrelated to Williams' murder.  In light of (1)
the very attenuated connection between Williams and Tuckenberry
known at the time of Petitioner's plea; and (2) Williams'
association with numerous men with criminal histories and personal
involvement in illegal activities, the mere fact that Tuckenberry
harassed a high school student in October through December, 2002,
would not have led to an "intense investigation" by defense counsel
(as asserted by petitioner).  Pet.'s Factual Memo. at 53.

The only reason to conclude otherwise is the 2013 discovery that Tuckenberry's DNA was found on Williams' body, and the information about the connection between Williams and Tuckenberry discovered in the ensuing investigation. These recent events, however, cannot support the conclusion that the Investigation Report was either exculpatory or material. Villasana v. Wilhoit, 368 F.3d 976, 979 (8th Cir. 2004) (prosecutor's duty to disclose under Brady is limited to evidence a reasonable prosecutor would perceive at the time to be material and favorable to the defense); Williams v. Ryan, 623 F.3d 1258, 1278-79 (9th Cir. 2010)(Ikuta, J., dissenting) (materiality of potential Brady material determined at the time of non-disclosure).

In sum, and considering all of the possible Brady violations together, in light of the evidence as a whole, I conclude that petitioner has failed to demonstrate that the prosecution withheld material evidence. Accordingly, habeas relief is not warranted.

## III. FREESTANDING CLAIM OF ACTUAL INNOCENCE

### A. Exhaustion

Petitioner alleges that she is actually innocent of manslaughter. This ground for relief is timely pursuant to 28 U.S.C. § 2244(d)(1)(D). Alternatively, untimeliness is excused based upon petitioner's colorable showing of actual innocence. Although this claim has not been raised in state court, respondent has affirmatively waived exhaustion, and the parties agree that no

state remedy exists wherein petitioner can raise a claim of actual innocence.[23]  Resp.'s Response Addressing Mixed Petition (#133) at 1-4; Pet.'s Reply (#139) at 1-2; Minutes of Proceeding (#144). Accordingly, exhaustion is excused. 28 U.S.C. § 2254(b)(1)(B)(I). I reject petitioner's suggestion that the interests of justice warrant that this proceeding be stayed and held in abeyance pending resolution of petitioner's motion for DNA testing in state court. See Pet.'s Reply (#186) at 18 (indicating no significant action has been taken in state proceeding).

Because this claim has not been adjudicated on the merits, my review is de novo. Dickens, 740 F.3d at 1321; Amado, 734 F.3d at 944. I assume, without deciding, that I may consider petitioner's new evidence because petitioner was diligent in developing the new factual basis of this claim (rendering § 2254(e)(2) inapplicable) and/or based upon her colorable showing of actual innocence.

B.  **Standards**

The U.S. Supreme Court has yet to hold that a freestanding claim of actual innocence is cognizable as an Eighth or Fourteenth Amendment claim subject to federal habeas review. McQuiggin, 133

---

[23] I do not consider the procedure by which a prisoner may move for DNA testing and a new trial (O.R.S. 138.690) to be an "available state remedy" under 28 U.S.C. § 2254(b)(1)(A). Although petitioner could obtain a new trial based on new DNA evidence, the statute does not provide an avenue by which petitioner can exhaust a freestanding, constitutional claim of actual innocence.

S.Ct. at 1931; House, 547 U.S. at 554-55.  However, on several occasions the Supreme Court has assumed, without deciding, that such a claim may exist in capital cases.  House, 547 U.S. 554-55; Herrera v. Collins, 506 U.S. 390, 417-19 & 427 (1993).

The Ninth Circuit has extended this *assumption* to non-capital cases, but has consistently found that the petitioner failed to satisfy the extraordinarily high threshold necessary to support such a claim.  See e.g. Henry v. Marshall, 224 Fed. Appx. 635, 637 (9th Cir. Mar. 12, 2007); Renteria v. Curry, 506 Fed. Appx. 644, 646 (9th Cir. Jan. 31, 2013); Hageman v. Hill, 314 Fed. Appx. 996, 998 (9th Cir. Mar. 2, 2009); Cotton v. Schriro, 360 Fed. Appx. 779, 781 (9th Cir. Dec. 23, 2009); Mills v. Hill, 330 Fed. Appx. 135, *1 (9th Cir. May 22, 2009).

In so doing, the Ninth Circuit has opined that the applicable threshold showing for such a claim is that articulated by Justice Blackmun in his Herrera dissent, i.e., that a petitioner must "go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." Carriger v. Stewart, 132 F.3d 463, 476 (9th Cir. 1997); Boyde v. Brown, 404 F.3d 1159, 1168 (9th Cir. 2005); Jackson v. Calderon, 211 F.3d 1148, 1165 (9th Cir. 2000); see also House, 547 U.S. at 555 (sequence of the Court's decisions in Herrera and Schlup "implies at the least that Herrera requires more convincing proof of innocence than Schlup"); Schlup, 513 U.S. at 317 (freestanding claim of actual innocence "would have

to fail unless the federal habeas court is itself convinced that [the] new facts unquestionably establish [the petitioner's] innocence"). The petitioner's burden under this standard is "extraordinarily high" and requires a showing that is "truly persuasive." Carriger, 132 F.3d at 476 (quoting Herrera, 506 U.S. at 417).

Assuming that Herrera may be extended to the guilty plea context, additional legal issues arise. First, because petitioner originally was charged with intentional murder in violation of O.R.S. 163.115(1) (rather than manslaughter), I conclude that petitioner must demonstrate that she is actually innocent of that more serious charge dismissed as a result of plea negotiations. Bousley, 523 U.S. at 623 (addressing actual innocence in the procedural default context).

Second, because under the indictment the prosecution could have proven at trial *either* that petitioner intentionally killed Williams (163.115(1)(a)), or that Williams was killed in the course of a felony (O.R.S. 163.115(1)(b)),[24] I conclude that petitioner must prove that she is "probably innocent" of murder under both theories. Cf. Kolacki v. Duncan, 2008 WL 2705020 *6 (N.D. Cal.

---

[24] See State v. Reyes, 209 Or. 595, 625-26, 308 P.2d 182 (1957); State v. Earp, 250 Or. 19, 26-27, 440 P.2d 214 (1968); State v. Tremblay, 4 Or. App. 512, 520, 479 P.2d 507 (1971); State v. Ventris, 337 Or. 283, 291, 296-97 & n.2, 96 P.3d 815 (2004).

July 9, 2008) (showing of actual innocence not satisfied by showing
that petitioner is not guilty under theory presented at trial).

C.  **The Merits**

    Petitioner has cast considerable doubt on the prosecution's
*theory* that petitioner killed Williams at home, placed her body in
a sleeping bag with a pillowcase over her head, transported her
body in a pickup truck, and dumped the body at Kelley Point Park
sometime prior to 10:27:59 a.m.  Additionally, as summarized above,
petitioner presents compelling new evidence implicating Tuckenberry
in the murder.  Tuckenberry's assertions that he did not know
Williams and was not in Portland in 2002 are contrary to
documentary evidence and witness statements and, in my view,
further implicate Tuckenberry in the crime.[25]  However, given
Williams history of prostitution, this is not the type of case in
which the presence of Mills or Tuckenberry's DNA necessarily
exonerates petitioner.  Moreover, a finding that Tuckenberry killed
Williams during the course of a sexual assault does not necessarily
negate petitioner's involvement in the murder.

    Williams seemingly surrounded herself with violent men and
women, many of whom had a history of strangling women.  Through

---

[25] Audio/Video Exhs. to Memo. in Support of Fourth Amd. Pet.
(#226), Exhs. 1, 3 & 4.  There is evidence in the record that
Tuckenberry was in Portland in 2002.  See Teesdale Dec. (#145),
Exh. L at 4-5; Pet.'s Exh. in Support of Petition (#222), Exhs.
10 & 12.

prostitution and her involvement in the drug trade, she associated with multiple people with criminal histories.  These associations render it particularly difficult to determine who killed Williams. While I agree with petitioner's assertion that she need not prove who killed Jerri Williams, she must do more than merely create *doubt* as to her own guilt.

I find it significant that multiple people told police that Williams was at the Madison Suites on the Thursday and Friday before her death.  Response, Att. I to Exh. B at 175-76, 190, 195, 205 & 421; Motion for Release, Exh. U at 22.  Given the fact that Mills lived at the Madison Suites, and Tuckenberry was known to frequent the motel, both men could have had sexual contact with Williams prior to the day she was murdered.  Indeed, Loop told police that she saw Williams leave the motel on Thursday with a black man she knew as Brian.  Response, Att. I to Exh. B at 195, but see ft. n. 7, *supra*.  However, I find the photographs of Williams' neck and thigh; the fact that Williams' naked body was found in the park with no drag marks; and Dr. Probst's expert report to be compelling evidence that Williams was sexually assaulted.

Further, the expert testimony of Fischbach and Schenk diminishes the *weight* of the prosecution's historical cell tower analysis, particularly given the fact that Verizon employee Roger Walters' conclusions were "preliminary" in nature.  However, the

prosecution's cell tower evidence, in conjunction with Patterson's testimony that she saw petitioner heading east on Marine Drive, is some evidence to support the prosecution's theory that petitioner was west of I-205 and near Kelley Point Park on the morning of Williams' death.

With regard to other possible suspects, including Alex Shanks, Charles Evans, Jr., Tyson Nettles, and Dennis Plather, I find their connection to Williams' murder speculative given the fact that no witness was able to connect any of these suspects to Kelley Point Park on the day of the murder. Additionally, Shanks and Nettles were excluded as DNA donors. This is not to say that evidence concerning these individuals is without probative value. It is the type of evidence that would be weighed by a jury if this case proceeded to trial. Cf. Herrera, 506 U.S. at 418.

Ultimately, however, I conclude that most of petitioner's new evidence is not inconsistent with the circumstantial evidence originally relied upon by the prosecution to implicate petitioner in the murder, including:

> (1) the fact that on the weekend of Williams' death, the animosity caused by a "love triangle" between petitioner, Williams, and Collins culminated due to Collins departure to Reno and her intention to live with her girlfriend Jueles;
>
> (2) petitioner's history of past domestic violence;
>
> (3) petitioner's threatening comments that she would harm Williams in order to resolve conflicts with Collins;

(4) petitioner's scheme to kidnap Collins' prior girlfriend (Naomi) and dump her in a park with only her socks on;

(5) petitioner's solicitation of Sarah Ater to find someone to kill a man involved in Williams' murder;

(6) a DNA report indicating that petitioner could not be excluded as a contributor of DNA found on a pillowcase at the crime scene;

(7) probative cell tower evidence supporting the conclusion that petitioner was west of I-205 on the morning of Williams' death;

(8) a 11:42 a.m. three second telephone call to Williams' cell phone that was routed to a cell tower located near the home of petitioner and Williams; and

(9) petitioner's request for a gun and two bullets after being notified of Williams' death.

While petitioner has presented persuasive evidence that the prosecution's theory of how the murder was committed is wrong, I nevertheless conclude that, considering the totality of the evidence and giving due regard to its reliability, petitioner has not made the "truly persuasive" and "extraordinarily high" showing necessary to support a finding that she is probably innocent of killing Williams intentionally, or during the commission of a felony. Accordingly, habeas relief is not warranted on this claim.[26]

---

[26] It is worthy of note that, had petitioner prevailed on her freestanding claim of actual innocence, this court would have issued a conditional order of release (which would permit the State of Oregon to retry petitioner), not immediate release. See Herrera, 506 U.S. at 403-04, 417, 435 & 442-43 (explaining that a
(continued...)

## CONCLUSION

Petitioner's Fourth Amended Petition (#173) is GRANTED on the basis that petitioner received ineffective assistance of counsel, and DENIED as to the remaining claims. Petitioner shall be released from custody unless the State of Oregon elects to retry her within 90 days of the date of this Opinion and Order. A certificate of appealability is issued as to all grounds for relief on the basis that petitioner has made a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

DATED this _9_ day of April, 2014.

_Malcolm F Marsh_
Malcolm F. Marsh
United States District Judge

---

[26](...continued)
freestanding claim of actual innocence would place tremendous burden on states to *retry* cases based on stale evidence); but see Jones v. Franke, 2013 WL 6780605 (D.Or. Dec. 19, 2013), *appeal pending*.